# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **GARY WALL,** | ) | |
| Plaintiff, | ) | Civil Action No.: 7:17cv00385 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **E. RASNICK, et al.,** | ) | |
| Defendants | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

The pro se plaintiff, Gary Wall, an inmate incarcerated at Red Onion State Prison, ("Red Onion"), brings this civil rights action pursuant to 42 U.S.C. § 1983, against 28 Virginia Department of Corrections, ("VDOC"), employees and officials. Wall's Second Amended Complaint, (Docket Item No. 42) ("Complaint"), raises a number of claims, including § 1983 claims based on allegations of excessive force, deliberate indifference to his serious medical needs, failure to intervene to protect him, violations of his substantive and procedural due process rights and conspiracy and Virginia state law claims for assault, abuse of process and negligence. Two of the defendants, Correctional Officers E. Rasnick and J. Hicks, filed counterclaims against Wall seeking damages based on state law assault and battery claims. (Docket Item No. 29) ("Counterclaims"). The matter is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). A bench trial was held in this matter on January 23-24, 2019. The undersigned now submits the following report and recommended disposition.

*I. Facts*

At trial, Wall testified that, on August 14, 2015,[1] while incarcerated at Red Onion, in cell A-106, he placed an empty jar of peanut butter on the floor outside of his cell door during pod recreation. He said the control booth officer, C. Holbrook, got his attention and told him to come near the control booth to speak to him. Wall said that, when he approached the control booth, Holbrook told him to lock down in his cell because Holbrook claimed that he saw Wall place something in someone else's cell. Wall said he was attempting to explain what Holbrook saw when Rasnick interrupted by yelling at Wall from the top tier, "Shut the fuck up." Wall admits that he then responded, "Fuck you," to Rasnick, and Rasnick replied, "No, fuck you."

Wall said that Defendant Hicks then ordered everyone in the pod to lock down. Wall said he started to walk toward his cell, when Hicks ordered him to go to the pod vestibule. Wall said that, when he arrived at the vestibule door, it did not open. He said that he turned around to ask why, and Rasnick grabbed his left arm. On cross-examination, Wall said Rasnick told him to "shut up." Wall said that he stepped to his right with his hands up and open. He denied throwing any punches at anyone. Instead, Wall said that he was attempting to get down on the floor when Hicks tackled him, knocking him to the floor. Wall said that Hicks placed his left hand in cuffs and then he, Wall, put his right hand behind his back so that Hicks could cuff it. He said that he heard someone place a "10-33" call, an officer needs assistance call. Wall said that the vestibule door then opened and Defendants J. Lyall and T. Large entered the pod. He said that Large immediately used OC spray

---

[1] Wall testified that this incident occurred on August 15, 2015, but VDOC documents show that it occurred on August 14, 2015.

on him. Wall said that he could not see anything when someone hit him in the back of his head and side of his face, and he lost consciousness.

Wall said that he regained consciousness as he was being escorted through the recreation yard with officers bending his hands back. Wall said that his left hand was extremely painful. He said that he was escorted from the A Building by Defendants C. Dockery and E. Gwinn, but he did not know which officer was on which side. Wall said that these officers purposefully ran him into steel fencing poles every few feet apart. Wall said that, as they entered the B Building vestibule, the officers told him to stand and face the wall, and he complied. Someone then asked his name. He also said that Dockery and Gwinn were replaced by Defendants B. Akers and S. Taylor. Wall said that these officers immediately tightened the cuffs, cutting his wrists. He said that Akers then rammed his face into the wall by placing both of his hands on the back of Wall's head. He said he was in this position for five to 10 minutes while correctional officers were coming by and hitting him. He said that he could not see who hit him because he was facing the wall.

Wall said that he was taken to cell B-308 without being decontaminated from the OC spray. Wall said that his clothes were taken from him, a spit mask was placed on his face, and he was placed in restraints. He said that he lost consciousness again. Wall said that he woke up some time later when another inmate yelled through the vent to ask him if he was okay. Wall said that he had intense pain in his left hand. He said he thought it was broken because it was swelled to twice its normal size. Wall said that he asked Defendant M. Addington, who was making rounds, if he could see a nurse.

Wall said that he was released from restraints at 7:45 p.m. He said that Nurse Woods was present and looked at his hand. He said that he was then walked to the sally port area, wearing only a safety smock, and placed in a holding cell. He said he used the sink in the cell to clean the OC spray from his face. He said that Officer Hall then gave him some inmate clothes to change into. He said he was placed in a transport van and taken to Wallens Ridge State Prison, ("Wallens Ridge").

Wall said that, when he arrived a Wallens Ridge, he requested medical attention and was examined by Nurse Stanford. Wall said that Stanford noted and took pictures of his injuries. Wall said that he had knots on his head, scars on his chest, his wrists were swollen and cut, and his ankles were cut. He said that Stanford treated his wounds and obtained x-rays of his left wrist. He said he then was placed in a cell in the Medical Unit at Wallens Ridge.

Wall testified that he was never given an Institutional Classification Authority, ("ICA"), hearing regarding his transfer. Wall said that, some time later, he did have an ICA hearing to change his security level to segregation. Wall said that cursing an officer was not sufficient justification for placing him in segregation. Wall said that, the day after being transferred to Wallens Ridge, he was served with notice that he had been charged with four disciplinary infractions based on the events of the previous day at Red Onion. He said that Holbrook charged him with a 201 offense code for disobeying an order and a 229 offense code for being in an unauthorized area, and Hicks charged him with an 129 offense code for approaching others in a threatening manner and an 105A offense code for assault. Wall said that he was served with notice on August 17, 2015, that Defendant D. Still had charged him with an 105A offense code for assaulting Rasnick.

Wall said that he was held in the Medical Unit at Wallens Ridge for approximately four weeks. He said that he was held without any of his property for approximately two weeks. He said that, after the "first few days," there was no reason for him to be held in medical. Wall said that he was later transferred to cell D-102 at Wallens Ridge, and he remained in that cell until he was transferred back to Red Onion on November 17, 2015.

Wall said that he asked for an advisor to assist him in preparing for his disciplinary offense hearings because he could barely see or write due to his injuries. He said that he also requested that prison officials review the video surveillance recordings of the incident. Wall said that Defendant Counselor O. Rose acted as his advisor. He said that he asked Rose how he could defend charges written against him at another prison.

Wall said that Defendant C. Franks was the disciplinary hearings officer for his first disciplinary hearing on the 229 offense code charge for being in an unauthorized area. He said that he requested that Franks look at earlier video recordings to see that inmates routinely crossed the red line during pod recreation to place items in front of their cell doors. Wall conceded that he was instructed that inmates could not be in the area outlined in red during pod recreation when he arrived at Red Onion. Wall said that he was found guilty of this disciplinary charge.

Wall testified that his next hearing, which he believes was held later that same day, was for the 201 offense code charge written by Holbrook for disobeying an order. He said that Defendant W. Hensley was the disciplinary hearings officer for this charge. He said that Holbrook claimed that he ignored Holbrook's order to lock down. He said that he asked Hensley to review the pod surveillance video

recordings because they would show that he put a finger up and his hand up to his ear to indicate that he could not hear Holbrook. Wall testified that he filled out requests for documentary evidence, asking that someone review the pod surveillance video recordings. He said that Hensley told him that he would have to convince him at the hearing to review the video evidence. Wall said that he was allowed to serve a questionnaire on Holbrook prior to the hearing, on which Holbrook falsely stated that Wall refused his order to lock down and demanded to see the sergeant. Wall said that he also was found guilty of this disciplinary charge.

Wall testified that Franks, on the following day, heard the 105A offense code disciplinary charge that Still wrote against him, alleging that he had assaulted Rasnick. Wall said that he, again, requested that Franks review the pod surveillance video. Wall said that he was informed that he was being criminally charged for the assault, and he was afraid that anything he said would be used against him on those state charges. Wall said that he was found guilty of this charge and was sentenced to a loss of 90 days of good-time credit.

Wall stated that, because Hicks was off work for a while after this incident, the offense charges he placed against Wall were not heard until September 8, 2015. When the assault charge was heard, Wall said, Hicks claimed that Wall had turned around and swung his fist at him. Wall said, "It never happened." Wall said that this assault charge was heard by Hensley. Wall said that Hicks claimed that Wall struck him in the eye. Wall said that he again requested Hensley to review the surveillance video. Wall said he was found guilty of this charge and sentenced to a loss of 180 days of good-time credit.

Wall submitted into evidence a number of photocopies of photographs taken of him when he was placed in restraints at Red Onion on August 15, 2015.

(Plaintiff's Exhibit No. 1, Docket Item No. 84-1.) At least two of these photos appear to show injuries Wall sustained in the incident. One appears to show blood and/or cuts on Wall's left wrist, (Docket Item No. 84-1 at 4), and one appears to show injuries to Wall's face, (Docket Item No. 84-1 at 6). Medical records submitted into evidence show that, when Wall was placed in restraints, Defendant Nurse J. Deel noted that Wall had been involved in an altercation and had "scattered [ecchymosis] scattered over body" with "no active bleeding at [that] time." (Plaintiff's Exhibit No. 2, Docket Item No. 84-2 at 1.)

Wall's medical records also show that he was examined by Nurse M. Stanford upon his arrival at Wallens Ridge later that day. (Docket Item No. 84-2 at 4-5.) Stanford noted that there was swelling around Wall's right eye with bright purple discoloration, but no bleeding, and swelling and bright purple discoloration over Wall's right brow. Stanford also noted swelling across the bridge of Wall's nose and some discoloration on his left eyelid and outer aspect of his eye. She also noted bright purple discoloration on Wall's left cheek and right side of his face. She noted that Wall's lips were swollen and that his upper lip was discolored dark purple. She also noted three well-defined red marks on the left side of his neck, approximately three-quarters of an inch in width. Stanford also noted swelling to the right back side of Wall's head and red areas on his left flank, with redness noted on his left lateral rib area, left upper arm, right shoulder, both clavicles, middle of his chest and right shoulder. She noted abrasions in the middle of his right clavicle and on his right shoulder. She noted that Wall's wrists were swollen with abrasions, and he complained of pain and tenderness in his left wrist and left fifth finger and tenderness in the back of his left hand. Stanford also noted small red areas on his left hip and both knees. X-rays taken of Wall's facial bones, skull and left hand and wrist were all normal except for a small chip fracture at the base

of the fifth distal phalanx with mild displacement, but no dislocation. (Docket Item No. 84-2 at 29-32.)

Wall also submitted the Disciplinary Offense Reports for the disciplinary offenses with which he was charged on August 14, 2015, and numerous related documents into evidence. (Plaintiff's Exhibit Nos. 6-10, Docket Item Nos. 84-6 to 84-10.) Disciplinary Offense Report No. ROSP-2015-1481 showed that Wall was charged with offense code 105A for aggravated assault upon a non-offender on August 14, 2015, by J. Hicks. (Docket Item No. 84-6 at 1.) Under the Description of Offense section, Hicks wrote:

> On the above date and approximate time while trying to place restraints on Offender G. Wall …, offender spun around and tried to strike me. This resulted in trying to gain control of the offender Wall at which point Offender Wall did strike me in my eye with his right fist.

(Docket Item No. 84-6 at 1.) This Report noted that it was served on Wall on August 16, 2015, at which time Wall requested the services of an advisor, documentary evidence and witnesses. (Docket Item No. 84-6 at 1.) Wall also was served with a Penalty Offer of an $8 fine, which he did not accept. (Docket Item No. 84-6 at 3.) This Report reflected that this charge against Wall was heard by Defendant Hensley on September 8, 2015. Wall pleaded not guilty to the charge, and Hensley found him guilty of the charge and imposed a penalty of a loss of 180 days of good-time credit. (Docket Item No. 84-6 at 2.) Under the Reason for Decision section, Hensley wrote:

> Officer Hicks stated that he was attempting to cuff Offender Wall to take him to segregation and he then was assaulted by Offender Wall. He stated that Offender Wall struck him in the eye with his fist

requiring three stitches. During the hearing Offender Wall stated that he was the one who was assaulted and if he struck Officer Hicks he did not mean to. Offender Wall struck Officer Hicks with a closed fist. Therefore I find Offender Wall Guilty of aggravated assault upon a non-offender.

(Docket Item No. 84-6 at 2.)

Attached to this Report was a Request for Documentary Evidence form from Wall requesting that the Hearings Officer review the A-100 pod Rapid Eye security cameras on August 14, 2015, from approximately 4 to 5 p.m. Wall wrote, "This requested evidence will show I never approached Officer Hicks while at the vestibule door nor tried to strike him…. Simply ask[ed] him about his unusual directive to 'Go into the Vestibule' after I was [going to cell] door to lock down." Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons such as video and audio recordings" or "information is not written documentation." (Docket Item No. 84-6 at 6.) A second attached Request for Documentary Evidence form from Wall sought any written policy, memorandum or directive governing a population offender's movement. (Docket Item No. 84-6 at 7.) Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons…." Also attached was a Witness Request Form asking for the A-100 pod Control Booth officer provide a statement regarding the disciplinary charge. (Docket Item No. 84-6 at 8.) In the Witness Statement section of the form, Defendant E. Hess wrote: "I could not see anything due to where the incident happened." Hearings Officer Hensley found Hess's statement not relevant to the offense. (Docket Item No. 84-6 at 8.)

Wall appealed his conviction of the 105A offense code to the Facility Unit Head. (Docket Item No. 84-6 at 10-11.) In his appeal, Wall claimed that his due process rights were violated, in that he did not receive an ICA hearing within 15 days of his transfer from general population at Red Onion to pre-hearing detention at Wallens Ridge, he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage, and adequate investigation could not be done by staff at Wallens Ridge since the incident occurred at Red Onion. (Docket Item No. 84-6 at 10-11.) Defendant Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-6 at 13-18.) Wall appealed Warden Fleming's decision to the Regional Administrator, (Docket Item No. 84-6 at 19-21), and Defendant Regional Administrator Henry Ponton upheld Wall's conviction on this charge. (Docket Item No. 84-6 at 22-23.)

Disciplinary Offense Report No. ROSP-2015-1503 showed that Wall was charged with offense code 105A for aggravated assault upon a non-offender on August 14, 2015, by Captain D. Still. (Docket Item No. 84-7 at 1.) Under the Description of Offense section, Still wrote:

> On August 14, 2015 at approximately 4:05 pm offender G. Wall did assault Officer E. Rasnick by [punching] him repeatedly resulting in injuries to the officer that were treated outside Red Onion State Prison by Mountain View Regional Medical Center. The basis of the charge is the result of an investigation completed August 17, 2015. Interviews of the victims and a review of security footage were completed and provided the factual knowledge in writing this charge.

(Docket Item No. 84-7 at 1.) This Report noted that it was served on Wall on August 17, 2015, at which time Wall requested the services of an advisor, documentary evidence and witnesses. (Docket Item No. 84-7 at 1.) Wall also was

served with a Penalty Offer of a loss of all accumulated good time, which he did not accept. (Docket Item No. 84-7 at 3.) This Report reflected that this charge against Wall was heard by Defendant Franks on August 25, 2015. Wall pleaded not guilty to the charge, and Franks found him guilty of the charge and imposed a penalty of loss of 90 days of good-time credit. (Docket Item No. 84-7 at 2.) In the Reason for Decision section, Hensley wrote:

> Offender Wall said that he did not hit anyone. Captain Still testified that he investigated the altercation between offender Wall and officer Rasnick. The video showed officer Rasnick coming to the aid of another officer that was having trouble with offender Wall and that in the process the officers ended up on the floor. Captain also said that as a result of the altercation officer Rasnick had to be treated at an off site medical facility (Mountain View Regional Medical Center) for his knee and a mark under his eye that looked like it was caused by a blow. Officer Rasnick has not yet returned to work because of the altercation. Offender Wall was found guilty on the reporting officer['s] testimony about what was viewed on the video, along with the injuries that officer Rasnick received.

(Docket Item No. 84-7 at 2.)

Attached to this Report was a Request for Documentary Evidence form from Wall requesting that the Hearings Officer obtain the statements obtained by Still when he interviewed Rasnick and Hicks. (Docket Item No. 84-7 at 4.) Wall wrote that this evidence would show inconsistencies with the video footage. (Docket Item No. 84-7 at 4.) Hensley responded on August 18, 2015, that the requested information would not be obtained because it was "from an outside source, restricted for security reasons such as video and audio recordings." (Docket Item No. 84-7 at 4.) Also attached to the Report was a Request for Documentary Evidence form from Wall requesting that the Hearings Officer obtain the Rapid-

Eye security camera video recordings from August 14, 2015, for the A-1 pod from approximately 4 to 5 p.m. Wall wrote:

> Reporting Officer Captain D. A. Still says review of the security video footage provided the factual knowledge in writing this charge. Since I never hit, punched, or attacked either officer as alleged to initiate this confrontation, so if there is ANY irrefutable video footage available showing I hit Officer Rasnick repeatedly, it should be provided.

(Docket Item No. 84-7 at 5.) Again, Hensley responded on August 18, 2015, that the requested information would not be obtained because it was "from an outside source, restricted for security reasons such as video and audio recordings." (Docket Item No. 84-7 at 5.)

Wall appealed his conviction of the 105A offense code charge to the Facility Unit Head. (Docket Item No. 84-7 at 7-8.) In his appeal, Wall claimed that his due process rights were violated, in that he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage, and an adequate investigation could not be done by staff at Wallens Ridge since the incident occurred at Red Onion. (Docket Item No. 84-7 at 7-8.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-7 at 9-16.) Wall appealed Warden Fleming's decision to the Regional Administrator, (Docket Item No. 84-7 at 17-20), and Regional Administrator Ponton upheld Wall's conviction on this charge. (Docket Item No. 84-7 at 21.)

Disciplinary Offense Report No. ROSP-2015-1480 showed that Wall was charged with offense code 129 for gathering around/approaching any person in a threatening/intimidating manner on August 14, 2015, by Hicks. (Docket Item No. 84-8 at 1.) Under the Description of Offense section, Hicks wrote:

> On the above date and approximate time as I C/O Hicks was escorting Offender [W]all to the vestibule to speak with a Supervisor. As we reach the vestibule door He turned and approached me in an intimidating and threatening manner, Resulting in an assault on me.

(Docket Item No. 84-8 at 1.) This Report noted that it was served on Wall on August 16, 2015, at which time Wall requested the services of an advisor, documentary evidence and witnesses. (Docket Item No. 84-8 at 1.) Wall also was served with a Penalty Offer of a loss of good time of 90 days, which he did not accept. (Docket Item No. 84-8 at 3.) This Report reflected that this charge against Wall was heard by Defendant Hensley on September 8, 2015. Wall pleaded not guilty to the charge, and Hensley found him guilty of the charge and imposed a penalty of 30 days disciplinary segregation. (Docket Item No. 84-8 at 2.) In the Reason for Decision section, Hensley wrote:

> Officer Hicks stated that he instructed Offender Wall to place his hands on the wall to be cuffed and Offender Wall complied. When he attempted to cuff Offender Wall … he turned and stated I [am] not fucking doing it and squared off and then an assault occurred. During the Hearing[,] Offender Wall denied approaching Officer Hicks and stated that he was assaulted by Officer Rasnick and Officer Hicks. The testimony from Officer Hicks was [m]ore convincing [than] the testimony from Offender Wall. Therefore I find Offender Wall guilty of approaching any person in a threatening or intimi[d]ating manner.

(Docket Item No. 84-8 at 2.)

Attached to this Report was a Request for Documentary Evidence form from Wall requesting that the Hearings Officer obtain the A-100 pod Log Book entry from approximately 4 p.m. on August 14, 2015, as evidence. (Docket Item No. 84-8 at 6.) Wall wrote that this evidence would show "when a Supervisor's assistance was requested by either working officer as alleged for offender to go speak

with….." (Docket Item No. 84-8 at 6.) Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons such as video and audio recordings." (Docket Item No. 84-8 at 6.) Another Request for Documentary Evidence form from Wall also was attached to the Report requesting Rapid-Eye security camera video recording from August 14, 2015, from approximately 4 to 5 p.m. Wall wrote, "This requested evidence will show [me] at the vestibule door. I never approached Officer Hicks nor tried to strike him. Simply ask[ed] him about his unusual directive to 'Go into the Vestibule' when I was at my door to lock down." (Docket Item No. 84-8 at 7.) Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons such as video and audio recordings" or "information is not written documentation." (Docket Item No. 84-8 at 7.) A third attached Request for Documentary Evidence form from Wall sought any written policy, memorandum or directive governing a population offender's movement. (Docket Item No. 84-8 at 8.) Again, Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons…." Also attached was a Witness Request Form asking for the A-100 pod Control Booth officer to provide a statement regarding the disciplinary charge. (Docket Item No. 84-8 at 9.) In the Witness Statement section of the form, Hess wrote: "I could not see anything due to where the incident happened." Hensley found Hess's statement not relevant to the offense. (Docket Item No. 84-8 at 9.)

Wall appealed his conviction of the 129 offense code charge to the Facility Unit Head. (Docket Item No. 84-8 at 11-12.) In his appeal, Wall claimed that his due process rights were violated, in that he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage, and an adequate investigation could not be done by staff at Wallens Ridge

since the incident occurred at Red Onion. (Docket Item No. 84-8 at 11-12.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-8 at 13-19.) Wall appealed Warden Fleming's decision to the Regional Administrator, (Docket Item No. 84-8 at 20-22), and Regional Administrator Ponton upheld Wall's conviction on this charge. (Docket Item No. 84-8 at 23-24.)

Disciplinary Offense Report No. ROSP-2015-1483 showed that Wall was charged with offense code 201 for disobeying an order on August 14, 2015, by Holbrook. (Docket Item No. 84-9 at 1.) Under the Description of Offense section, Holbrook wrote:

> On 08-14-2015 at approx. 4:00 PM, I officer Holbrook was observing pod recreation in A-1 pod. I officer Holbrook gave offender G. Wall … a direct order to return to his cell and lock down, offender Wall refused.

(Docket Item No. 84-9 at 1.) This Report noted that it was served on Wall on August 16, 2015, at which time Wall requested the services of an advisor, documentary evidence and witnesses. (Docket Item No. 84-9 at 1.) Wall also was served with a Penalty Offer of 15 days disciplinary segregation, which he did not accept. (Docket Item No. 84-9 at 3.) This Report stated that this charge against Wall was heard by Defendant C. W. Franks on August 24, 2015. Wall pleaded not guilty to the charge, and Franks found him guilty of the charge and imposed a penalty of 15 days disciplinary segregation. (Docket Item No. 84-9 at 2.) In the Reason for Decision section, Franks wrote:

> Offender Wall said that he did not refuse to go back to his cell, that he just did not understand what was said. Reporting Officer Holbrook said that offender refused an order to return to his cell, and

approached the control booth asking to speak to a sergeant. Officer Holbrook also said that offender Wall started toward his cell and once again turned around and ask[ed] for a sergeant. Offender Wall was found guilty on the preponderance of the evidence.

(Docket Item No. 84-9 at 2.)

Attached to this Report was a Reporting Officer Response Form containing Holbrook's answers to several questions posed to him by Wall. (Docket Item No. 84-9 at 4.) In response to "was your directive 'heard' or 'understood' by Offender Wall," Holbrook wrote: "When Offender Wall heard me say to lock down he refused my order and approached the control room and demanded to speak to a [sergeant]." In response to Wall's question, "Did Offender Wall, at any time after your directive was understood, return to his cell to lock-down," Holbrook wrote, "After several direct orders he began to approach his cell, then turned and once again demanded to speak with a [sergeant]." In response to Wall's question, "Why wasn't Offender Wall locked in his cell as directed," Holbrook wrote, "After orders were given to lock down your continued disruptive behavior during pod recreation you were being escorted by staff to speak with a [sergeant]."

A Request for Documentary Evidence form from Wall also was attached to the Report requesting the Rapid-Eye recordings from the three security cameras in the A-100 pod on August 14, 2015, from approximately 4 to 5 p.m. (Docket Item No. 84-9 at 5.) Wall wrote, "This requested evidence will show after the directive was 'heard' and 'understood,' I did comply." (Docket Item No. 84-9 at 5.) Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons such as video and audio recordings" or "information is not written documentation." (Docket Item No. 84-9 at 5.)

Wall appealed his conviction of the 201 offense code charge to the Facility Unit Head. (Docket Item No. 84-9 at 7-8.) In his appeal, Wall claimed that his due process rights were violated, in that he was not allowed the assistance of an advisor as he had requested, and the hearings officer did not review the requested video footage. (Docket Item No. 84-9 at 7-8.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-9 at 9-13.)

Disciplinary Offense Report No. ROSP-2015-1485 showed that Wall was charged with offense code 229 for being in an unauthorized area on August 14, 2015, by Holbrook. (Docket Item No. 84-10 at 1.) Under the Description of Offense section, Holbrook wrote:

> On 08-14-2015 at approximately 4:00 PM[,] I officer Holbrook was observing pod recreation, and saw offender G. Wall … cross the red line in front of the cell doors in A-1 pod during pod recreation, this area is unauthorized to be in during pod recreation.

(Docket Item No. 84-10 at 1.) This Report noted that it was served on Wall on August 16, 2015, at which time Wall requested the services of an advisor, documentary evidence and witnesses. (Docket Item No. 84-10 at 1.) Wall also was served with a Penalty Offer of a loss of telephone privileges for 30 days, which he did not accept. (Docket Item No. 84-10 at 3.) This Report reflected that this charge against Wall was heard by Defendant Franks on August 24, 2015. Wall pleaded not guilty to the charge, and Franks found him guilty of the charge and imposed a penalty of a $5 fine. (Docket Item No. 84-10 at 2.) In the Reason for Decision section, Franks wrote:

> Offender Wall said that this is not a charge that most officer[s] write. Officer Holbrook stated that he saw offender Wall cross that red line in front of cell A106, and was in an unauthorized area. This was

> where Offender Wall was housed. Offender Wall was found guilty on
> the preponderance of the evidence.

(Docket Item No. 84-10 at 2.)

Attached to this Report are two Reporting Officer Response Forms containing Holbrook's answers to several questions posed to him by Wall. (Docket Item No. 84-10 at 5-6.) In response to, "What cell is Offender Wall assigned to in Alpha-100 pod," Holbrook wrote: "A-106." In response to Wall's question, "When you observed Offender Wall cross the 'red-line,' what cell was he in front of," Holbrook wrote, "A-106." In response to Wall's question, "What was Offender Wall doing," Holbrook wrote, "I don't know I just saw offender Wall cross the red line 'in an unauthorized area' and slide something under A106." In response to Wall's question, "What happened next, after you observed this," Holbrook wrote, "Offender Wall was ordered to lock down but refused." In response to Wall's question, "Is it [Red Onion's] custom to terminate an Offender[']s [recreation] for placing items in front of his cell door and/or to charge him with being in an unauthorized area in the past," Holbrook wrote, "I can not speak for the past, but on this day I saw you in an unauthorized [area]."

Wall appealed his conviction of the 229 offense code charge to the Facility Unit Head. (Docket Item No. 84-10 at 8-9.) In his appeal, Wall claimed that his due process rights were violated, in that he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage, and an adequate investigation could not be done by staff at Wallens Ridge since the incident occurred at Red Onion. (Docket Item No. 84-10 at 8-9.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-10 at 10-15.)

Wall testified that, on August 19, 2015, he told Special Investigations Unit, ("SIU"), Investigator J. Wood that he had been assaulted at Red Onion and could not write. He said that he later mailed a notarized statement to Wood. (Plaintiff's Exhibit No. 12, Docket Item No. 84-12 at 11-15.) Wall testified that, when Wood returned to speak with him a second time, Wood was saying that he had said "things I did not say." He said that he spoke to Wood a third time in November 2015, after he had been transferred back to Red Onion. Wall submitted a copy of the SIU case file of its investigation of this incident for the limited purpose of showing that both the Rapid-Eye and handheld video recordings of this incident were saved and reviewed by Wood. (Docket Item No. 84-12.)

Wall also testified that VDOC Operating Procedure, ("OP"), 861.1 was revised in February 2016. Nonetheless, Wall said that his disciplinary hearings that occurred in August and September 2015 were conducted pursuant to the new policy that was not yet in effect.

Later in Wall's testimony, he stated that Rasnick, on August 14, 2015, kept saying, "We got to do something about your mouth." Wall did not, however, testify to these statements when he testified earlier regarding the events of that day, and he did not state when Rasnick made these statements.

The Rapid-Eye surveillance video recording from the A-1 pod, taken on August 14, 2015, at the relevant time, was admitted into evidence at Plaintiff's Exhibit No. 13. This video evidence shows that an inmate crosses the red line in the A-1 pod and appears to place something on the floor outside of cell 106. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:58:47 to 3:58:55.) Wall testified that he crossed the red line and approached his cell at this time. The video shows that Wall then returned to a table in the middle of the pod with other inmates before

walking toward the control booth end of the pod. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:59:03 to 3:59:14.) Wall then can be seen speaking to someone and gesturing with his hands, although the surveillance video contains no audio. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:59:14 to 3:59:39.) Wall then turned to his left, as if someone spoke to him, and he turned and walked back toward a table in the middle of the pod, picked up something and went and stood in front of his cell door. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:59:39 to 4:00:13.) As the other inmates return to their cells, it appears that Wall set something down on the floor in front of his cell and then walked toward two officers in the middle of the pod. (Plaintiff's Exhibit No. 13, A1 Pod Left at 4:00:18 to 4:00:31.) Wall and the two officers then walked toward the control booth end of the pod. (Plaintiff's Exhibit No. 13, A1 Pod Left at 4:00:35 to 4:00:46.) The three passed out of the view of this recording.

A few seconds later, a recording from another surveillance camera shows that a scuffle occurred on the pod side of the A-1 door. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:00:51.) As the A-1 door opens, the video shows that the two officers were struggling with Wall, who is on his feet. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:03.) The officers were still struggling with Wall, who was then on the floor, when a third officer entered the pod through the opened door, (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:11), then a fourth officer followed. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:14.) It appears that all four officers then struggled with Wall. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:16 to 4:01:35.) A canine handler and canine then entered the pod with several other responding officers. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:36.) An officer, who appears to be bleeding from his face, then exited the pod with the assistance of other officers, and walked through the vestibule. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:57 to 4:02:01.) An additional canine

handler and canine and additional officers responded and entered the vestibule. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:02:08.)

After these additional officers arrived, it appears that officers stood Wall up, and Wall was visible in the A-1 doorway. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:02:23.) Wall, however, testified that he was lapsing in and out of consciousness at this point. It appears that several of the officers continued to struggle with Wall as they entered the vestibule with him and leave the A Building. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:02:23 to 4:02:42.)

The video recording taken by an additional surveillance camera shows Wall on the ground with at least three officers over him. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:30.) By the time this camera focuses in on the disturbance, four officers were kneeling over Wall, and the first canine handler and canine were entering the A-1 pod. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:38.) From this view, it appears that the four officers struggled with Wall, who appears to be lying on his stomach on the floor, for a few seconds until they were able to place both his hands behind his back and restrain him. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:38 to 4:01:52.) As the court watched the video, Wall testified that Hicks and Rasnick had him restrained before the first two responding officers, Lyall and Large, arrived. At this point, the video recording shows that an officer leaned against the wall who was bleeding from his right eye area. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:53.) That officer then got up and exited the pod with assistance. The officers then stood Wall up on his feet and escorted him from the pod. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:02:20.) The video recording from another surveillance camera in the A-1 Building Entrance shows officers escorting Wall from the building. (Plaintiff's Exhibit No. 13, A123 Entrance at 4:02:53 to 4:02:57.) The video evidence shows that, from the time the

scuffle began, approximately one minute elapsed before Wall was restrained, and, within two minutes, Wall was being escorted from the building.

A handheld camera video recording taken on August 14, 2015, was admitted into evidence as Plaintiff's Exhibit No. 14. This recording begins with Wall against the wall with officers surrounding him in the B Building vestibule. Defendant Collins is seen and heard asking who the offender is and then yells, "What is your fucking name?" (Plaintiff's Exhibit No. 14 at 00:15.) Other officers can be heard telling Wall to "face the wall" and, later, telling Wall "don't move again." Wall is not visible through much of this recording due to the number of officers surrounding him. When officers began moving Wall, Wall's face is not visible on the video except for one brief moment, but Wall clearly was walking under his own power. (Plaintiff's Exhibit No. 14 at 5:23.) During his testimony, Wall stated that, for the brief moment his face was visible, he could see blood on his nose and shirt. He said that the blood was a result of his face being rammed into the wall. Wall did admit that he walked of his power from the B Building vestibule to cell B-308 to be placed in restraints. Once Wall was escorted into a cell, an officer can be heard asking another officer to bring a spit mask. (Plaintiff's Exhibit No. 14 at 6:29.) The video shows that officers placed Wall on a bed, removed his clothing and placed him in a safety smock and restraints. Again, Wall is not visible during much of this time. At one point, the video shows Wall sitting up so his shirt can be removed, and blood is clearly visible on his shirt. (Plaintiff's Exhibit No. 14 at 10:27.) After Wall is placed in restraints, two nurses came into the cell and checked the restraints. (Plaintiff's Exhibit No. 14 at 16:10.) While the nurses are present, it sounds like defendant Collins asked Wall, "Do you have any complaints for the nurse?" (Plaintiff's Exhibit No. 14 at 16:40.) Wall does not respond. One of the nurses spoke to Wall at one point, but what she says is not audible. (Plaintiff's

Exhibit No. 14 at 17:13.) Collins can then be heard saying, "Wall, the nurse is here." (Plaintiff's Exhibit No. 14 at 17:16.) It does not appear that Wall responds.

The video recordings do not show any medical treatment being offered to Wall, and they do not show that he was ever offered or received decontamination from OC spray.

During cross-examination, Wall stated that, after Rasnick grabbed his left arm, Rasnick swung his fist and hit Wall in the right side of his head. Wall said that he then put his hands up to block Rasnick's punches while Rasnick was holding his right arm. Wall said that he was trying to get down on the ground when Officer Hicks tackled them, and they all fell to the floor. Wall said that he ended up on his back on the floor. He said that he attempted to roll over onto his stomach, but when he rolled one way, Hicks was in his way, so he rolled the other way. Wall said that, after he rolled onto his stomach, Hicks grabbed his left hand, and he then put his right hand behind his back so it could be restrained. Wall said, while he was lying on his stomach restrained, with Hicks and Rasnick on top of him, the vestibule door opened, and "I got gassed" as Lyall and Large came into the pod. Wall said that he also was kicked and punched in the head while restrained. Wall said that on the way from the A Building to the B Building, the escorting officers purposefully ran him into fence poles, doors and entryways. Wall admitted that he did not tell the nurses he needed any medical treatment, but he claimed this was because he was unconscious when the nurses inspected his restraints.

Correctional Officer Holbrook testified that he had worked for the VDOC at Red Onion for eight years. Holbrook said that he was working as the gun officer in the control booth of the Red Onion A Building 1, 2, 3 side on August 14, 2015, when he saw Wall cross the red line and appear to slide something under a cell

door during pod recreation. He said that he yelled at Wall and asked him to step to the control booth so he could talk with Wall. When Wall approached the control booth, Holbrook said, he asked Wall what he had done. Holbrook said that he told Wall to return to his cell. He said that Wall asked to speak to a sergeant and kept telling Holbrook that he was not going to his cell.

Holbrook said that he saw Officers Rasnick and Hicks come down from the top tier of the pod and tell everyone to return to their cells to lock down. Otherwise, Holbrook said that he did not hear any of the conversation between these officers and Wall. Holbrook said that he saw Wall and the officers walk toward the vestibule door, which was underneath the control booth. Holbrook said that, after the three disappeared from his view out of the control booth window, he "heard a commotion" that sounded like a "physical altercation" beneath the control booth, and he called a code 10-33, officers need assistance, in the A-1 pod on the prison radio. Holbrook said that he stepped back and looked through a clear portion of the control booth floor and saw Wall, Rasnick and Hicks lying on the floor. He said that numerous other officers then responded, and all he could see was a "jumble" of officers below. Holbrook testified that Officer Hess was working in the control booth with him that day, and Hess opened the A-1 door.

Holbrook said that he completed an Internal Incident Report regarding what he witnessed. This Internal Incident Report was admitted into evidence as Plaintiff's Exhibit No. 15. (Docket Item No. 84-13.) On this Internal Incident Report, Holbrook wrote:

> On 08-14-2015 at approximately 4:05 PM, I officer C. Holbrook was observing pod recreation in A-1 pod, and saw Offender G. Wall cross the red line and approach cell A-106[] and slide something under the door. The control room officer[] and I gave a

direct order to the bottom tier to lock down[] and return to their cells, all offenders complied except offender [W]all. After the bottom tier was locked down offender [W]all started walking towards the control room saying he would like to speak with a sergeant. Officer[s] Hicks and Rasnick came off the top tier to escort offender [W]all to speak with a sergeant, at this time the offender, [O]fficers Hicks, and Rasnick were out of my view at the A-1 door, I officer Holbrook heard a commotion at the A-1 door, and called for assistance from staff.

(Docket Item No. 84-13.)

Holbrook testified that he also wrote out a statement for Investigator Wood from the SIU. This statement, written on a form entitled "Investigative Interview," was admitted into evidence as Plaintiff's Exhibit No. 16. (Docket Item No. 84-14.) On this form, Holbrook wrote:

On 8-14-15 at approximat[e]ly 4:00 PM[,] I Officer Holbrook saw offender Wall slide an object under cell A106. I Officer Holbrook gave offender Wall a direct order to lock down for being in an unauthorized area, Offender Wall refused and began walking to the control room cursing at me refusing to lock down. Once the bottom tier was locked down[,] Officer Hicks and Officer Rasnick were attempting to escort offender Wall to speak with the supervisor at this time offender Wall and officers Hicks and Rasnick were out of my sight at the A1 pod door. I officer Holbrook [heard] a strange noise at the door and concluded that the officers were attempting to gain control of offender Wall. I officer Holbrook called for assistance from staff. Staff entered and escorted offender Wall out of the building.

(Docket Item No. 84-14 at 1-3.) This statement was dated August 24, 2015.

Holbrook also testified that he completed the Reporting Officer Response Form, admitted into evidence as Plaintiff's Exhibit No. 9. (Docket Item No. 84-9 at 4.) He stated that he answered Wall's questions contained on this form based on

his recollections, and he did not give any untrue information to the hearings officer. Holbrook further testified that he completed the Reporting Officer Response Form, admitted into evidence in Plaintiff's Exhibit No. 10. (Docket Item No. 84-10 at 5-6.) Again, he said that he did not provide any untrue information on this form and that the information he provided accurately reflected what had occurred. He further testified that he completed the Disciplinary Offense Reports, admitted into evidence in Plaintiff's Exhibit Nos. 9 and 10, on the day after the incident, August 15, 2015.

Correctional Officer Hess testified that he was working in the control booth with Holbrook on August 14, 2015, when he heard Holbrook tell Wall to lock down. Hess stated that Wall responded "fuck you" to Holbrook. Hess said that he opened all cell doors in the A-1 pod, except for Wall's cell. Hess admitted that he had provided the answers to interrogatories, admitted into evidence at Plaintiff's Exhibit No. 17, (Docket Item No. 84-15), in which he stated that he did not open Wall's cell door because Wall was refusing to lock down. Hess also stated that he provided the written statement to Investigator Wood, admitted into evidence as Plaintiff's Exhibit No. 18. In this statement, Hess wrote:

> I, C/O Hess, was the control room officer during the incident in A1 pod. I heard C/O Holbrook give inmate G. Wall a direct order to lock down. Inmate Wall said "fuck you" and refused to lockdown. C/O Rasnick also gave inmate Wall a direct order to lockdown. I could not see any of the altercation between Inmate Wall and C/Os Rasnick and Hicks.

(Docket Item No. 84-16.) Hess stated that he did not hear Wall ask to speak to a supervisor.

Hess admitted that he wrote an entry in the A-1 Control Log Book on August 14, 2015, that described the incident between Wall and Officers Rasnick and Hicks and that was admitted into evidence as Defense Exhibit No. 1. (Docket Item No. 84-21 at 5.) Nonetheless, Hess admitted that he did not see the altercation between Wall and the officers. Hess admitted that he provided statements on Witness Request Forms, admitted into evidence in Plaintiff's Exhibit Nos. 6 and 8. On these forms, Hess wrote: "I could not see anything due to where the incident happened." (Docket Item Nos. 84-6 at 8, 84-8 at 9.)

Defendant and Counter Claimant Rasnick testified that, on August 14, 2015, his attention was drawn to Wall when he heard Wall tell Holbrook, "fuck you I am not locking down." He said when he heard that, he and Hicks went down from the top tier of the pod. He said that one of them told the other offenders to lock down, but he did not remember who told them. He said that he and Hicks then approached Wall and told him to "cuff up." He said that Wall responded, "fuck you." Rasnick said that he grabbed Wall's right wrist, and Wall jerked away from him. Rasnick said that he then tried to grab Wall around the waist and take him to the ground to control him. He said that all three men went to the ground.

Rasnick admitted that he did not see Wall hit Hicks in the face, but he did see that Hicks's face was bloody after the incident. Rasnick said that he and Hicks did not butt heads during the incident. Rasnick said that he injured his right knee by tearing the meniscus in it during the incident. He said that, because of his injury, he was relieved by other officers before they removed Wall from the pod. Rasnick admitted that he did not see Wall as he was escorted out of the A-1 pod or from the A Building. Rasnick said that he was never able to come back to work at the prison after his injury. He said that the injury to his knee required surgery and that he was out of work until the middle of December that year. Rasnick said that

Captain Still came and spoke to him about the incident later that day while he was at the hospital emergency department seeking treatment for his injury.

Rasnick testified that Defense Exhibit No. 2 was a copy of his medical records for the treatment of the injury to his knee. (Docket Item No. 22.) Rasnick said that he was taken to the emergency department at Mountain View Regional Hospital after the incident, where an x-ray was performed on his knee. He said the emergency department physician told him to see his primary physician so he could be referred to an orthopedic specialist. Rasnick said that he eventually was referred to Dr. Wells with Watauga Orthopedics, who ordered an MRI of his knee and performed surgery to repair the torn meniscus in September 2015. Rasnick testified that, since his injury was work-related, he had incurred no out-of-pocket expenses related to his medical treatment. Rasnick stated that he still experienced pain and that his right knee would give out on occasion. He said this was the first time he had ever had an altercation with an inmate while working for the VDOC and that it was one of the reasons he quit working for the VDOC.

Rasnick testified that he took Wall to the floor in an effort to gain control of him. He said once all three of the men were on the floor, Wall "was fighting to try to get loose." Rasnick said that Defendants Large and Lyall entered the pod. He said that he did not recall anyone using any OC pepper spray on Wall. Rasnick said that he did not push, kick or hit Wall, and he used only that amount of force necessary to gain control of Wall. Rasnick said that he did not know if Wall ever lost consciousness while on the floor, but he said that Wall was never just passively lying on the floor during the incident.

Rasnick admitted that Plaintiff's Exhibit No. 19, (Docket Item No. 84-17 at 1-2), was a written statement he gave to Investigator Wood regarding the incident. On this Investigative Interview form, Rasnick wrote:

> On 8/14/15 at approximately 4:00 PM I C/O Rasnick and C/O J. Hicks [were] talking with offenders at the phone. The I C/O E. Rasnick heard C/O Holbrook tell offender G. Wall … to go back to his cell[.] The offender Wall stated to C/O Holbrook "fuck you I ain't doing shit." C/O Hicks gave offender G. Wall a direct order to lock down[,] he then stated "fuck you I ain't locking down." Then C/O Hicks and myself C/O Rasnick told the rest of the pod to lock down[;] they complied. C/O Hicks then gave G. Wall an order to go [to] the [vestibule] at which time he went in that direction. When myself C/O Rasnick and offender Wall was near the wall and under the gun we then gave him a direct order to cuff up. Offender Wall then walked to the wall[.] I C/O Rasnick [grabbed] his hand and [Wall] pull[ed] from me and said "Get your fucking hands off me." Then C/O Hicks and myself [grabbed] offender Wall and got him to the ground to get control of his hands[.] Offender Wall struck C/O Hicks in the right eye[,] cutting it. I C/O Rasnick twisted my right knee, then responding staff entered the pod and control of offender was gained. I then went to medical for treatment[.]

(Docket Item No. 84-17 at 1-2.)

Rasnick testified that he did not recall experiencing any problems with Wall before this incident, and he held no negative feelings toward Wall on August 14, 2015. Rasnick specifically denied telling Wall, "Shut the fuck up and get the fuck in your cell." He said that he did not use profanity toward Wall.

Red Onion Intelligence Officer Bentley testified that he assisted the SIU in its investigation of this incident. Bentley testified that one of the tasks he performed was to save the video recording from the A-1 pod from the day of the incident. Bentley testified that, unless the video recording was downloaded and

saved as a separate file, the Rapid-Eye surveillance camera system would record over an incident within about 90 days time. Bentley said that, to save a recording, he would go to the specific cameras at issue and download the video recording in a digital format and save it on his desktop computer. He would then copy the recording to DVDs or CDs for counsel. Bentley said that there were three Rapid-Eye surveillance cameras operating in the A-1 pod on August 14, 2015.

Bentley testified that Plaintiff's Exhibit No. 23 was an Informal Complaint that Wall filed on August 20, 2015, asking that the Warden review the surveillance video recordings from the A-1 pod cameras, the A and B recreation yard, the B 1, 2 and 3 vestibule and the cell B-308 camera recordings for August 14, 2015, as well as the recordings made by the handheld video camera that day. (Docket Item No. 85-1.) Bentley said that he responded to this Informal Complaint by informing Wall that the incident was being investigated by the SIU.

Bentley testified that he did not know if any Operating Procedures required that video of such an incident be saved. He also said that he did not know how to alter any of the video recordings he downloaded and saved from the Rapid-Eye surveillance cameras. He said that, at the time of this incident, the Rapid-Eye surveillance system was password protected and that a person had to have authority to access the system with a password to retrieve video recordings. Bentley said that he could not specifically recall if he was the officer who actually downloaded and saved the recordings of this incident from the Rapid-Eye surveillance system, but he knew that he did not alter the recordings because he did not know how to alter the recordings.

Defendant and Counter Claimant Hicks testified that he was working as a correctional officer at Red Onion on August 14, 2015, when he and Rasnick

entered the A-1 Pod at Red Onion and heard Wall talking with the officers in the control booth. Hicks said that Rasnick told Wall to "lock down." He said that Wall responded, "Fuck you, I'm doing nothing." He said that Wall said for them to get a sergeant. Hicks said that he then told Wall, "This is a direct order. You will lock down." Hicks said that Wall did not obey him and just threw his hand up in the air. Hicks said that he then gave the order for all the inmates in the pod to lock down.

Hicks said that Wall walked over to his cell door, but Hicks told him to go to the vestibule. He said that Wall responded, "Fuck you." He said that he gave Wall a second order to go to the vestibule. Hicks testified that he wanted Wall to go to the vestibule to speak with a sergeant to settle him down. Hicks said that he wanted to restrain Wall before entering the vestibule, so he told him to get on the wall and Rasnick told Wall to "cuff up." Hicks said that Wall walked toward the wall and was standing about two feet from the wall with his hands by his side. Hicks said that as he reached for Wall's left arm and Rasnick reached for Wall's right arm, Wall turned around and swung his arm at him and said, "Don't fucking touch me." Hicks said that he and Rasnick then took Wall to the floor, where Wall "was fighting hard." Hicks said that, while he had Wall lying on his left side with his left arm pinned, he looked down to try to gain control of Wall's right arm, and Wall struck Hicks in the right eye with his right fist. Hicks said that he and Rasnick continued to struggle to control Wall until Lyall and Large responded and helped them gain control. He said that Wall continued to fight the officers even after they got Wall on his stomach. Hicks said that he never placed handcuffs on Wall and that handcuffs were not placed on Wall until after Lyall and Large responded.

Hicks admitted that he could not identify the precise moment on the video recordings that showed Wall hitting him in his eye. Hicks stated that Plaintiff's

Exhibit No. 24, (Docket Item No. 85-2), was an Internal Incident Report he prepared the day after this incident. On this Report, Hicks wrote:

> On the above date and approximate time I C/O J. Hicks along with C/O E. Rasnick were on the top tier of Alpha 1 speaking with the offenders below us on the phone. I C/O Hicks heard C/O Holbrook who was the gunman give offender G. Wall … a direct order to lockdown. At that point offender G. Wall screamed, "Fuck you I ain't gotta do shit. Get the Sgt." At this point I C/O Hicks along with C/O Rasnick both gave offender Wall orders to comply and lockdown to [which] his answer was, "fuck y'all I ain't doin[g] shit." I C/O Hicks gave all offenders the order to lockdown immediately at which point they complied. I then told Offender Wall to proceed to the vestibule at which point he walked up to me in a[n] intimidating manner at which point I gave him another order to proceed to the vestibule. Offender Wall turned and then began to walk towards the vestibule. When we were close to the wall I gave offender Wall the order to be restrained when I tried to place the first cuff on him he spun around and swung at me and yelled, "don't fucking touch me." [A]t this point I grabbed offender Wall to gain control. Myself and offender and C/O Rasnick went to the floor and struggled with offender to gain control. Offender Wall['s] right fist struck [me] in the right eye causing me to bleed. Other C/Os arrived and offender was brought under control.

Hicks said that he was taken to the emergency department at a local hospital after this incident for treatment of the injuries he had sustained. In addition to the injury to his eye, Hicks said that his right hand was swollen after the incident. X-rays showed that he had fractured his hand near his wrist. Hicks said that he did not strike, hit or kick Wall during the incident, and he did not see anyone else do so. Hicks said that Plaintiff's Exhibit No. 26, (Docket Item No. 85-4), contained three photographs of his injuries taken that day by Captain Still. One was a photograph of the cut above his right eye before it was treated, and the other two were photographs of his hand. Hicks said that Plaintiff's Exhibit No. 27, (Docket Item

No. 85-5), contained the medical records of the treatment he received at Mountain View Regional Hospital.

Hicks said that he still had a visible 1½-inch scar over his right eye. He also said that he suffered from post-traumatic stress disorder, in part, as a result of this incident. As a result, he said that he left his job with the VDOC. Hicks said that the day of trial was the first day he had been out of his house in six to seven months.

Hicks testified that, when he and Rasnick took Wall to the ground, Wall fell onto the right side of his body. He said that he was not sure when Wall's face was injured in the incident. Hicks also testified that he never observed Wall lose consciousness and said, "I would have noticed that." Hicks said that, if Wall had ever been unconscious, Wall would have stopped fighting. Wall "never stopped fighting," he said. Hicks said that, once Wall swung at him, Wall was being aggressive, and this needed to be controlled, so they took him to the floor. Hicks also said that, to the best of his knowledge, he gave accurate information to the hearings officer. He said that he never gave the hearings officer any false information.

Defendant and Red Onion Lieutenant J. Lyall testified that he responded to the incident with Wall on August 14, 2015, along with Large. Lyall said that Large went through the door first. He said that, when he entered the pod, Wall, Hicks and Rasnick were all on the floor. Lyall said that Wall was resisting and being very combative. He said that Wall was not in handcuffs when he arrived. He said that he and Large also got down on the floor to try to regain control of Wall. Lyall said that he thought that he and Large put the handcuffs on Wall. He said that he believed that leg restraints were placed on Wall's ankles before he was moved. Lyall said that he believes he was the officer who stood Wall up against the wall

after he was restrained. Lyall said that Wall was still struggling and still combative after being placed in restraints and walked into the vestibule.

Lyall said that he did not see anyone punch, kick or hit Wall. He said that he did not see any officer use any force greater than necessary, and he did not use any force greater than necessary. He also said that he never saw Wall lose consciousness that day. He said that he did not accompany Wall to the B Building. He said that he did not recall if Wall had visible injuries to his face because he did not look at Wall's face that day.

Lyall said that he was the A Building lieutenant on that day. He said that he had not been told that Wall wanted to speak to him, but that it was normal procedure to take offenders to the building vestibule to speak with supervisors.

Lyall said that Plaintiff's Exhibit No. 28 was the Incident Report that he prepared. (Docket Item No. 85-6.) Lyall admitted that he wrote that Wall "sustained only minor injuries" on the second page of the Report. (Docket Item No. 85-6 at 2.) He said he got this information from the nurse's report. Lyall testified, "I wasn't looking for injuries when I arrived. When I arrived I was focusing on restraining [Wall]." Lyall testified that he prepared the Incident Report after reviewing the Internal Incident Reports. Lyall said that the time of the incident listed was the approximate time that the incident was reported.

In this Incident Report, Lyall wrote:

On Friday, August 14, 2015 at approximately 4:05 pm, the offenders housed on the bottom tier of the A-1 Pod were participating in pod recreation. Officer Holbrook, working as the A-1 Control Gun Officer, observed offender Wall cross over the red boundary line and

pass something under A-106 Cell Door. Officer Holbrook ordered the offender to return to his cell but the offender refused stating, "Fuck you, I ain't gotta do shit."

Officer Hicks and Officer Rasnick were presnt in the pod observing pod recreation. Officer Hicks gave offender Wall several orders to lock down but he refused, again stating "Fuck you" to the Officer. At this point the staff ordered all other offenders in the pod to return to their cells. Offender Wall initially moved toward his cell, but stopped and again approached the Officers. All other offenders complied and did return to their cells.

Offender Wall stated to Officer Holbrook that he wanted to speak to a Sergeant. Officer Hicks and Officer Rasnick approached the offender to restrain him, so that he could be taken out of the pod. As Officer Hicks was in the process of placing the offender in handcuffs, offender Wall spun around and swung at Officer Hicks yelling, "Don't fucking touch me," striking the Officer above his right eye.

The Officers began to struggle with the offender, falling to the floor while attempting to gain control. Officer Holbrook announced the situation over the radio and requested immediate assistance. Officer Holbrook did not have a direct line of sight of the altercation and was not able to use the 40 MM to aid the Officers.

Lieutenant Lyall (A Building Supervisor) and Sergeant Large (A Building Sergeant) responded to the pod and observed the Officers in the struggle with the offender. Lieutenant Lyall and Sergeant Large assisted the Officers in gaining control of the offender. Sergeant Large administered a ½ to 1 second burst of OC Spray in an attempt to bring the offender under control. Staff were able to gain control of offender Wall's hands and place him in handcuffs as other responding staff were able to place him in leg irons. While attempting to remove the offender from the pod, he continued to be combative with staff and had to be placed on the floor several times to maintain control. The offender was removed from A-building and escorted to B-building by Officer Dockery and Officer Gwinn and several other staff.

K-9 Officers responded to the pod but did not engage as the offender was being restrained by several staff.

Lieutenant Collins (B Building Supervisor) with Officer Taylor, Officer Akers and Officer Bishop, placed the offender into 5-point restraints, per orders of Warden Barksdale, after he refused decontamination for OC Pepper Spray exposure.

Nurse J. Deel assessed the offender with the following noted, "Placed in five point restraints, able to place 2 fingers under each restraint. Involved in altercation, scattered ecchymosis over body, no active bleeding at this time. Follow up with Medical as needed."…

(Docket Item No. 85-6 at 2-3).

Defendant L. Collins testified that he was a lieutenant at Red Onion on August 14, 2015, when he responded to the officers in need of assistance, or 10-33 call, on the radio. Collins stated that Plaintiff's Exhibit No. 29, (Docket Item No. 85-7), was the Internal Incident Report that he completed. He said that Plaintiff's Exhibit No. 30, (Docket Item No. 85-8), was a copy of his Answers to Plaintiff's Interrogatories. On the Internal Incident Report, Collins wrote:

On Friday, August 14, 2015, at approximately 4:00 pm, I Lieutenant Collins responded to a 10-33 in A-1 pod involving offender G. Wall. Once staff restrained offender G. Wall, he was escorted to B-3 pod. I asked offender Wall if he needed to be placed in the shower for O.C. pepper spray decontamination. Offender Wall refused to answer me. Offender Wall made several statements that he was going to harm more staff members. I contacted Warden Barksdale about offender Wall's statements. Warden Barksdale approved the use of five-point restraints to prevent offender Wall from harming staff. Myself, Officer Taylor, Officer Akers, and Officer Bishop placed offender Wall in five-point restraints in B-308 without incident. Nurse Deel assessed offender Wall. There were no injuries to myself and there were no injuries reported to me [by] staff.

(Docket Item No. 85-7.)

Collins said that he walked with Wall to the B Building, but he did not physically touch Wall. He said that he heard Wall continue to threaten to hurt staff. He said that, while walking to the B Building, Wall made several statements that he was planning to harm more staff members. He said the officers stopped in the B Building vestibule with Wall while he contacted Warden Barksdale to gain permission to place Wall in five-point restraints. He said that Wall made threats to harm staff while standing in the vestibule. Collins said that he placed Wall in cell B-308 in five-point restraints with 15-minute watches. Collins said that Plaintiff's Exhibit No. 31 was the pod Log Book that showed that the 10-33 call went out on the radio at 4:04 p.m. and that restraints and the handheld video camera were handed down from the control booth to use while placing Wall in five-point restraints. (Docket Item No. 85-9 at 2.) Collins said that he authorized placing a spit mask on Wall because Wall had just assaulted officers, and he did not like leaving an offender's mouth uncovered while he was in five-point restraints.

Collins said that he offered to decontaminate Wall by asking if he needed to be placed in the shower. He said that Wall refused to answer. Collins said that he did not remember which officers escorted Wall from the A Building to the B Building that day. He also said that he did not see anyone walk him into any poles, walls or door frames. Collins admitted that he saw Wall's face, but he said he did not remember any injuries. Collins admitted that he asked Wall when he arrived in the B Building, "What's your fucking name?"

Collins testified that Plaintiff's Exhibit No. 32 was an Internal Incident Report prepared by Correctional Officer B. Akers. (Docket Item No. 85-10.) On this Report, Akers wrote:

[O]n 08-14-15 @ 4:04pm I C/O B. Akers responded to a 10[-]33. [W]hen I arrived inside B 123 side, I relieved C/O Gwinn and helped maintain control of Offender G. Wall .... Also helped escort Offender G. Wall from B-123 vestibule to cell B-308 where Offender Wall made several comments about how he was going to continue harming staff. Once inside Cell B-308 I helped Lt. Collins, C/O Taylor, and C/O Bishop place Offender G. Wall into 5-point [restraints], no injury to myself at this time.

(Docket Item No. 85-10.)

Collins testified that Plaintiff's Exhibit No. 33 was an Internal Incident Report filed by Defendant Correctional Officer S. Taylor. (Docket Item No. 85-11.) On this Report, Taylor wrote:

On August 14 2015 at approximately 4:05 PM I responded to a 10-33 called in Alpha 1 upon arriving at the building Offender Wall was being brought out the front door. At this time I observed Offender Wall was being very disruptive and combative toward staff stating "You haven't seen the last of me I am going to continue to hurt everyone of you motheruckers". At this time I helped escort Offender Wall to Bravo 308 where I assisted Lt. Collins in placing Offender Wall in 5-Point Restraints.

(Docket Item No. 85-11.)

Collins said the he knew that he asked Wall if he wanted to be placed in the shower to decontaminate because he noted so on his Internal Incident Report. Collins said that he would not have noted that he asked Wall if he wanted to decontaminate if he had not done so.

Collins said that Wall walked erect from Building A to Building B that day. He said that Wall did not make any complaints about injury to his wrists or his

wrists hurting while walking to B Building or after being placed in restraints. Collins said that, if Wall had voiced any complaints, he would have documented those complaints.

Collins specifically said that he did not see Defendant Akers slam Wall's face into the wall. He said that he did not see anyone punch or hit Wall that day. Collins said that he did not see anyone use any greater force than necessary to gain control of Wall that day. Collins said that he helped placed Wall in five-point restraints. He said that he did not see any injuries to the portion of Wall's face that he could see. Collins said that he did not recall if Wall had the spit mask on his face when the nurse assessed him. Collins said that, if Wall had reported that he was injured, he would have allowed the nurse to examine Wall. Collins also testified that, to his knowledge, Wall never lost consciousness that day.

Collins admitted that the handheld video recording showed that Wall and the escorting officers stopped in the middle of the B pod for a moment. He said that he did not recall why they stopped, but it was possible that this could have been one of the times that Wall said something threatening.

Defendant T. Large testified that he worked as a Correctional Sergeant at Red Onion for the A-1 Building on August 14, 2015. Large said that he was not notified that Wall had wanted to talk to him on August 14, 2015. Large said that he was in the office in the building vestibule when he heard the 10-33 call on the radio. Large said that he entered the pod and used OC pepper spray on Wall. Large said that, when he entered the pod, Wall was on the floor "squirming from side to side" and "twisting" his arms and elbows. Large said that Wall's arms were not completely free, but he was slinging his elbows and resisting. Large said that he came around the side of Wall and administered OC spray to Wall's head area.

Large said that he then helped restrain Wall. Large said that, after Wall was restrained, he asked Wall if he needed decontamination from the OC spray. He said that Wall did not respond.

Large testified that Plaintiff's Exhibit No. 34, (Docket Item No. 85-12), was a copy of the Internal Incident Report he prepared on the August 14, 2015, incident with Wall. On this Report, Large wrote:

> On 8-14-15 at approximately 405p I Sergeant Large responded to a 10-33 in the A-1 pod. As I entered the vestibule Officers E Rasnick and J Hicks were in the floor in a scuffle, [b]eing assaulted by Offender G Wall. At that time I utilized a one half to one second burst of OC pepper spray from the MK9 to the facial area of Offender Wall in an attempt to Stop the assault. Myself and Lieutenant Lyall then attempted to pull the offender off of the officers, he was still resisting and striking staff with his fists. We managed to apply the handcuffs, assisting staff arrived and placed leg irons on the offender. As offender Wall was being escorted out of the pod he continued to be combative and had to be placed on the floor several times by assisting staff, to maintain control. Sgt L Collins, Officer Dockery, Officer Gwinn and several other assisting staff escorted the offender to B building to be placed in 5 point restraints by orders of Warden Barksdale. Video camera was started by Officer Bryant as soon as possible and remained on until offender was placed in 5 point restraints. OC decontamination started as soon a[s] the offender exited the building into fresh air he refused to respond when asked if he needed water to decontaminate. Offender was assessed by Nurse Deel.

(Docket Item No. 85-12.)

Large testified that, once Wall was in the building vestibule, he looked directly at Wall and asked Wall if he wanted to decontaminate. He said that Wall did not respond. In fact, he said that Wall did not respond to "anything" after he was restrained. Large said that he used OC spray on Wall because he was

continuing to assault the officers trying to restrain him. Large said that OC spray did not do any damage to an offender, but it caused temporary burning and disorientation. He said that Wall was resisting, combative and still struggling when he used OC spray on him. Large said that he told Wall to "Stop!" before he sprayed him with OC spray. He said that he used the OC spray on Wall to try to gain control of Wall to get him in restraints. Large said that Wall's actions made it clear to him that Wall was not going to comply. After using the OC spray, Large said, Wall calmed down enough to allow Lyall to grab his arm, and he and Lyall placed handcuffs on Wall.

Large said that he never saw any correctional officer punch or kick Wall. He said that it was Wall who was thrashing from side to side and hitting officers when he entered the pod. In describing what occurred, Large said, "I am responding to an assault." He said, "We are fighting for our lives, you are in fight or flight mode just trying to defend ourselves." He said that Wall continued being combative after being placed in restraints, and he had to be taken to the floor a couple of times as they attempted to take him out to the A-1 vestibule. Large said that he did not see anyone slam Wall against any door frame. Large said that, after Wall was standing up in restraints, Wall would bend over and lunge forward, as if he was trying to throw himself on the ground.

Large also testified that it was common knowledge among the offenders that they were not allowed to cross the red line into unauthorized areas while on pod recreation because it was explained to them at orientation when they arrived at Red Onion.

Defendant J. Deel, a licensed practical nurse who works at Red Onion, testified that she assessed Wall's injuries and the restraints placed on him on

August 14, 2015. As a result of her assessment, she said, she noted that Wall had scattered bruises and bleeding. Deel said that Plaintiff's Exhibit No. 2, (Docket Item No. 84-2 at 1), contained an Inmate Accident/Injury Report Form that she completed on Wall on August 14, 2015. On this Report, Deel wrote:

> Placed in 5 point restraints able to place 2 fingers under each restraint[.] Involved in altercation … [ecchymosis] scattered over body[.] No active bleeding at this time. … No bleeding when nurse arrived.

(Docket Item No. 84-2 at 1.) Deel said that she recalled seeing Wall's entire face, but did not recall if he had a spit mask on or not when she saw him. Deel said that she "charted" that Wall had suffered from a nose bleed, but there was no active bleeding when she arrived. (Docket Item No. 84-2 at 3.) Deel said that, if at any time she had thought Wall was unconscious, she would have summonsed medical assistance. Deel stated that Wall did not speak to her, did not complain about any injury and did not request decontamination. She said that, if she had thought that Wall needed decontamination, she would have asked the officers to do it.

Deel said that Wall had bruising above his right eye and on the bridge of his nose. She said that she had no indication of and did not note any injury to Wall's wrist, knuckles or right hand. Deel said that the injuries she observed on Wall that day were consistent with an offender struggling with officers on the floor. She also admitted that these injuries were consistent with being struck in the face.

Deel testified that it was possible for a person to break bones in his hands by striking someone or something with his hand. Deel also said that restraints used on Wall's wrist were made of leather and that she has seen these restraints chafe offenders' wrists in the past. Deel said that she did not see any officer do anything

inappropriate toward Wall that day. She said that, if she had seen an officer mistreat Wall, she would have asked the officer to stop and reported the officer.

Defendant Correctional Officer E. Gwinn testified that he was working in the A 4, 5 and 6 pod at Red Onion on August 14 when he heard the 10-33 call over the prison radio. Gwinn said that when he arrived at the scene, Wall was being escorted through the inner vestibule and into the outer vestibule of the building. Gwinn said that he was one of the officers who was responsible for controlling Wall inside the B Building vestibule. Gwinn testified that Plaintiff's Exhibit No. 35, (Docket Item No. 85-13), was the Internal Incident Report he prepared. He agreed that this Report stated that Gwinn escorted Wall from the A Building to the B Building. Gwinn said that he could not recall whether he actually had his hands on Wall while escorting him or whether he simply assisted and accompanied other officers.

Gwinn said that he did recall that, while being escorted, Wall would bend forward and move from side to side. Gwinn said that, if he had seen any officers ram Wall into fence poles or into walls, he would have documented it and reported it. In addition to recognizing himself in the handheld video footage taken in the B Building vestibule, Gwinn said that he recognized Officers Akers, Stevens and Duncan as assisting in the video recording.

Gwinn said that, when he had control of Wall that day, Wall did not try to pull away from him. Gwinn stated that, most of the time that Wall was in the B Building vestibule, he simply stood there with the officers. Gwinn specifically denied seeing any officer push Wall's head toward the wall that day.

Defendant and VDOC Hearings Officer C. Franks testified that he heard three of the disciplinary charges placed against Wall on August 14, 2015. Franks said that these hearings occurred at Wallens Ridge. Franks admitted that, on the Disciplinary Offense Report for the Offense Code 201 charge for disobeying an order, Wall had requested documentary evidence. (Docket Item No. 84-9 at 1.) He admitted that Wall filed a Request for Documentary Evidence form, (Docket Item No. 84-9 at 5), asking that the hearings officer review the video recordings from the A-1 pod Rapid-Eye surveillance cameras for the date and time of this incident. This form states on it: "This form shall not be used to obtain information … restricted for security reasons such as video … recordings…." (Docket Item No. 84-9 at 5.) A box on this form is checked stating that the requested information would not be obtained "due to being from an outside source, restricted for security reasons such as video and audio recordings, information is not written documentation, or is otherwise restricted to the offender." (Docket Item No. 84-9 at 5.) Franks said that he explained to Wall the proper way to request that surveillance camera video recordings be considered, which was to request the hearings officer to review the video recordings at the disciplinary hearing.

Franks said that he had authority to obtain and view surveillance video recordings, but he did not review the video evidence on this charge. He said he did not review the video because he determined it was not necessary because the order Wall disobeyed was verbal, and the surveillance cameras did not record sound. Franks testified that he found Wall guilty of the charge based on Holbrook's testimony that, after giving Wall the order to lock down, Wall walked toward his cell and, then, turned and approached Holbrook, again, asking to see a sergeant.

Franks further admitted that, on the Disciplinary Offense Report for the offense code 105A charge for aggravated assault upon a non-offender, Wall also

had requested documentary evidence. (Docket Item No. 84-7 at 1.) He admitted that Wall filed a Request for Documentary Evidence form, (Docket Item No. 84-7 at 5), asking that the hearings officer review the video recordings from the A-1 pod Rapid-Eye surveillance cameras for the date and time of this incident. Again, a box was checked indicating that the requested information would not be obtained. Franks testified that he did not view the surveillance video in this case because Captain Still had reviewed it and testified to what the video recordings showed. Franks said that he did not review video footage if a witness viewed the video and testified to what it showed.

Franks agreed that, according to Still's statement on the Disciplinary Offense Report, the video footage showed Wall punched Rasnick repeatedly. (Docket Item No. 84-7 at 1.) He further conceded that, from viewing the Rapid-Eye video footage of the incident in court, it was hard to tell if Wall punched anyone.

Franks said that he did not come into these hearings with any preconceived idea that Wall was guilty of the disciplinary offenses. He said that he listened fairly to all the evidence and found Wall guilty based on the evidence presented. Franks testified that, if he had reviewed the Rapid-Eye video, the video recordings would not have changed his mind about Wall's guilt to these charges.

Franks testified that Wall's hearings at Wallens Ridge were heard under the policy that was in effect until February 2016, which required disciplinary hearings to be held wherever the offender was being housed. Franks said that this policy changed in February 2016 to require disciplinary offenses be heard at the prison where the offense occurred. Franks said that this disciplinary charge against Wall was handled under the policy in effect prior to February 2016. Franks conceded

that Wall appealed the findings of guilt on these disciplinary offense charges, and the appeals went to the Warden of Wallens Ridge.

Defendant and VDOC Hearings Officer R. Hensley testified that he heard the two remaining disciplinary offense charges against Wall for offense code 105A for aggravated assault on Officer Hicks and offense code 129 for failing to obey Hicks's order. Hensley said that hearings on these charges were conducted on September 8, 2014. Hensley said that Wall requested that he view the video evidence and the pod Log Book on the 105A offense code charge. He said that he rejected both requests. Hensley said that Wall used the wrong form to request that he obtain the video recordings of the incident, and he said that he could not recall if Wall verbally requested that he review the video at the hearing. Hensley said that he did not review the video because "I saw no reason to review the video."

Hensley said that he had never met Wall prior to the date of these disciplinary hearings. Hensley said that he had no preconceived thoughts of Wall's guilt. He said that he rendered his decisions to the best of his ability. He said that he would not have reached a different conclusion if he had reviewed the surveillance system video recordings.

Defendant Captain D. Still testified that he investigated the 105A offense code charges placed against Wall. Still said that he took statements from Hicks and Rasnick while they were at the hospital emergency departments being treated for their injuries on the date of the incident. Still said that these statements were the basis of the 105A charge he wrote against Wall and contained in Plaintiff's Exhibit No. 7, (Docket Item No. 84-7 at 1.) Still said that Rasnick told him that Wall swung his arm and started throwing punches, and he, Rasnick, took Wall to the floor. Still said that he was not at Red Onion when this incident occurred, but was

at home. He said that he was called and told to go to the hospital emergency department and interview Hicks and Rasnick. Still testified that he turned his notes from these interviews over to Investigator Wood with SIU.

Still testified that he was not sure where J. B. Hall had obtained the information that Wall had struck Rasnick in the face, contained in the Disciplinary Offense Report and admitted as Plaintiff's Exhibit No. 37, (Docket Item No. 85-14). Still said that this Disciplinary Offense Report was never served on Wall.

Still said that the information he provided during his investigation, and his testimony at Wall's disciplinary hearings, was accurate to his knowledge. He specifically denied that he had lied at Wall's disciplinary hearings. He also testified that he never conspired with anyone to charge Wall with additional charges.

Wall also submitted into evidence, as Plaintiff's Exhibit No. 38, a number of Internal Incident Reports concerning the August 14, 2015, incident. These Reports included an Internal Incident Report from Defendant L. Bryant stating that he relieved Officer Taylor of running the video camera in the B 1, 2 and 3 vestibule. (Docket Item No. 85-15 at 1.) Bryant stated that he operated the video camera while Wall was placed in five-point restraints without incident. Also included is the Internal Incident Report completed by Defendant C. Dockery, which stated that he responded to the 10-33 call in A-1 and found Wall already restrained. (Docket Item No. 85-15 at 2.) Dockery said that he assisted in escorting Wall from the A Building to the B Building. Also included is the Internal Incident Report completed by Defendant C. Bishop, which stated that he assisted Collins, Taylor and Akers place Wall in five-point restraints. (Docket Item No. 85-15 at 3.) Also included is that Internal Incident Report completed by Defendant A. Mullins, which stated that he relieved the officers who had restrained Wall and escorted Wall to the B

Building. (Docket Item No. 85-15 at 4.) Also included is the Internal Incident Report completed by Defendant J. Testerman, which stated that he had secured Wall's legs that day and placed him in leg irons. (Docket Item No. 85-15 at 5.) Also included is the Internal Incident Report completed by J. Williams, a canine officer, who responded to the A-1 pod upon hearing the 10-33 call. (Docket Item No. 85-15 at 6.) Williams said that he and his canine, Bruno, escorted Wall to the B Building. Williams wrote, "No force was used." Also included is the Internal Incident Report completed by Sergeant T. Hall, who wrote that he removed Wall from five-point restraints in cell B-308, restrained him and escorted him to the intake area for transport to Wallens Ridge. (Docket Item No. 85-15 at 7.)

## II. Analysis

As stated above, Wall's Complaint raises a number of claims, including §1983 claims based on allegations of excessive force, deliberate indifference to his serious medical needs, failure to intervene to protect him, violations of his substantive and procedural due process rights and conspiracy and Virginia state law claims for assault, abuse of process and negligence. Wall's Complaint, however, contained no allegations against Defendants Bryant and Rose. Therefore, I recommend that the court enter judgment in their favor. Furthermore, Wall presented no evidence at trial against the defendants B. Hughes, a lieutenant at Wallens Ridge, or VDOC Director Harold Clarke. Therefore, I also recommend that the court enter judgment in favor of these defendants.

Next, I will address Wall's §1983 claims against the remaining defendants. Based on my review of Wall's Complaint, it raises the following § 1983 claims against the following defendants:

1.    A claim based on allegations of the use of excessive force by Defendants Rasnick, Hicks, Lyall and Large for the August 14, 2015, altercation and use of OC pepper spray;

2.    A claim based on allegations of the use of excessive force and/or bystander liability by Defendants Lyall, Large, Akers, Collins, Taylor, Bishop, Testerman, Addington, Dockery, Gwinn and Mullins during the escort from A Building to B Building and being placed in restraints without decontamination;

3.    A claim based on allegations of cruel and unusual punishment by Collins, Bishop, Akers, Taylor, Deel and Barksdale for placing Wall in restraints for four hours without medical attention:

4.    A claim against Barksdale, Fleming and Ponton for allowing pervasive constitutional violations;

5.    A claim alleging deliberate indifference to serious medical needs by Collins, Bishop, Akers, Taylor, Deel and Barksdale for placing Wall in restraints for four hours without medical attention;

6.    A claim alleging a violation of substantive due process rights by Hicks, Holbrook and Still for filing false disciplinary charges;

7.    A claim alleging violation of procedural due process rights by Franks, Hensley, Fleming and Ponton by failing to retrieve the video evidence for his disciplinary charge hearings; and

8.    A claim alleging that Rasnick, Hicks, Collins, Akers and Taylor conspired to use excessive force against him.

The plaintiff asserting a § 1983 claim has the burden of proof. *See Oliver v. Powell*, 250 F. Supp. 2d 593, 598 (E.D. Va. 2002). Wall's Complaint attempts to assert a claim under § 1983 against Red Onion Warden Barksdale, Wallens Ridge Warden Fleming and VDOC Western Regional Administrator Ponton because they "'knew or should have known' of the continued pervasive and unreasonable Constitutional injuries being practiced at Red Onion State Prison and Wallens Ridge State Prison because Grievances and Disciplinary appeals were appealed to finality in complete 'specifics' and upheld the unfounded decision(s), failing to

-49-

[remedy] plaintiff's Constitutional injury did constitute cruel and unusual punishment (deliberate indifference) in violation of the [Eighth] Amendment of the United States Constitution…." (Complaint at 13.) To prevail against a defendant on a § 1983 claim, a plaintiff must show that the defendant acted personally in the deprivation of the plaintiff's rights. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (citing *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). The doctrine of respondeat superior has no application to § 1983 claims. *See Vinnedge*, 550 F.2d at 928.

Other than Warden Barksdale's approval of placing Wall in restraints, the entirety of the evidence Wall presented against these defendants at trial pertains to Fleming's and Ponton's decisions upholding Wall's convictions on the five disciplinary offenses with which he was charged as a result of the events of August 14, 2015. Wall testified, and the Disciplinary Offense records showed, (Plaintiff's Exhibit Nos. 6-10; Docket Item Nos. 84-6 to 84-10), that Wall appealed each of his disciplinary offense code convictions and that his appeals were considered by Fleming, who upheld each of the convictions. Wall then appealed Fleming's decisions to Ponton, who upheld Fleming's decisions.

As interpreted by the court, Wall's Complaint contains both procedural and substantive due process claims based on his disciplinary offense convictions. Prisoners may not be deprived of life, liberty or property without due process of law. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Nonetheless, prison disciplinary proceedings are not a criminal prosecution, and, therefore, "the full panoply of rights due a defendant in such proceedings does not apply." *Wolff*, 418 U.S. at 556. Courts have held that small monetary penalties and penalties that do not impose restraint do not impose atypical and significant hardship on a prisoner in relation to the ordinary incidents of prison life and are not constitutionally

protected interests under the Due Process Clause. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (holding that disciplinary segregation did not present the type of atypical, significant deprivation in which a state might create a liberty interest); *Bratcher v. Mathena*, 2016 WL 4250500, at *1 (W.D. Va. Aug. 10, 2016) (finding $12 fine did not pose an atypical and significant hardship on the plaintiff in comparison to the ordinary incidents of prison life). When, however, state prison regulations create a system by which prisoners earn good-time credit resulting in reduction of their sentences, such system creates a liberty interest under the Fourteenth Amendment that may not be arbitrarily abrogated. *See Wolff*, 418 U.S. at 557-58.

To provide constitutionally sufficient procedural due process, a disciplinary proceeding must provide the following: (1) advance written notice of a claimed violation at least 24 hours before any disciplinary hearing; (2) the ability of the prisoner to call witnesses and present documentary evidence at the disciplinary hearing; (3) a written statement of the evidence relied upon by the factfinder and the reasons for the disciplinary action taken. *See Dilworth v. Adams*, 841 F.3d 246, 253 (4th Cir. 2016) (citing *Wolff*, 418 U.S. at 563-566). To provide constitutionally sufficient substantive due process, a disciplinary offense finding must be "supported by some evidence in the record." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985). Prisoners, however, may not bring suit under § 1983 for relief that, if granted, would imply the invalidity of the prisoner's disciplinary offense conviction, unless the conviction has been overturned. *See Edwards v. Balisok*, 520 U.S. 641, 645-48 (1997); *see also Thompson v. Clarke*, 2018 WL 4764294 (W.D. Va. Sept. 30, 2018).

In this case, Wall seeks recovery under § 1983 for violation of his due process rights by Barksdale, Fleming, Ponton, Hicks, Holbrook, Still, Franks and

Hensley. Since only two of Wall's disciplinary offense convictions, ROSP-2015-1481 and ROSP-2015-1503 for aggravated assault upon a non-offender, imposed losses of good-time credit, they are the only ones that involved constitutionally protected liberty interests. The 105A offense code charge, contained in ROSP-2015-1481, was written by Defendant Hicks, heard by Defendant Hensley and appealed to Defendants Fleming and Ponton. The 105A offense code charge, contained in ROSP-2015-1503, was written by Defendant Still, heard by Defendant Franks and appealed to defendants Fleming and Ponton. Therefore, I will recommend that the court find in favor of Defendants Barksdale and Holbrook because Wall has produced no evidence that these defendants took any action to impair Wall's constitutionally protected liberty interests.

On both of these disciplinary charges, the evidence presented at trial showed that Wall was provided written notice of the charges against him more than 24 hours before his disciplinary hearings, he was allowed to request witnesses and documentary evidence,[2] and he was provided written statements of the evidence relied upon by the factfinder and the reasons for the disciplinary actions taken. Also, the evidence presented at trial showed that there was "some evidence" in the record to support the Hearings Officers' decisions. Nevertheless, it is not necessary to reach a decision on the merits of Wall's due process claims against Still, Hicks, Franks, Hensley, Fleming and Ponton. Wall claims that his substantive due process rights were violated because these two aggravated assault charges were false charges, in that he did not assault Hicks or Rasnick, but rather, was the victim of their assault. He also claims that he was wrongly convicted of these disciplinary offenses because the proper procedures were not followed, in that the charges were pursued at Wallens Ridge, the Hearings Officers did not obtain and review the

---

[2] A disciplinary hearing officer's decision not to review surveillance video himself does not constitute a due process violation. *See DePaola v. Clarke*, 2019 WL 1370882, at *6 n.9 (W.D. Va. Mar. 26, 2019) (citing *Neal v. Casterline*, 129 F. App'x 113, 115 (5th Cir. 2005).

video evidence, and Fleming, instead of Barksdale, heard his appeals. Thus, if the court were to find in Wall's favor on his due process claims, it would imply the invalidity of his disciplinary offense convictions. Since Wall has produced no evidence that his convictions on these two disciplinary offenses have been overturned, he may not pursue § 1983 claims based on them. *See Edwards*, 520 U.S. at 645-48. Therefore, I will recommend that the court enter judgment in favor of Still, Hicks, Franks, Hensley, Fleming and Ponton on Wall's due process claims.

Wall also has alleged that various defendants have violated his right to be free from cruel and unusual punishment under the Eighth Amendment, either by the use of excessive force, by deliberate indifference to his serious medical needs or by failing to protect him from the use of excessive force or deliberate indifference to his serious medical needs. The Eighth Amendment to the U.S. Constitution protects prison inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian,* 503 U.S. 1, 5 (1992); *Whitley v. Albers,* 475 U.S. 312, 319 (1986). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994*); Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984).

The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component. *See Williams,* 77 F.3d at 761 (citing *Wilson v. Seiter,* 501 U.S. 294, 302 (1991)). Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson,* 503 U.S. at 9 (citing *Johnson v. Glick,* 481 F.2d

1028, 1033 (2d Cir. 1973)). To meet the objective component in an excessive force case, an inmate must show that the force used was "nontrivial," *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), given that "contemporary standards of decency always are violated… whether or not significant injury is evident." *Hudson,* 503 U.S. at 9. "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Wilkins,* 559 U.S. at 37 (quoting *Hudson,* 503 U.S. at 7). In fact, the extent of the injury may suggest that "'the use of force could plausibly have been thought necessary' in a particular situation" or "provide some indication of the amount of force applied." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7). For example, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins,* 559 U.S. at 38 (quoting *Johnson*, 481 F.2d at 1033). As *Wilkins* clarified, it is the nature of the force "that ultimately counts" and provides the "core judicial inquiry" in an excessive force case. 559 U.S. at 37, 38. In particular, courts must consider "whether [the force] was nontrivial and 'was applied…maliciously and sadistically to cause harm.'" *Wilkins*, 559 U.S. at 39 (quoting *Hudson*, 503 U.S. at 7).

To meet the subjective component in an excessive force case, the inmate must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320-21. The inquiry under the subjective standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. The Supreme Court in *Whitley* set out several factors which should be considered in determining whether prison officials acted maliciously and sadistically. In particular, the court should consider:

1)      The need for application of force,

    2)       The relationship between that need and the amount of force used,

    3)       The threat "reasonably perceived by the responsible officials," and

    4)       "any efforts made to temper the severity of a forceful response."

*Williams,* 77 F.3d at 762 (citing *Whitley,* 475 U.S. at 321).

While I am persuaded that the evidence presented at trial showed that the force used against Wall was objectively excessive, I am not persuaded that force used against Wall was subjectively excessive. More specifically, I find that Wall's injuries – a bruised, swollen and bloodied face and a broken finger – show that the force used against him was "nontrivial." Nevertheless, based on the evidence presented at trial, I am persuaded that the force used was not excessive, in that it was used in a good-faith effort to maintain or restore discipline. In particular, I find Wall's version of being attacked without provocation not credible.

In his Complaint, Wall alleged that Rasnick started the altercation on August 14 by grabbing Wall's left arm and then punching Wall in the left side of his face. (Complaint, Docket Item No. 42, at 4.) Wall alleged that Hicks then charged him and took him to the ground on his back, where he immediately tried to roll over on his stomach to assume a "nonthreatening position" while both Rasnick and Hicks continued to punch his head and face. (Complaint, Docket Item No. 42, at 4.) Wall also alleged that he was "handcuffed and shackled, while laying in a prostrate position offering no resistance" before the vestibule door opened allowing other officers to enter. (Complaint, Docket Item No. 42, at 5.) Wall alleged that he then was sprayed with OC pepper spray, kicked and punched and lost consciousness. (Complaint, Docket Item No. 42, at 5.) At trial, Wall testified that, when he turned around to ask why the vestibule door was not opening, Rasnick grabbed his left arm and told him to "shut up." Wall said nothing about Rasnick punching him in

the left side of the face. Wall also testified that he stepped to his right with his hands up and open and was attempting to get down on the floor when Hicks tackled him. Wall testified that, while on the floor, Hicks had placed Wall's left hand in handcuffs and, then he, Wall, had voluntarily put his right hand behind his back so that Hicks could cuff it before the vestibule door opened.

Defendants Hicks, Rasnick, Large and Lyall all testified to the contrary. Both Hicks and Rasnick testified that Wall refused an order to be restrained by pulling away from them and using profanity toward them. All four of these defendants testified that Wall was not restrained when the vestibule door opened and Large and Lyall entered. In fact, Large and Lyall testified that they restrained Wall. All four of these defendants testified that Wall was never passively lying on the floor after being restrained. Furthermore, the video evidence confirms much of the officers' versions of events. In particular, the video shows that Hicks and Rasnick still were struggling with Wall, who was on his feet, as the A-1 vestibule door opened. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:03.) The video also shows that Hicks and Rasnick were still struggling with Wall, who was then on the floor, when Large and, then, Lyall entered the A-1 pod, and that all four officers then struggled with Wall. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:16 to 4:01:35.)

Based on this evidence, I am persuaded that Wall provoked the initial use of force by Hicks and Rasnick in taking him to the ground by his aggressive act when they attempted to restrain him. I further find that the use of OC pepper spray and the physical force used to place Wall in restraints was necessitated by Wall continuing to struggle with the officers. I do not find credible Wall's claims that responding officers continued to kick and punch him even after he was restrained and removed from the pod. Again, the video evidence from both the surveillance

and the handheld cameras refutes this statement for the periods of time that Wall was shown on these recordings. Also, every officer who was present that day and who testified at trial stated that they did not see any officer punch, hit or kick Wall at any time. I also do not find credible Wall's testimony that the officers purposefully ran him into fence posts and door frames as they escorted him to the B Building. Thus, I find that the force used against Wall by the defendants on August 14, 2015, was not excessive, in that the defendants used only that amount of force necessary to obtain and maintain control of Wall. Insofar as Wall alleges that placing him in five-point restraints was a use of excessive force, I am persuaded that the evidence that Wall continued to threaten staff justified this use of force.

Wall's Complaint also appears to state a claim for excessive force for being placed in restraints without being contaminated and without being offered any medical treatment for his injuries. It is undisputed that Wall was not placed in the shower after OC pepper spray was used on him. It also is undisputed that no medical treatment was rendered to Wall at Red Onion after this altercation. Both Collins and Large testified that they asked Wall if he needed to be placed in the shower to decontaminate before he was placed in five-point restraints. Both said that Wall refused to answer them. Also, Nurse Deel, who examined Wall after he was placed in five-point restraints, said that Wall made no request of her to be placed in the shower to decontaminate. In fact, the video shows that defendant Collins asked Wall if he had any complaints for the nurse, and he did not answer. (Plaintiff's Exhibit No. 14 at 16:40.) The video does not show that Wall was coughing, gasping or having any trouble breathing when Nurse Deel examined him. Nurse Deel also testified that she would have ordered that Wall be placed in the shower to decontaminate if she had thought it was necessary. Nurse Deel testified that, based on her examination of Wall, there was no active bleeding from

any of his wounds. She said that she had no indication that Wall had suffered any injury to his wrist, hand or fingers. Furthermore, Deel testified that, if she had thought Deel needed any further medical assessment or treatment, she would have obtained it. Based on this evidence, I am persuaded that placing Wall in five-point restraints without a shower or any treatment for his injuries was not done maliciously or sadistically to cause harm as is required for a finding of excessive force.

Having found no use of excessive force by any of the defendants, there can be no bystander liability on the part of any defendants for failing to protect Wall. Therefore, I will recommend that the court find in favor of the defendants Rasnick, Hicks, Lyall, Large, Akers, Collins, Taylor, Bishop, Testerman, Addington, Dockery, Gwinn, Mullins, Deel and Barksdale on Wall's excessive force claims. I also will recommend that the court find in favor of the defendants Rasnick, Hicks, Collins, Akers and Taylor on Wall's claim that they conspired to use excessive force against him. At trial, Wall produced no evidence of any such conspiracy.

Wall also has failed to persuade the court that any of the defendants violated his Eight Amendment rights by being deliberately indifferent to any serious medical need. The Eighth Amendment's protections include a requirement that a state provide medical care to those it punishes by incarceration. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Godfrey v. Russell*, 2015 WL 5657037, at *8 (W.D. Va. Sept. 24, 2015) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)); *Chapman v. Rhodes*, 434 F. Supp. 1007, 1020 (S.D. Ohio 1977), *aff'd*, 624 F. Supp. 1099 (6th Cir. 1980), *rev'd on other grounds*, 452 U.S. 337, 344 (1981). A claim for deliberate indifference to serious medical needs also requires both an objective and a subjective showing. Objectively, the medical condition must be "sufficiently serious," meaning that it is "one that has been diagnosed by a

physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebee v. Murphy*, 797 F.2d 179, 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978); *Rush v. Vandevander*, 2008 WL 495651, at *1 (W.D. Va. Feb. 21, 2008). As for the second, subjective component, a defendant must be "deliberately indifferent," which occurs when he "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837 ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"); *see also Iko*, 535 F.3d at 241. More specifically, the evidence must show that the defendants subjectively recognized that their actions were inappropriate in light of a substantial risk of serious harm to Wall. It is insufficient that they should have recognized that their actions were inappropriate. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001).

Even if the court assumes that the injuries suffered by Wall were serious enough to give rise to a constitutional claim, the court finds that Wall has failed to meet his burden of proof to show that any of the defendants subjectively recognized that his or her actions caused a substantial risk of serious harm to Wall. After the altercation and placing Wall in five-point restraints, those defendants present allowed Nurse Deel to see and evaluate Wall's injuries. Wall made no complaint to Nurse Deel, and Nurse Deel saw no need for any further treatment at the time. Based on this evidence, I find that none of the defendants were deliberately indifferent to Wall's serious medical needs, and I will recommend that

the court find in favor of Collins, Bishop, Akers, Taylor, Deel and Barksdale on this claim.

Next, I will address Wall's, Hicks's and Rasnick's state law claims. Based on my review of Wall's Complaint, it raises the following state law claims against the following defendants:

1.    A claim under Virginia state law alleging an assault by Rasnick, Hicks, Large, Lyall, Collins, Taylor, Akers, Bishop, Dockery and Gwinn based on the use of excessive force and placing him in restraints;

2.    A claim under Virginia state law alleging abuse of process by McCoy and Church based on their generating disciplinary reports for Red Onion after Wall's transfer to Wallens Ridge; and

3.    A claim under Virginia state law against all defendants alleging negligence and willful and wanton negligence.

Both Hicks and Rasnick have filed counterclaims under state law for common law assault and battery against Wall.

Under Virginia common law, an assault occurs when a person engages in an overt act intended to inflict bodily harm, coupled with the present ability to inflict such harm or engages in an overt act intended to place the victim in fear of bodily harm and creates a well-founded fear in the victim. *See Bowie v. Murphy*, 624 S.E.2d 74, 80 (Va. 2006) (quoting *Carter v. Commonwealth*, 606 S.E.2d 839, 841 (Va. 2005)). Under Virginia common law, a battery occurs when a person engages in the unwanted touching of another that is neither consented to, excused, nor justified. *See Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003). Although the torts of assault and battery often appear together, the difference between the two is battery requires actual physical contact, while assault requires only the fear of

physical injury. *See Koffman*, 574 S.E.2d at 261. Based on the view of the evidence outlined above on Wall's excessive force claims, I will recommend that the court find in favor of the defendants on Wall's assault claim and in favor of Hicks and Rasnick on their assault and battery claims against Wall.

I further find that both Hicks and Rasnick suffered physical injuries as the result of Wall's battery, for which Wall should be held liable. "'There is no fixed rule or exact standard by which damages can be measured in personal-injury cases. The law does not assume that a particular injury calls for a definite amount of compensation.... The amount to be awarded is therefore largely a question ... to be determined ... in view of the facts and circumstances of each particular case.'" *Williams Paving Co. v. Kreidl*, 104 S.E.2d 758, 764 (Va. 1958) (quoting 15 AM. JUR., Damages, § 71, p. 479). In determining the amount of damages to award in a personal injury case, the court may consider the nature and extent of a plaintiff's injuries, including any alleged permanency, *see Glass v. David Pender Grocery Co.*, 174 Va. 196, 202 (1939), as well as the plaintiff's pain and suffering, *see Rome v. Kelly Springfield Tire Co.*, 234 S.E.2d 277, 281 (Va. 1977) (citing *Robertson v. Stanley*, 206 S.E.2d 190, 193 (N.C. 1974)).

Based on the evidence presented at trial, I find that Wall struck Hicks in the eye, causing a cut in Hicks's eyebrow area that had to be closed with sutures and has left a permanent scar. I also find that Hicks suffered a fracture to a bone in his right hand near his wrist during the scuffle with Wall. I further find that, during the scuffle with Wall, Rasnick tore the meniscus in his right knee, requiring surgical repair. Hicks and Rasnick testified to these injuries and provided medical records to support their claimed injuries. I also find that Hicks suffers from post-traumatic stress disorder as a result of this incident. I find credible Hicks's testimony that his psychological injury was so severe that his appearance at trial was the first time he

had left his home in several months. The undisputed evidence is that neither Hicks nor Rasnick incurred any out-of-pocket expenses for medical treatment because their injuries were covered by workers' compensation. Additionally, neither Hicks nor Rasnick makes any claim for lost wages. Nonetheless, I find that both Hicks and Rasnic have suffered injuries that have caused them significant pain and suffering to date, and will likely continue to do so. That being the case, I will recommend that the court award each Hicks and Rasnick the requested amount of $20,000.00 in compensatory damages for their injuries.

Hicks and Rasnick also seek an award of punitive damages against Wall. Under Virginia law, the tort of battery can be sufficient to prove the type of malice and willful and wanton conduct necessary to award punitive damages. *See Baldwin v. McConnell*, 643 S.E.2d 703 (Va. 2007); *Bannister v. Mitchell*, 104 S.E. 800 (Va. 1920). Under Virginia law, punitive damages are exemplary damages, which are "something in addition to full compensation, and something not given as plaintiff's due, but for the protection of the public, as a punishment to defendant, and as a warning and example to deter him and others from committing like offenses." *Baker v. Marcus*, 114 S.E.2d 617, 620 (Va. 1960). There is no set standard for determining the amount of punitive damages. *See Worrie v. Boze*, 95 S.E.2d 192, 201 (Va. 1956). However, Virginia courts have held that, in determining whether an award of punitive damages is excessive, a court should consider "the reasonableness between the damages sustained and the amount of the award and the measurement of punishment required, … whether the award will amount to a double recovery, … the proportionality between the compensatory and punitive damages … and the ability of the defendant to pay…." *Poulston v. Rock*, 467 S.E.2d 479, 484 (Va. 1996).

Considering these factors in light of the facts of this case, I will recommend that the court award each Hicks and Rasnick the requested amount of $20,000.00 in punitive damages for their injuries. In reaching this conclusion, the court notes that Wall's actions were not merely negligent, but were intentional. From the evidence presented, the court has found that Wall purposefully struck Hicks with his fist. There can be no doubt that a person swinging his fist at another intends to injure. Also, the court has found that Wall continued to struggle and inflicted additional injuries even after he was taken to the floor. Any punitive damages awarded should send a clear signal that such conduct by incarcerated persons against correctional officers should be severely punished. I do not recommend an award of punitive damages in an amount any greater than the recommended compensatory damages, in part, because Wall, as an incarcerated person, is indigent and has little ability to pay an award of any damages.

Wall's Complaint also contains a claim under Virginia state law alleging abuse of process by McCoy and Church based on their generating disciplinary reports for Red Onion after Wall's transfer to Wallens Ridge. To prevail on a cause of action for abuse of process under Virginia law, a plaintiff must prove: (1) the existence of an ulterior purpose; and (2) an act in the use of process not proper in the regular course of the proceedings. *See Donohoe Const. Co., Inc. v. Mount Vernon Assocs.*, 369 S.E.2d 857, 862 (Va. 1988) (citing *Mullins v. Sanders*, 54 S.E.2d 116, 121 (Va. 1949)). The distinctive nature of malicious abuse of process lies in the perversion of regularly issued process to accomplish some ulterior purpose for which the procedure was not intended. *See Glidewell v. Murray-Lacy & Co.*, 98 S.E.2d 665 (Va. 1919).

Without deciding whether the facts alleged against McCoy and Church would qualify as "process" under Virginia law,[3] Wall, at trial, did not produce any evidence of an ulterior motive on the part of McCoy or Church. In fact, the only mention of Defendants McCoy and Church in the evidence presented at trial is their names and signatures on the Disciplinary Offense Reports as "Officer in Charge" and on the Penalty Offers issued in the disciplinary charges placed against Wall as a result of the August 14, 2015, altercation. (Docket Item Nos. 84-6 at 1, 3; 84-7 at 1, 3; 84-8 at 1, 3; 84-9 at 1, 3; 84-10 at 1, 3.) I find that this evidence is not sufficient to prevail on a claim of abuse of process. Therefore, I will recommend that the court enter judgment in favor of McCoy and Church on Wall's abuse of process claim.

Wall's Complaint also contained a claim under Virginia state law for negligence and willful and wanton negligence against all defendants. To prevail on a cause of action for negligence under Virginia law, a plaintiff must prove: (1) the existence of a legal duty; (2) the defendant's violation of that duty; and (3) the defendant's violation of the duty owed the plaintiff was the proximate cause of injury to the plaintiff. *See Kellerman v. McDonough,* 684 S.E.2d 786, 790 (Va. 2009). Whether a legal duty in tort exists is a pure question of law. *See Kellerman*, 684 S.E.2d at 790. In this case, Wall alleged violation of no duty by the defendants other than those addressed above. Since I have recommended that the court enter judgment in favor of the defendants on these claims, I also recommend that the court enter judgment in favor of the defendants on this claim.

---

[3] *See Ubl v. Kachouroff*, 937 F. Supp. 2d 765, 769-70 (E.D. Va. 2013) ("process" is a mandate of a court by which a party is commanded to do certain acts, such as subpoenas, summonses, injunctions, orders, writs, warrants and the like).

## PROPOSED FINDINGS OF FACTS AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Wall's Complaint contained no allegations against Defendants Bryant and Rose. Therefore, I recommend that the court enter judgment in favor of these defendants;

2.    Wall presented no evidence at trial against Defendants Hughes and Clarke. Therefore, I recommend that the court enter judgment in favor of these defendants;

3.    Wall presented no evidence that Defendants Barksdale and Holbrook took any action to impair Wall's constitutionally protected liberty interests under the Due Process Clause. Therefore, I recommend that the court enter judgment in favor of these defendants on Wall's due process claims;

4.    Wall presented no evidence at trial that his disciplinary offense convictions for aggravated assault in ROSP-2015-1481 and ROSP-2015-1503 have been overturned. Thus, he may not pursue § 1983 claims based on them because, if the court were to find in Wall's favor on these claims, it would imply the invalidity of his convictions. Therefore, I recommend that the court enter judgment in favor of Still, Hicks, Franks, Hensley, Fleming and Ponton on Wall's due process claims;

5.    Based on the evidence presented at trial, I find that none of the defendants used any excessive force against Wall in violation of his Eighth Amendment right to be free from cruel and unusual

punishment. Therefore, I recommend that the court enter judgment in favor of Rasnick, Hicks, Lyall, Large, Akers, Collins, Taylor, Bishop, Testerman, Addington, Dockery, Gwinn, Mullins, Deel and Barksdale on Wall's excessive force claims;

6.   Based on the evidence presented at trial, I find that none of the defendants conspired to use excessive force against Wall. Therefore, I recommend that the court enter judgment in favor of Defendants Rasnick, Hicks, Collins, Akers and Taylor;

7.   Based on the evidence presented at trial, I find that none of the defendants were deliberately indifferent to Wall's serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Therefore, I recommend that the court enter judgment in favor of Defendants Bishop, Akers, Taylor, Deel and Barksdale on Wall's deliberate indifference claim;

8.   Based on the evidence presented at trial, I find that Defendants Rasnick, Hicks, Large, Lyall, Collins, Taylor, Akers, Bishop, Dockery and Gwinn did not assault Wall. Therefore, I recommend that the court enter judgment in favor of these defendants on Wall's state law assault claim;

9.   Based on the evidence presented at trial, I find that Wall did commit an assault and battery on Hicks and Rasnick on August 14, 2015. Therefore, I recommend that the court enter judgment against Wall and in favor of these counter plaintiffs on their state law assault and battery claims;

10. Based on the evidence presented at trial, I recommend that the court award Hicks compensatory damages in the amount of $20,000.00 and punitive damages in the amount of $20,000.00;

11. Based on the evidence presented at trial, I recommend that the court award Rasnick compensatory damages in the amount of $20,000.00 and punitive damages in the amount of $20,000.00;

12. Wall produced no evidence at trial to show an ulterior motive on the part of Defendants McCoy and Church. Therefore, I recommend that the court enter judgment in favor of McCoy and Church on Wall's state law abuse of process claim; and

13. I recommend that the court enter judgment in favor of the defendants on Wall's state law negligence claim.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court enter judgment in favor of the defendants on Wall's claims. I also recommend that the court enter judgment against Wall, and in favor Hicks, on his claims for assault and battery and award compensatory damages in the amount of $20,000.00 and punitive damages in the amount of $20,000.00. I also recommend that the court enter judgment against Wall, and in favor Rasnick, on his claims for assault and battery and award compensatory damages in the amount of $20,000.00 and punitive damages in the amount of $20,000.00.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.   §
636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: May 17, 2019.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE