## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

|  |  |  |
|---|---|---|
| **GARY WALL,** | ) | |
| Plaintiff, | ) | Civil Action No.: 7:17cv00385 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **E. RASNICK, et al.,** | ) | |
| Defendants | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

The plaintiff, Gary Wall, ("Wall"), an inmate previously incarcerated at Red Onion State Prison, ("Red Onion"), brings this civil rights action pro se pursuant to 42 U.S.C. § 1983, against 28 Virginia Department of Corrections, ("VDOC"), employees and officials. Wall's Second Amended Complaint, (Docket Item No. 42) ("Complaint"), raises a number of claims, including § 1983 claims based on allegations of excessive force, deliberate indifference to his serious medical needs, failure to intervene to protect him, violations of his substantive and procedural due process rights and conspiracy and Virginia state law claims for assault, abuse of process and negligence. Two of the defendants, Correctional Officers E. Rasnick and J. Hicks, filed counterclaims against Wall seeking damages based on state law assault and battery claims. (Docket Item No. 29) ("Counterclaims"). The matter is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).

In December 2018, Wall moved for discovery sanctions against the defendants, (Docket Item Nos. 75, 77) ("Motions"), including a request for sanctions based on spoliation of certain video recording evidence, pursuant to Federal Rules of Civil Procedure Rule 37(e). These Motions were set for hearing at the January 23-24, 2019, bench trial. By Order entered May 13, 2019, the Motions were denied.

-1-

(Docket Item No. 86.) By Report and Recommendation filed May 17, 2019, the undersigned recommended that the court enter judgment in favor of the defendants on Wall's claims. (Docket Item No. 87.) The Report and Recommendation also recommended that the court enter judgment against Wall in favor of Rasnick and Hicks on their assault and battery claims and award each $20,000.00 in compensatory damages and $20,000.00 in punitive damages.

By motion filed January 28, 2020, (Docket Item No. 102), Wall appealed the order denying his motions for sanctions. Wall also filed objections to the Report and Recommendation. (Docket Item No. 91.) By Memorandum Opinion and Order entered March 23, 2021, the district court overruled Wall's objections, adopted in part and denied in part the Report and Recommendations and entered judgment for all defendants and the counter-plaintiffs. (Docket Item Nos. 109, 110.) The Memorandum Opinion, however, did not address Wall's appeal of the May 13, 2019, Order denying the Motions. Wall appealed the court's decision, and, by Memorandum Opinion entered July 25, 2022, the Fourth Circuit vacated this court's decision and remanded Wall's claims to the court with instructions to hold an evidentiary hearing on Wall's objections to the denial of spoliation sanctions. (Docket Item No. 129.)

By Order entered August 23, 2022, (Docket Item No. 135), Wall's claims were recommitted to the undersigned to conduct further proceedings, including, if necessary, preparation of amended findings and recommendation, including reopening, and recommitted Wall's Motions for further consideration. Upon remand, Wall's appellate counsel entered an appearance on his behalf and requested a further evidentiary hearing. This evidentiary hearing was held on May 4-5, 2023.

*I. Facts[1]*

At the January 2019 bench trial, Wall testified that, on August 14, 2015,[2] while incarcerated at Red Onion, in the A-1 pod, he was tackled to the floor by Hicks and beaten and kicked by Rasnick, Hicks, J. Lyall and T. Large for no reason. Wall said the incident started when he placed an empty jar of peanut butter on the floor outside of his cell door during pod recreation. He said the control booth officer, C. Holbrook, got his attention and told him to come near the control booth to speak to him. Wall said that, when he approached the control booth, Holbrook told him to lock down in his cell because Holbrook claimed that he saw Wall place something in someone else's cell. Wall said he was attempting to explain what Holbrook saw when Rasnick interrupted by yelling at Wall from the top tier, "Shut the fuck up." Wall admits that he then responded, "Fuck you," to Rasnick, and Rasnick replied, "No, fuck you."

Wall said that Defendant Hicks then ordered everyone in the pod to lock down. Wall said he started to walk toward his cell, when Hicks ordered him to go to the pod vestibule. Wall said that, when he arrived at the vestibule door, it did not open. He said that he turned around to ask why, and Rasnick grabbed his left arm. On cross-examination, Wall said Rasnick told him to "shut up." Wall said that he stepped to his right with his hands up and open. He denied throwing any punches at anyone. Instead, Wall said that he was attempting to get down on the floor when Hicks tackled him, knocking him to the floor. Wall said that Hicks placed his left

---

[1] The evidence presented at the January 2019 bench trial and the May 2023 evidentiary hearing is set out in complete detail in the Report and Recommendation on Wall's substantive claims entered this same date. For purposes of this Memorandum Opinion, the facts listed here are only those relevant to the Motions.

[2] Wall testified that this incident occurred on August 15, 2015, but VDOC documents show that it occurred on August 14, 2015.

hand in cuffs and then he, Wall, put his right hand behind his back so that Hicks could cuff it. He said that he heard someone place a "10-33" call, an officer needs assistance call. Wall said that the vestibule door then opened and Defendants J. Lyall and T. Large entered the pod. He said that Large immediately used OC, (oleoresin capsicum), spray on him. Wall said that he could not see anything when someone hit him in the back of his head and side of his face, and he lost consciousness.

Wall said that he regained consciousness as he was being escorted through the recreation yard with officers bending his hands back. Wall said that his left hand was extremely painful. He said that he was escorted from the A Building by Defendants C. Dockery and E. Gwinn, but he did not know which officer was on which side. Wall said that these officers purposefully ran him into steel fencing poles every few feet apart. Wall said that, as they entered the B Building vestibule, the officers told him to stand and face the wall, and he complied. Someone then asked his name. He also said that Dockery and Gwinn were replaced by Defendants B. Akers and S. Taylor. Wall said that these officers immediately tightened the cuffs, cutting his wrists. He said that Akers then rammed his face into the wall by placing both of his hands on the back of Wall's head. He said he was in this position for five to 10 minutes while correctional officers were coming by and hitting him. He said that he could not see who hit him because he was facing the wall.

Wall said that he was taken to cell B-308 without being decontaminated from the OC spray. Wall said that his clothes were taken from him, a spit mask was placed on his face, and he was placed in restraints. He said that he lost consciousness again. Wall said that he woke up some time later when another inmate yelled through the vent to ask him if he was okay. Wall said that he had intense pain in his left hand. He said he thought it was broken because it was swelled to twice its normal size.

Wall said that he asked Defendant M. Addington, who was making rounds, if he could see a nurse.

Wall said that he was released from restraints at 7:45 p.m. He said that Nurse Woods was present and looked at his hand. He said that he was then walked to the sally port area, wearing only a safety smock, and placed in a holding cell. He said he used the sink in the cell to clean the OC spray from his face. He said that Officer Hall then gave him some inmate clothes to change into. He said he was placed in a transport van and taken to Wallens Ridge State Prison, ("Wallens Ridge").

Wall said that, when he arrived at Wallens Ridge, he requested medical attention and was examined by Nurse Stanford. Wall said that Stanford noted and took pictures of his injuries. Wall said that he had knots on his head, scars on his chest, his wrists were swollen and cut, and his ankles were cut. He said that Stanford treated his wounds and obtained x-rays of his left wrist. He said he then was placed in a cell in the Medical Unit at Wallens Ridge.

Wall said that, the day after being transferred to Wallens Ridge, he was served with notice that he had been charged with four disciplinary infractions based on the events of the previous day at Red Onion. He said that Holbrook charged him with a 201 offense code for disobeying an order and a 229 offense code for being in an unauthorized area, and Hicks charged him with a 129 offense code for approaching others in a threatening manner and a 105A offense code for assault. Wall said that he was served with notice on August 17, 2015, that Defendant D. Still had charged him with a 105A offense code for assaulting Rasnick.

Wall said that he was held in the Medical Unit at Wallens Ridge for approximately four weeks. Wall said that he was later transferred to cell D-102 at

Wallens Ridge, and he remained in that cell until he was transferred back to Red Onion on November 17, 2015.

Wall said that he asked for an advisor to assist him in preparing for his disciplinary offense hearings because he could barely see or write due to his injuries. He said that he also requested that prison officials review the video surveillance recordings of the incident. Wall said that Defendant Counselor O. Rose acted as his advisor. He said that he asked Rose how he could defend charges written against him at another prison.

Wall said that Defendant C. Franks was the disciplinary hearings officer for his first disciplinary hearing on the 229 offense code charge for being in an unauthorized area. He said that he requested that Franks look at earlier video recordings to see that inmates routinely crossed the red line during pod recreation to place items in front of their cell doors.

Wall testified that his next disciplinary hearing, which he believes was held later that same day, was for the 201 offense code charge written by Holbrook for disobeying an order. He said that defendant W. Hensley was the disciplinary hearings officer for this charge. He said that Holbrook claimed that he ignored Holbrook's order to lock down. He said that he asked Hensley to review the pod surveillance video recordings because they would show that he put a finger up and his hand up to his ear to indicate that he could not hear Holbrook. Wall testified that he filled out requests for documentary evidence, asking that someone review the pod surveillance video recordings. He said that Hensley told him that he would have to convince him at the hearing to review the video evidence.

Wall testified that Franks, on the following day, heard the 105A offense code disciplinary charge that Still wrote against him, alleging that he had assaulted Rasnick. Wall said that he, again, requested that Franks review the pod surveillance video.

Wall stated that, because Hicks was off work for a while after this incident, the offense charges he placed against Wall were not heard until September 8, 2015. Wall said that this assault charge was heard by Hensley. Wall said that he again requested Hensley to review the surveillance video.

Wall submitted into evidence a number of photocopies of photographs taken of him when he was placed in restraints at Red Onion on August 14, 2015. (Plaintiff's Exhibit No. 1, Docket Item No. 84-1.) At least two of these photos appear to show injuries Wall sustained in the incident. One appears to show blood and/or cuts on Wall's left wrist, (Docket Item No. 84-1 at 4), and one appears to show injuries to Wall's face, (Docket Item No. 84-1 at 6). Medical records submitted into evidence show that, when Wall was placed in restraints, Defendant Nurse J. Deel noted that Wall had been involved in an altercation and had "scattered [ecchymosis] scattered over body" with "no active bleeding at [that] time." (Plaintiff's Exhibit No. 2, Docket Item No. 84-2 at 1.)

Wall's medical records also show that he was examined by Nurse M. Stanford upon his arrival at Wallens Ridge later that day. (Docket Item No. 84-2 at 4-5.) Stanford noted that there was swelling around Wall's right eye with bright purple discoloration, but no bleeding, and swelling and bright purple discoloration over Wall's right brow. Stanford also noted swelling across the bridge of Wall's nose and some discoloration on his left eyelid and outer aspect of his eye. She also noted bright purple discoloration on Wall's left cheek and right side of his face. She noted

that Wall's lips were swollen and that his upper lip was discolored dark purple. She also noted three well-defined red marks on the left side of his neck, approximately three-quarters of an inch in width. Stanford also noted swelling to the right back side of Wall's head and red areas on his left flank, with redness noted on his left lateral rib area, left upper arm, right shoulder, both clavicles, middle of his chest and right shoulder. She noted abrasions in the middle of his right clavicle and on his right shoulder. She noted that Wall's wrists were swollen with abrasions, and he complained of pain and tenderness in his left wrist and left fifth finger and tenderness in the back of his left hand. Stanford also noted small red areas on his left hip and both knees. X-rays taken of Wall's facial bones, skull and left hand and wrist were all normal except for a small chip fracture at the base of the fifth distal phalanx with mild displacement, but no dislocation. (Docket Item No. 84-2 at 29-32.)

Wall also submitted the Disciplinary Offense Reports for the disciplinary offenses with which he was charged on August 14, 2015, and numerous related documents into evidence. (Plaintiff's Exhibit Nos. 6-10, Docket Item Nos. 84-6 to 84-10.) Disciplinary Offense Report No. ROSP-2015-1481 showed that Wall was charged with offense code 105A for aggravated assault upon a non-offender on August 14, 2015, by J. Hicks. (Docket Item No. 84-6 at 1.) Under the Description of Offense section, Hicks wrote:

> On the above date and approximate time while trying to place restraints on Offender G. Wall …, offender spun around and tried to strike me. This resulted in trying to gain control of the offender Wall at which point Offender Wall did strike me in my eye with his right fist.

(Docket Item No. 84-6 at 1.)

Attached to this Report was a Request for Documentary Evidence form from Wall requesting that the Hearings Officer review the A-100 pod Rapid Eye security cameras on August 14, 2015, from approximately 4 to 5 p.m. Wall wrote, "This requested evidence will show I never approached Officer Hicks while at the vestibule door nor tried to strike him…. Simply ask[ed] him about his unusual directive to 'Go into the Vestibule' after I was [going to cell] door to lock down." Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons such as video and audio recordings" or "information is not written documentation." (Docket Item No. 84-6 at 6.)

Wall appealed his conviction of the 105A offense code to the Facility Unit Head. (Docket Item No. 84-6 at 10-11.) In his appeal, Wall claimed that his due process rights were violated, in that he did not receive an ICA hearing within 15 days of his transfer from general population at Red Onion to pre-hearing detention at Wallens Ridge, he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage, and adequate investigation could not be done by staff at Wallens Ridge since the incident occurred at Red Onion. (Docket Item No. 84-6 at 10-11.) Defendant Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-6 at 13-18.) Wall appealed Warden Fleming's decision to the Regional Administrator, (Docket Item No. 84-6 at 19-21), and Defendant Regional Administrator Henry Ponton upheld Wall's conviction on this charge. (Docket Item No. 84-6 at 22-23.)

Disciplinary Offense Report No. ROSP-2015-1503 showed that Wall was charged with offense code 105A for aggravated assault upon a non-offender on August 14, 2015, by Captain D. Still. (Docket Item No. 84-7 at 1.) Under the Description of Offense section, Still wrote:

On August 14, 2015 at approximately 4:05 pm offender G. Wall did assault Officer E. Rasnick by [punching] him repeatedly resulting in injuries to the officer that were treated outside Red Onion State Prison by Mountain View Regional Medical Center. The basis of the charge is the result of an investigation completed August 17, 2015. Interviews of the victims and a review of security footage were completed and provided the factual knowledge in writing this charge.

(Docket Item No. 84-7 at 1.)

Attached to this Report was a Request for Documentary Evidence form from Wall requesting that the Hearings Officer obtain the Rapid-Eye security camera video recordings from August 14, 2015, for the A-1 pod from approximately 4 to 5 p.m. Wall wrote:

Reporting Officer Captain D. A. Still says review of the security video footage provided the factual knowledge in writing this charge. Since I never hit, punched, or attacked either officer as alleged to initiate this confrontation, so if there is ANY irrefutable video footage available showing I hit Officer Rasnick repeatedly, it should be provided.

(Docket Item No. 84-7 at 5.) Again, Hensley responded on August 18, 2015, that the requested information would not be obtained because it was "from an outside source, restricted for security reasons such as video and audio recordings." (Docket Item No. 84-7 at 5.)

Wall appealed his conviction of the 105A offense code charge to the Facility Unit Head. (Docket Item No. 84-7 at 7-8.) In his appeal, Wall claimed that his due process rights were violated, in that he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage, and an adequate investigation could not be done by staff at Wallens Ridge since the

incident occurred at Red Onion. (Docket Item No. 84-7 at 7-8.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-7 at 9-16.) Wall appealed Warden Fleming's decision to the Regional Administrator, (Docket Item No. 84-7 at 17-20), and Regional Administrator Ponton upheld Wall's conviction on this charge. (Docket Item No. 84-7 at 21.)

Disciplinary Offense Report No. ROSP-2015-1480 showed that Wall was charged with offense code 129 for gathering around/approaching any person in a threatening/intimidating manner on August 14, 2015, by Hicks. (Docket Item No. 84-8 at 1.) Under the Description of Offense section, Hicks wrote:

> On the above date and approximate time as I C/O Hicks was escorting Offender [W]all to the vestibule to speak with a Supervisor. As we reach the vestibule door He turned and approached me in an intimidating and threatening manner, Resulting in an assault on me.

(Docket Item No. 84-8 at 1.)

Attached to this Report was a Request for Documentary Evidence form from Wall requesting Rapid-Eye security camera video recording from August 14, 2015, from approximately 4 to 5 p.m. Wall wrote, "This requested evidence will show [me] at the vestibule door. I never approached Officer Hicks nor tried to strike him. Simply ask[ed] him about his unusual directive to 'Go into the Vestibule' when I was at my door to lock down." (Docket Item No. 84-8 at 7.) Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons such as video and audio recordings" or "information is not written documentation." (Docket Item No. 84-8 at 7.)

Wall appealed his conviction of the 129 offense code charge to the Facility Unit Head. (Docket Item No. 84-8 at 11-12.) In his appeal, Wall claimed that his due

process rights were violated, in that he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage, and an adequate investigation could not be done by staff at Wallens Ridge since the incident occurred at Red Onion. (Docket Item No. 84-8 at 11-12.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-8 at 13-19.) Wall appealed Warden Fleming's decision to the Regional Administrator, (Docket Item No. 84-8 at 20-22), and Regional Administrator Ponton upheld Wall's conviction on this charge. (Docket Item No. 84-8 at 23-24.)

Disciplinary Offense Report No. ROSP-2015-1483 showed that Wall was charged with offense code 201 for disobeying an order on August 14, 2015, by Holbrook. (Docket Item No. 84-9 at 1.) Under the Description of Offense section, Holbrook wrote:

> On 08-14-2015 at approx. 4:00 PM, I officer Holbrook was observing pod recreation in A-1 pod. I officer Holbrook gave offender G. Wall … a direct order to return to his cell and lock down, offender Wall refused.

(Docket Item No. 84-9 at 1.)

A Request for Documentary Evidence form from Wall was attached to the Report requesting the Rapid-Eye recordings from the three security cameras in the A-100 pod on August 14, 2015, from approximately 4 to 5 p.m. (Docket Item No. 84-9 at 5.) Wall wrote, "This requested evidence will show after the directive was 'heard' and 'understood,' I did comply." (Docket Item No. 84-9 at 5.) Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons such as video and audio recordings" or "information is not written documentation." (Docket Item No. 84-9 at 5.)

Wall appealed his conviction of the 201 offense code charge to the Facility Unit Head. (Docket Item No. 84-9 at 7-8.) In his appeal, Wall claimed that his due process rights were violated, in that he was not allowed the assistance of an advisor as he had requested, and the hearings officer did not review the requested video footage. (Docket Item No. 84-9 at 7-8.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-9 at 9-13.)

Disciplinary Offense Report No. ROSP-2015-1485 showed that Wall was charged with offense code 229 for being in an unauthorized area on August 14, 2015, by Holbrook. (Docket Item No. 84-10 at 1.) Under the Description of Offense section, Holbrook wrote:

> On 08-14-2015 at approximately 4:00 PM[,] I officer Holbrook was observing pod recreation, and saw offender G. Wall … cross the red line in front of the cell doors in A-1 pod during pod recreation, this area is unauthorized to be in during pod recreation.

(Docket Item No. 84-10 at 1.)

Wall appealed his conviction of the 229 offense code charge to the Facility Unit Head. (Docket Item No. 84-10 at 8-9.) In his appeal, Wall claimed that his due process rights were violated, in that he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage, and an adequate investigation could not be done by staff at Wallens Ridge since the incident occurred at Red Onion. (Docket Item No. 84-10 at 8-9.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-10 at 10-15.)

Wall testified that, on August 19, 2015, he told Special Investigations Unit, ("SIU"), Investigator J. Wood that he had been assaulted at Red Onion and could not write. He said that he later mailed a notarized statement to Wood. (Plaintiff's Exhibit No. 12, Docket Item No. 84-12 at 11-15.) Wall testified that, when Wood returned to speak with him a second time, Wood was saying that he had said "things I did not say." He said that he spoke to Wood a third time in November 2015, after he had been transferred back to Red Onion. Wall submitted a copy of the SIU case file of its investigation of this incident for the limited purpose of showing that both the Rapid-Eye and handheld video recordings of this incident were saved and reviewed by Wood. (Docket Item No. 84-12.)

The Rapid-Eye surveillance video recording from the A-1 pod, taken on August 14, 2015, at the relevant time, was admitted into evidence at Plaintiff's Exhibit No. 13. This video evidence shows that an inmate crosses the red line in the A-1 pod and appears to place something on the floor outside of cell 106. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:58:47 to 3:58:55.) Wall testified that this video recording showed that he crossed the red line and approached his cell at this time. The video shows that Wall then returned to a table in the middle of the pod with other inmates before walking toward the control booth end of the pod. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:59:03 to 3:59:14.) Wall then can be seen speaking to someone and gesturing with his hands, although the surveillance video contains no audio. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:59:14 to 3:59:39.) Wall then turned to his left, as if someone spoke to him, and he turned and walked back toward a table in the middle of the pod, picked up something and went and stood in front of his cell door. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:59:39 to 4:00:13.) As the other inmates return to their cells, it appears that Wall set something down on the floor in front of his cell and then walked toward two officers in the middle of the pod. (Plaintiff's Exhibit No. 13, A1 Pod Left at 4:00:18 to 4:00:31.) Wall and the

two officers then walked toward the control booth end of the pod. (Plaintiff's Exhibit No. 13, A1 Pod Left at 4:00:35 to 4:00:46.) The three passed out of the view of this recording.

A few seconds later, a recording from another surveillance camera shows that a scuffle occurred on the pod side of the A-1 door. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:00:51.) As the A-1 door opens, the video shows that the two officers were struggling with Wall, who is on his feet. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:03.) The officers were still struggling with Wall, who was then on the floor, when a third officer entered the pod through the opened door, (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:11), then a fourth officer followed. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:14.) It appears that all four officers then struggled with Wall. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:16 to 4:01:35.) A canine handler and canine then entered the pod with several other responding officers. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:36.) An officer, who appears to be bleeding from his face, then exited the pod with the assistance of other officers, and walked through the vestibule. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:57 to 4:02:01.) An additional canine handler and canine and additional officers responded and entered the vestibule. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:02:08.)

After these additional officers arrived, it appears that officers stood Wall up, and Wall was visible in the A-1 doorway. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:02:23.) Wall, however, testified that he was lapsing in and out of consciousness at this point. It appears that several of the officers continued to struggle with Wall as they entered the vestibule with him and leave the A Building. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:02:23 to 4:02:42.)

The video recording taken by an additional surveillance camera shows Wall on the ground with at least three officers over him. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:30.) By the time this camera focuses in on the disturbance, four officers were kneeling over Wall, and the first canine handler and canine were entering the A-1 pod. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:38.) From this view, it appears that the four officers struggled with Wall, who appears to be lying on his stomach on the floor, for a few seconds until they were able to place both his hands behind his back and restrain him. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:38 to 4:01:52.) As the court watched the video, Wall testified that Hicks and Rasnick had him restrained before the first two responding officers, Lyall and Large, arrived. At this point, the video recording shows that an officer leaned against the wall who was bleeding from his right eye area. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:53.) That officer then got up and exited the pod with assistance. The officers then stood Wall up on his feet and escorted him from the pod. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:02:20.) The video recording from another surveillance camera in the A-1 Building Entrance shows officers escorting Wall from the building. (Plaintiff's Exhibit No. 13, A123 Entrance at 4:02:53 to 4:02:57.) The video evidence shows that, from the time the scuffle began, approximately one minute elapsed before Wall was restrained, and, within two minutes, Wall was being escorted from the building.

A handheld camera video recording taken on August 14, 2015, was admitted into evidence as Plaintiff's Exhibit No. 14. This recording begins with Wall against the wall with officers surrounding him in the B Building vestibule. Defendant Collins is seen and heard asking who the offender is and then yells, "What is your fucking name?" (Plaintiff's Exhibit No. 14 at 00:15.) Other officers can be heard telling Wall to "face the wall" and, later, telling Wall "don't move again." Wall is not visible through much of this recording due to the number of officers surrounding

him. When officers began moving Wall, Wall's face is not visible on the video except for one brief moment, but Wall clearly was walking under his own power. (Plaintiff's Exhibit No. 14 at 5:23.) During his testimony, Wall stated that, for the brief moment his face was visible, he could see blood on his nose and shirt. He said that the blood was a result of his face being rammed into the wall. Wall did admit that he walked of his own power from the B Building vestibule to cell B-308 to be placed in restraints. Once Wall was escorted into a cell, an officer can be heard asking another officer to bring a spit mask. (Plaintiff's Exhibit No. 14 at 6:29.) The video shows that officers placed Wall on a bed, removed his clothing and placed him in a safety smock and restraints. Again, Wall is not visible during much of this time. At one point, the video shows Wall sitting up so his shirt can be removed, and blood is clearly visible on his shirt. (Plaintiff's Exhibit No. 14 at 10:27.) After Wall is placed in restraints, two nurses came into the cell and checked the restraints. (Plaintiff's Exhibit No. 14 at 16:10.) While the nurses are present, it sounds like Defendant Collins asked Wall, "Do you have any complaints for the nurse?" (Plaintiff's Exhibit No. 14 at 16:40.) Wall does not respond. One of the nurses spoke to Wall at one point, but what she says is not audible. (Plaintiff's Exhibit No. 14 at 17:13.) Collins can then be heard saying, "Wall, the nurse is here." (Plaintiff's Exhibit No. 14 at 17:16.) It does not appear that Wall responds.

The video recordings do not show any medical treatment being offered to Wall, and they do not show that he was ever offered or received decontamination from OC spray.

During cross-examination, Wall stated that, after Rasnick grabbed his left arm, Rasnick swung his fist and hit Wall in the right side of his head. Wall said that he then put his hands up to block Rasnick's punches while Rasnick was holding his right arm. Wall said that he was trying to get down on the ground when Officer Hicks

tackled them, and they all fell to the floor. Wall said that he ended up on his back on the floor. He said that he attempted to roll over onto his stomach, but when he rolled one way, Hicks was in his way, so he rolled the other way. Wall said that, after he rolled onto his stomach, Hicks grabbed his left hand, and he then put his right hand behind his back so it could be restrained. Wall said, while he was lying on his stomach restrained, with Hicks and Rasnick on top of him, the vestibule door opened, and "I got gassed" as Lyall and Large came into the pod. Wall said that he also was kicked and punched in the head while restrained. Wall said that on the way from the A Building to the B Building, the escorting officers purposefully ran him into fence poles, doors and entryways. Wall admitted that he did not tell the nurses he needed any medical treatment, but he claimed this was because he was unconscious when the nurses inspected his restraints.

Correctional Officer Holbrook testified that he had worked for the VDOC at Red Onion for eight years. Holbrook said that he was working as the gun officer in the control booth of the Red Onion A Building 1, 2, 3 side on August 14, 2015, when he saw Wall cross the red line and appear to slide something under a cell door during pod recreation. He said that he yelled at Wall and asked him to step to the control booth so he could talk with Wall. When Wall approached the control booth, Holbrook said, he asked Wall what he had done. Holbrook said that he told Wall to return to his cell. He said that Wall asked to speak to a sergeant and kept telling Holbrook that he was not going to his cell.

Holbrook said that he saw Officers Rasnick and Hicks come down from the top tier of the pod and tell everyone to return to their cells to lock down. Otherwise, Holbrook said that he did not hear any of the conversation between these officers and Wall. Holbrook said that he saw Wall and the officers walk toward the vestibule door, which was underneath the control booth. Holbrook said that, after the three

disappeared from his view out of the control booth window, he "heard a commotion" that sounded like a "physical altercation" beneath the control booth, and he called a code 10-33, officers need assistance, in the A-1 pod on the prison radio. Holbrook said that he stepped back and looked through a clear portion of the control booth floor and saw Wall, Rasnick and Hicks lying on the floor. He said that numerous other officers then responded, and all he could see was a "jumble" of officers below. Holbrook testified that Officer Hess was working in the control booth with him that day, and Hess opened the A-1 door.

Holbrook said that he completed an Internal Incident Report regarding what he witnessed. This Internal Incident Report was admitted into evidence as Plaintiff's Exhibit No. 15. (Docket Item No. 84-13.) On this Internal Incident Report, Holbrook wrote:

> On 08-14-2015 at approximately 4:05 PM, I officer C. Holbrook was observing pod recreation in A-1 pod, and saw Offender G. Wall cross the red line and approach cell A-106[] and slide something under the door. The control room officer[] I gave a direct order to the bottom tier to lock down[] and return to their cells, all offenders complied except offender [W]all. After the bottom tier was locked down offender [W]all started walking towards the control room saying he would like to speak with a sergeant. Officer[s] Hicks and Rasnick came off the top tier to escort offender [W]all to speak with a sergeant, at this time the offender, [O]fficers Hicks, and Rasnick were out of my view at the A-1 door, I officer Holbrook heard a commotion at the A-1 door, and called for assistance from staff.

(Docket Item No. 84-13.)

Holbrook testified that he also wrote out a statement for Investigator Wood from the SIU. This statement, written on a form entitled "Investigative Interview,"

was admitted into evidence as Plaintiff's Exhibit No. 16. (Docket Item No. 84-14.) On this form, Holbrook wrote:

> On 8-14-15 at approximat[e]ly 4:00 PM[,] I Officer Holbrook saw offender Wall slide an object under cell A106. I Officer Holbrook gave offender Wall a direct order to lock down for being in an unauthorized area, Offender Wall refused and began walking to the control room cursing at me refusing to lock down. Once the bottom tier was locked down[,] Officer Hicks and Officer Rasnick were attempting to escort offender Wall to speak with the supervisor at this time offender Wall and officers Hicks and Rasnick were out of my sight at the A1 pod door. I officer Holbrook [heard] a strange noise at the door and concluded that the officers were attempting to gain control of offender Wall. I officer Holbrook called for assistance from staff. Staff entered and escorted offender Wall out of the building.

(Docket Item No. 84-14 at 1-3.) This statement was dated August 24, 2015.

Correctional Officer Hess testified that he was working in the control booth with Holbrook on August 14, 2015, when he heard Holbrook tell Wall to lock down. Hess stated that Wall responded "fuck you" to Holbrook. Hess said that he opened all cell doors in the A-1 pod, except for Wall's cell. Hess admitted that he had provided the answers to interrogatories, admitted into evidence at Plaintiff's Exhibit No. 17, (Docket Item No. 84-15), in which he stated that he did not open Wall's cell door because Wall was refusing to lock down. Hess also stated that he provided the written statement to Investigator Wood, admitted into evidence as Plaintiff's Exhibit No. 18. In this statement, Hess wrote:

> I, C/O Hess, was the control room officer during the incident in A1 pod. I heard C/O Holbrook give inmate G. Wall a direct order to lock down. Inmate Wall said "fuck you" and refused to lockdown. C/O Rasnick also gave inmate Wall a direct order to lockdown. I could not see any of the altercation between Inmate Wall and C/Os Rasnick and Hicks.

(Docket Item No. 84-16.) Hess stated that he did not hear Wall ask to speak to a supervisor.

Defendant and Counter Claimant Rasnick testified that, on August 14, 2015, his attention was drawn to Wall when he heard Wall tell Holbrook, "fuck you I am not locking down." He said when he heard that, he and Hicks went down from the top tier of the pod. He said that one of them told the other offenders to lock down, but he did not remember who told them. He said that he and Hicks then approached Wall and told him to "cuff up." He said that Wall responded, "fuck you." Rasnick said that he grabbed Wall's right wrist, and Wall jerked away from him. Rasnick said that he then tried to grab Wall around the waist and take him to the ground to control him. He said that all three men went to the ground.

Rasnick admitted that he did not see Wall hit Hicks in the face, but he did see that Hicks's face was bloody after the incident. Rasnick said that he and Hicks did not butt heads during the incident. Rasnick said that he injured his right knee by tearing the meniscus in it during the incident. He said that, because of his injury, he was relieved by other officers before they removed Wall from the pod. Rasnick admitted that he did not see Wall as he was escorted out of the A-1 pod or from the A Building. Rasnick said that Captain Still came and spoke to him about the incident later that day while he was at the hospital emergency department seeking treatment for his injury.

Rasnick testified that he took Wall to the floor in an effort to gain control of him. He said once all three of the men were on the floor, Wall "was fighting to try to get loose." Rasnick said that Defendants Large and Lyall entered the pod. He said that he did not recall anyone using any OC pepper spray on Wall. Rasnick said that he did not push, kick or hit Wall, and he used only that amount of force necessary to

gain control of Wall. Rasnick said that he did not know if Wall ever lost consciousness while on the floor, but he said that Wall was never just passively lying on the floor during the incident.

Rasnick admitted that Plaintiff's Exhibit No. 19, (Docket Item No. 84-17 at 1-2), was a written statement he gave to Investigator Wood regarding the incident. On this Investigative Interview form, Rasnick wrote:

> On 8/14/15 at approximately 4:00 PM I C/O Rasnick and C/O J. Hicks [were] talking with offenders at the phone. The I C/O E. Rasnick heard C/O Holbrook tell offender G. Wall … to go back to his cell[.] The offender Wall stated to C/O Holbrook "fuck you I ain't doing shit." C/O Hicks gave offender G. Wall a direct order to lock down[,] he then stated "fuck you I ain't locking down." Then C/O Hicks and myself C/O Rasnick told the rest of the pod to lock down[;] they complied. C/O Hicks then gave G. Wall an order to go [to] the [vestibule] at which time he went in that direction. When myself C/O Rasnick and offender Wall was near the wall and under the gun we then gave him a direct order to cuff up. Offender Wall then walked to the wall[.] I C/O Rasnick [grabbed] his hand and [Wall] pull[ed] from me and said "Get your fucking hands off me." Then C/O Hicks and myself [grabbed] offender Wall and got him to the ground to get control of his hands[.] Offender Wall struck C/O Hicks in the right eye[,] cutting it. I C/O Rasnick twisted my right knee, then responding staff entered the pod and control of offender was gained. I then went to medical for treatment[.]

(Docket Item No. 84-17 at 1-2.)

Rasnick testified that he did not recall experiencing any problems with Wall before this incident, and he held no negative feelings toward Wall on August 14, 2015. Rasnick specifically denied telling Wall, "Shut the fuck up and get the fuck in your cell." He said that he did not use profanity toward Wall.

Red Onion Intelligence Officer Bentley testified that he assisted the SIU in its investigation of this incident. Bentley testified that one of the tasks he performed was to save the video recording from the A-1 pod from the day of the incident. Bentley testified that, unless the video recording was downloaded and saved as a separate file, the Rapid-Eye surveillance camera system would record over an incident within about 90 days time. Bentley said that, to save a recording, he would go to the specific cameras at issue and download the video recording in a digital format and save it on his desktop computer. He would then copy the recording to DVDs or CDs for counsel. Bentley said that there were three Rapid-Eye surveillance cameras operating in the A-1 pod on August 14, 2015.

Bentley testified that Plaintiff's Exhibit No. 23 was an Informal Complaint that Wall filed on August 20, 2015, asking that the Warden review the surveillance video recordings from the A-1 pod cameras, the A and B recreation yard, the B 1, 2 and 3 vestibule and the cell B-308 camera recordings for August 14, 2015, as well as the recordings made by the handheld video camera that day. (Docket Item No. 85-1.) Bentley said that he responded to this Informal Complaint by informing Wall that the incident was being investigated by the SIU.

Bentley testified that he did not know if any Operating Procedures required video of such an incident be saved. He also said that he did not know how to alter any of the video recordings he downloaded and saved from the Rapid-Eye surveillance cameras. He said that, at the time of this incident, the Rapid-Eye surveillance system was password protected and that a person had to have authority to access the system with a password to retrieve video recordings. Bentley said that he could not specifically recall if he was the officer who actually downloaded and saved the recordings of this incident from the Rapid-Eye surveillance system, but he

knew that he did not alter the recordings because he did not know how to alter the recordings.

Defendant and Counter Claimant Hicks testified that he was working as a correctional officer at Red Onion on August 14, 2015, when he and Rasnick entered the A-1 pod at Red Onion and heard Wall talking with the officers in the control booth. Hicks said that Rasnick told Wall to "lock down." He said that Wall responded, "Fuck you, I'm doing nothing." He said that Wall said for them to get a sergeant. Hicks said that he then told Wall, "This is a direct order. You will lock down." Hicks said that Wall did not obey him and just threw his hand up in the air. Hicks said that he then gave the order for all the inmates in the pod to lock down.

Hicks said that Wall walked over to his cell door, but Hicks told him to go to the vestibule. He said that Wall responded, "Fuck you." He said that he gave Wall a second order to go to the vestibule. Hicks testified that he wanted Wall to go to the vestibule to speak with a sergeant to settle him down. Hicks said that he wanted to restrain Wall before entering the vestibule, so he told him to get on the wall and Rasnick told Wall to "cuff up." Hicks said that Wall walked toward the wall and was standing about two feet from the wall with his hands by his side. Hicks said that as he reached for Wall's left arm and Rasnick reached for Wall's right arm, Wall turned around and swung his arm at him and said, "Don't fucking touch me." Hicks said that he and Rasnick then took Wall to the floor, where Wall "was fighting hard." Hicks said that, while he had Wall lying on his left side with his left arm pinned, he looked down to try to gain control of Wall's right arm, and Wall struck him in the right eye with his right fist. Hicks said that he and Rasnick continued to struggle to control Wall until Lyall and Large responded and helped them gain control. He said that Wall continued to fight the officers even after they got Wall on his stomach.

Hicks said that he never placed handcuffs on Wall and that handcuffs were not placed on Wall until after Lyall and Large responded.

Hicks admitted that he could not identify the precise moment on the video recordings that showed Wall hitting him in his eye. Hicks stated that Plaintiff's Exhibit No. 24, (Docket Item No. 85-2), was an Internal Incident Report he prepared the day after this incident. On this Report, Hicks wrote:

> On the above date and approximate time I C/O J. Hicks along with C/O E. Rasnick were on the top tier of Alpha 1 speaking with the offenders below us on the phone. I C/O Hicks heard C/O Holbrook who was the gunman give offender G. Wall … a direct order to lockdown. At that point offender G. Wall screamed, "Fuck you I ain't gotta do shit. Get the Sgt." At this point I C/O Hicks along with C/O Rasnick both gave offender Wall orders to comply and lockdown to [which] his answer was, "fuck y'all I ain't doin[g] shit." I C/O Hicks gave all offenders the order to lockdown immediately at which point they complied. I then told Offender Wall to proceed to the vestibule at which point he walked up to me in a[n] intimidating manner at which point I gave him another order to proceed to the vestibule. Offender Wall turned and then began to walk towards the vestibule. When we were close to the wall I gave offender Wall the order to be restrained when I tried to place the first cuff on him he spun around and swung at me and yelled, "don't fucking touch me." [A]t this point I grabbed offender Wall to gain control. Myself and offender and C/O Rasnick went to the floor and struggled with offender to gain control. Offender Wall['s] right fist struck [me] in the right eye causing me to bleed. Other C/Os arrived and offender was brought under control.

Hicks testified that, when he and Rasnick took Wall to the ground, Wall fell onto the right side of his body. He said that he was not sure when Wall's face was injured in the incident. Hicks also testified that he never observed Wall lose consciousness and said, "I would have noticed that." Hicks said that, if Wall had ever been unconscious, Wall would have stopped fighting. Wall "never stopped

fighting," he said. Hicks said that, once Wall swung at him, Wall was being aggressive, and this needed to be controlled, so they took him to the floor. Hicks also said that, to the best of his knowledge, he gave accurate information to the hearings officer. He said that he never gave the hearings officer any false information.

Defendant and Red Onion Lieutenant J. Lyall testified that he responded to the incident with Wall on August 14, 2015, along with Large. Lyall said that Large went through the door first. He said that, when he entered the pod, Wall, Hicks and Rasnick were all on the floor. Lyall said that Wall was resisting and being very combative. He said that Wall was not in handcuffs when he arrived. He said that he and Large also got down on the floor to try to regain control of Wall. Lyall said that he thought that he and Large put the handcuffs on Wall. He said that he believed that leg restraints were placed on Wall's ankles before he was moved. Lyall said that he believes he was the officer who stood Wall up against the wall after he was restrained. Lyall said that Wall was still struggling and still combative after being placed in restraints and walked into the vestibule.

Lyall said that he did not see anyone punch, kick or hit Wall. He said that he did not see any officer use any force greater than necessary, and he did not use any force greater than necessary. He also said that he never saw Wall lose consciousness that day. He said that he did not accompany Wall to the B Building. He said that he did not recall if Wall had visible injuries to his face because he did not look at Wall's face that day.

Lyall said that he was the A Building lieutenant on that day. He said that he had not been told that Wall wanted to speak to him, but that it was normal procedure to take offenders to the building vestibule to speak with supervisors.

Lyall said that Plaintiff's Exhibit No. 28 was the Incident Report that he prepared. (Docket Item No. 85-6.) Lyall admitted that he wrote that Wall "sustained only minor injuries" on the second page of the Report. (Docket Item No. 85-6 at 2.) He said he got this information from the nurse's report. Lyall testified, "I wasn't looking for injuries when I arrived. When I arrived I was focusing on restraining [Wall]." Lyall testified that he prepared the Incident Report after reviewing the Internal Incident Reports. Lyall said that the time of the incident listed was the approximate time that the incident was reported.

In this Incident Report, Lyall wrote:

On Friday, August 14, 2015 at approximately 4:05 pm, the offenders housed on the bottom tier of the A-1 Pod were participating in pod recreation. Officer Holbrook, working as the A-1 Control Gun Officer, observed offender Wall cross over the red boundary line and pass something under A-106 Cell Door. Officer Holbrook ordered the offender to return to his cell but the offender refused stating, "Fuck you, I ain't gotta do shit."

Officer Hicks and Officer Rasnick were presnt in the pod observing pod recreation. Officer Hicks gave offender Wall several orders to lock down but he refused, again stating "Fuck you" to the Officer. At this point the staff ordered all other offenders in the pod to return to their cells. Offender Wall initially moved toward his cell, but stopped and again approached the Officers. All other offenders complied and did return to their cells.

Offender Wall stated to Officer Holbrook that he wanted to speak to a Sergeant. Officer Hicks and Officer Rasnick approached the offender to restrain him, so that he could be taken out of the pod. As Officer Hicks was in the process of placing the offender in handcuffs, offender Wall spun around and swung at Officer Hicks yelling, "Don't fucking touch me," striking the Officer above his right eye.

The Officers began to struggle with the offender, falling to the floor while attempting to gain control. Officer Holbrook announced the

situation over the radio and requested immediate assistance. Officer Holbrook did not have a direct line of sight of the altercation and was not able to use the 40 MM to aid the Officers.

Lieutenant Lyall (A Building Supervisor) and Sergeant Large (A Building Sergeant) responded to the pod and observed the Officers in the struggle with the offender. Lieutenant Lyall and Sergeant Large assisted the Officers in gaining control of the offender. Sergeant Large administered a ½ to 1 second burst of OC Spray in an attempt to bring the offender under control. Staff were able to gain control of offender Wall's hands and place him in handcuffs as other responding staff were able to place him in leg irons. While attempting to remove the offender from the pod, he continued to be combative with staff and had to be placed on the floor several times to maintain control. The offender was removed from A-building and escorted to B-building by Officer Dockery and Officer Gwinn and several other staff.

K-9 Officers responded to the pod but did not engage as the offender was being restrained by several staff.

Lieutenant Collins (B Building Supervisor) with Officer Taylor, Officer Akers and Officer Bishop, placed the offender into 5-point restraints, per orders of Warden Barksdale, after he refused decontamination for OC Pepper Spray exposure.

Nurse J. Deel assessed the offender with the following noted, "Placed in five point restraints, able to place 2 fingers under each restraint. Involved in altercation, scattered ecchymosis over body, no active bleeding at this time. Follow up with Medical as needed."…

(Docket Item No. 85-6 at 2-3).

Defendant L. Collins testified that he was a lieutenant at Red Onion on August 14, 2015, when he responded to the officers in need of assistance, or 10-33 call, on the radio. Collins stated that Plaintiff's Exhibit No. 29, (Docket Item No. 85-7), was the Internal Incident Report that he completed. On the Internal Incident Report, Collins wrote:

On Friday, August 14, 2015, at approximately 4:00 pm, I Lieutenant Collins responded to a 10-33 in A-1 pod involving offender G. Wall. Once staff restrained offender G. Wall, he was escorted to B-3 pod. I asked offender Wall if he needed to be placed in the shower for O.C. pepper spray decontamination. Offender Wall refused to answer me. Offender Wall made several statements that he was going to harm more staff members. I contacted Warden Barksdale about offender Wall's statements. Warden Barksdale approved the use of five-point restraints to prevent offender Wall from harming staff. Myself, Officer Taylor, Officer Akers, and Officer Bishop placed offender Wall in five-point restraints in B-308 without incident. Nurse Deel assessed offender Wall. There were no injuries to myself and there were no injuries reported to me [by] staff.

(Docket Item No. 85-7.)

Collins said that he walked with Wall to the B Building, but he did not physically touch Wall. He said that he heard Wall continue to threaten to hurt staff. He said that, while walking to the B Building, Wall made several statements that he was planning to harm more staff members. He said the officers stopped in the B Building vestibule with Wall while he contacted Warden Barksdale to gain permission to place Wall in five-point restraints. He said that Wall made threats to harm staff while standing in the vestibule. Collins said that he placed Wall in cell B-308 in five-point restraints with 15-minute watches. Collins said that Plaintiff's Exhibit No. 31 was the pod Log Book that showed that the 10-33 call went out on the radio at 4:04 p.m. and that restraints and the handheld video camera were handed down from the control booth to use while placing Wall in five-point restraints. (Docket Item No. 85-9 at 2.) Collins said that he authorized placing a spit mask on Wall because Wall had just assaulted officers, and he did not like leaving an offender's mouth uncovered while he was in five-point restraints.

Collins said that he offered to decontaminate Wall by asking if he needed to be placed in the shower. He said that Wall refused to answer. Collins said that he did not remember which officers escorted Wall from the A Building to the B Building that day. He also said that he did not see anyone walk him into any poles, walls or door frames. Collins admitted that he saw Wall's face, but he said he did not remember any injuries. Collins admitted that he asked Wall when he arrived in the B Building, "What's your fucking name?"

Collins testified that Plaintiff's Exhibit No. 32 was an Internal Incident Report prepared by Correctional Officer B. Akers. (Docket Item No. 85-10.) On this Report, Akers wrote:

> [O]n 08-14-15 @ 4:04pm I C/O B. Akers responded to a 10[-]33. [W]hen I arrived inside B 123 side, I relieved C/O Gwinn and helped maintain control of Offender G. Wall …. Also helped escort Offender G. Wall from B-123 vestibule to cell B-308 where Offender Wall made several comments about how he was going to continue harming staff. Once inside Cell B-308 I helped Lt. Collins, C/O Taylor, and C/O Bishop place Offender G. Wall into 5-point [restraints], no injury to myself at this time.

(Docket Item No. 85-10.)

Collins testified that Plaintiff's Exhibit No. 33 was an Internal Incident Report filed by Defendant Correctional Officer S. Taylor. (Docket Item No. 85-11.) On this Report, Taylor wrote:

> On August 14 2015 at approximately 4:05 PM I responded to a 10-33 called in Alpha 1 upon arriving at the building Offender Wall was being brought out the front door. At this time I observed Offender Wall was being very disruptive and combative toward staff stating "You haven't seen the last of me I am going to continue to hurt

everyone of you motherfuckers". At this time I helped escort Offender Wall to Bravo 308 where I assisted Lt. Collins in placing Offender Wall in 5-Point Restraints.

(Docket Item No. 85-11.)

Collins said he knew that he asked Wall if he wanted to be placed in the shower to decontaminate because he noted so on his Internal Incident Report. Collins said that he would not have noted that he asked Wall if he wanted to decontaminate if he had not done so.

Collins said that Wall walked erect from Building A to Building B that day. He said that Wall did not make any complaints about injury to his wrists or his wrists hurting while walking to B Building or after being placed in restraints. Collins said that, if Wall had voiced any complaints, he would have documented those complaints.

Collins specifically said that he did not see Defendant Akers slam Wall's face into the wall. He said that he did not see anyone punch or hit Wall that day. Collins said that he did not see anyone use any greater force than necessary to gain control of Wall that day. Collins said that he helped placed Wall in five-point restraints. He said that he did not see any injuries to the portion of Wall's face that he could see. Collins said that he did not recall if Wall had the spit mask on his face when the nurse assessed him. Collins said that, if Wall had reported that he was injured, he would have allowed the nurse to examine Wall. Collins also testified that, to his knowledge, Wall never lost consciousness that day.

Collins admitted that the handheld video recording showed that Wall and the escorting officers stopped in the middle of the B pod for a moment. He said that he

did not recall why they stopped, but it was possible that this could have been one of the times that Wall said something threatening.

Defendant T. Large testified that he worked as a Correctional Sergeant at Red Onion for the A-1 Building on August 14, 2015. Large said that he was not notified that Wall had wanted to talk to him on August 14, 2015. Large said that he was in the office in the building vestibule when he heard the 10-33 call on the radio. Large said that he entered the pod and used OC pepper spray on Wall. Large said that, when he entered the pod, Wall was on the floor "squirming from side to side" and "twisting" his arms and elbows. Large said that Wall's arms were not completely free, but he was slinging his elbows and resisting. Large said that he came around the side of Wall and administered OC spray to Wall's head area. Large said that he then helped restrain Wall. Large said that, after Wall was restrained, he asked Wall if he needed decontamination from the OC spray. He said that Wall did not respond.

Large testified that Plaintiff's Exhibit No. 34, (Docket Item No. 85-12), was a copy of the Internal Incident Report he prepared on the August 14, 2015, incident with Wall. On this Report, Large wrote:

> On 8-14-15 at approximately 405p I Sergeant Large responded to a 10-33 in the A-1 pod. As I entered the vestibule Officers E Rasnick and J Hicks were in the floor in a scuffle, [b]eing assaulted by Offender G Wall. At that time I utilized a one half to one second burst of OC pepper spray from the MK9 to the facial area of Offender Wall in an attempt to Stop the assault. Myself and Lieutenant Lyall then attempted to pull the offender off of the officers, he was still resisting and striking staff with his fists. We managed to apply the handcuffs, assisting staff arrived and placed leg irons on the offender. As offender Wall was being escorted out of the pod he continued to be combative and had to be placed on the floor several times by assisting staff, to maintain control. Sgt L Collins, Officer Dockery, Officer Gwinn and several other assisting staff escorted the offender to B building to be placed in

5 point restraints by orders of Warden Barksdale. Video camera was
started by Officer Bryant as soon as possible and remained on until
offender was placed in 5 point restraints. OC decontamination started
as soon a[s] the offender exited the building into fresh air he refused to
respond when asked if he needed water to decontaminate. Offender was
assessed by Nurse Deel.

(Docket Item No. 85-12.)

Large testified that, once Wall was in the building vestibule, he looked directly
at Wall and asked Wall if he wanted to decontaminate. He said that Wall did not
respond. In fact, he said that Wall did not respond to "anything" after he was
restrained. Large said that he used OC spray on Wall because he was continuing to
assault the officers trying to restrain him. Large said that OC spray did not do any
damage to an offender, but it caused temporary burning and disorientation. He said
that Wall was resisting, combative and still struggling when he used OC spray on
him. Large said that he told Wall to "Stop!" before he sprayed him with OC spray.
He said that he used the OC spray on Wall to try to gain control of Wall to get him
in restraints. Large said that Wall's actions made it clear to him that Wall was not
going to comply. After using the OC spray, Large said, Wall calmed down enough
to allow Lyall to grab his arm, and he and Lyall placed handcuffs on Wall.

Large said that he never saw any correctional officer punch or kick Wall. He
said that it was Wall who was thrashing from side to side and hitting officers when
he entered the pod. In describing what occurred, Large said, "I am responding to an
assault." He said, "We are fighting for our lives, you are in fight or flight mode just
trying to defend ourselves." He said that Wall continued being combative after being
placed in restraints, and he had to be taken to the floor a couple of times as they
attempted to take him out to the A-1 vestibule. Large said that he did not see anyone
slam Wall against any door frame. Large said that, after Wall was standing up in

restraints, Wall would bend over and lunge forward, as if he was trying to throw himself on the ground.

Defendant J. Deel, a licensed practical nurse who works at Red Onion, testified that she assessed Wall's injuries and the restraints placed on him on August 14, 2015. As a result of her assessment, she said, she noted that Wall had scattered bruises and bleeding. Deel said that Plaintiff's Exhibit No. 2, (Docket Item No. 84-2 at 1), contained an Inmate Accident/Injury Report Form that she completed on Wall on August 14, 2015. On this Report, Deel wrote:

> Placed in 5 point restraints able to place 2 fingers under each restraint[.] Involved in altercation … [ecchymosis] scattered over body[.] No active bleeding at this time. … No bleeding when nurse arrived.

(Docket Item No. 84-2 at 1.) Deel said that she recalled seeing Wall's entire face, but did not recall if he had a spit mask on or not when she saw him. Deel said that she "charted" that Wall had suffered from a nose bleed, but there was no active bleeding when she arrived. (Docket Item No. 84-2 at 3.) Deel said that, if at any time she had thought Wall was unconscious, she would have summoned medical assistance. Deel stated that Wall did not speak to her, did not complain about any injury and did not request decontamination. She said that, if she had thought that Wall needed decontamination, she would have asked the officers to do it.

Deel said that Wall had bruising above his right eye and on the bridge of his nose. She said that she had no indication of and did not note any injury to Wall's wrist, knuckles or right hand. Deel said that the injuries she observed on Wall that day were consistent with an offender struggling with officers on the floor. She also admitted that these injuries were consistent with being struck in the face.

Deel testified that it was possible for a person to break bones in his hands by striking someone or something with his hand. Deel also said that restraints used on Wall's wrist were made of leather and that she has seen these restraints chafe offenders' wrists in the past. Deel said that she did not see any officer do anything inappropriate toward Wall that day. She said that, if she had seen an officer mistreat Wall, she would have asked the officer to stop and reported the officer.

Defendant Correctional Officer E. Gwinn testified that he was working in the A 4, 5 and 6 pod at Red Onion on August 14 when he heard the 10-33 call over the prison radio. Gwinn said that when he arrived at the scene, Wall was being escorted through the inner vestibule and into the outer vestibule of the building. Gwinn said that he was one of the officers who was responsible for controlling Wall inside the B Building vestibule. Gwinn testified that Plaintiff's Exhibit No. 35, (Docket Item No. 85-13), was the Internal Incident Report he prepared. He agreed that this Report stated that Gwinn escorted Wall from the A Building to the B Building. Gwinn said that he could not recall whether he actually had his hands on Wall while escorting him or whether he simply assisted and accompanied other officers.

Gwinn said that he did recall that, while being escorted, Wall would bend forward and move from side to side. Gwinn said that, if he had seen any officers ram Wall into fence poles or into walls, he would have documented it and reported it. In addition to recognizing himself in the handheld video footage taken in the B Building vestibule, Gwinn said that he recognized Officers Akers, Stevens and Duncan as assisting in the video recording.

Gwinn said that, when he had control of Wall that day, Wall did not try to pull away from him. Gwinn stated that, most of the time that Wall was in the B Building

vestibule, he simply stood there with the officers. Gwinn specifically denied seeing any officer push Wall's head toward the wall that day.

Defendant and VDOC Hearings Officer C. Franks testified that he heard three of the disciplinary charges placed against Wall on August 14, 2015. Franks said that these hearings occurred at Wallens Ridge. Franks admitted that, on the Disciplinary Offense Report for the Offense Code 201 charge for disobeying an order, Wall had requested documentary evidence. (Docket Item No. 84-9 at 1.) He admitted that Wall filed a Request for Documentary Evidence form, (Docket Item No. 84-9 at 5), asking that the hearings officer review the video recordings from the A-1 pod Rapid-Eye surveillance cameras for the date and time of this incident. This form states on it: "This form shall not be used to obtain information … restricted for security reasons such as video … recordings…." (Docket Item No. 84-9 at 5.) A box on this form is checked stating that the requested information would not be obtained "due to being from an outside source, restricted for security reasons such as video and audio recordings, information is not written documentation, or is otherwise restricted to the offender." (Docket Item No. 84-9 at 5.) Franks said that he explained to Wall the proper way to request that surveillance camera video recordings be considered, which was to request the hearings officer to review the video recordings at the disciplinary hearing.

Franks said that he had authority to obtain and view surveillance video recordings, but he did not review the video evidence on this charge. He said he did not review the video because he determined it was not necessary because the order Wall disobeyed was verbal, and the surveillance cameras did not record sound.

Franks further admitted that, on the Disciplinary Offense Report for the offense code 105A charge for aggravated assault upon a non-offender, Wall also had

requested documentary evidence. (Docket Item No. 84-7 at 1.) He admitted that Wall filed a Request for Documentary Evidence form, (Docket Item No. 84-7 at 5), asking that the hearings officer review the video recordings from the A-1 pod Rapid-Eye surveillance cameras for the date and time of this incident. Again, a box was checked indicating that the requested information would not be obtained. Franks testified that he did not view the surveillance video in this case because Captain Still had reviewed it and testified to what the video recordings showed. Franks said that he did not review video footage if a witness viewed the video and testified to what it showed.

Franks agreed that, according to Still's statement on the Disciplinary Offense Report, the video footage showed Wall punched Rasnick repeatedly. (Docket Item No. 84-7 at 1.) He further conceded that, from viewing the Rapid-Eye video footage of the incident in court, it was hard to tell if Wall punched anyone.

Defendant and VDOC Hearings Officer R. Hensley testified that he heard the two remaining disciplinary offense charges against Wall for offense code 105A for aggravated assault on Officer Hicks and offense code 129 for failing to obey Hicks's order. Hensley said that hearings on these charges were conducted on September 8, 2014. Hensley said that Wall requested that he view the video evidence and the pod Log Book on the 105A offense code charge. He said that he rejected both requests. Hensley said that Wall used the wrong form to request that he obtain the video recordings of the incident, and he said that he could not recall if Wall verbally requested that he review the video at the hearing. Hensley said that he did not review the video because "I saw no reason to review the video."

Defendant Captain D. Still testified that he investigated the 105A offense code charges placed against Wall. Still said that he took statements from Hicks and Rasnick while they were at the hospital emergency departments being treated for

their injuries on the date of the incident. Still said that these statements were the basis of the 105A charge he wrote against Wall and contained in Plaintiff's Exhibit No. 7, (Docket Item No. 84-7 at 1.) Still said that Rasnick told him that Wall swung his arm and started throwing punches, and he, Rasnick, took Wall to the floor. Still said that he was not at Red Onion when this incident occurred, but was at home. He said that he was called and told to go to the hospital emergency department and interview Hicks and Rasnick. Still testified that he turned his notes from these interviews over to Investigator Wood with SIU.

Wall also submitted into evidence, as Plaintiff's Exhibit No. 38, a number of Internal Incident Reports concerning the August 14, 2015, incident. These Reports included an Internal Incident Report from Defendant L. Bryant stating that he relieved Officer Taylor of running the video camera in the B 1, 2 and 3 vestibule. (Docket Item No. 85-15 at 1.) Bryant stated that he operated the video camera while Wall was placed in five-point restraints without incident. Also included is the Internal Incident Report completed by Defendant C. Dockery, which stated that he responded to the 10-33 call in A-1 and found Wall already restrained. (Docket Item No. 85-15 at 2.) Dockery said that he assisted in escorting Wall from the A Building to the B Building. Also included is the Internal Incident Report completed by Defendant C. Bishop, which stated that he assisted Collins, Taylor and Akers place Wall in five-point restraints. (Docket Item No. 85-15 at 3.) Also included is the Internal Incident Report completed by Defendant A. Mullins, which stated that he relieved the officers who had restrained Wall and escorted Wall to the B Building. (Docket Item No. 85-15 at 4.) Also included is the Internal Incident Report completed by Defendant J. Testerman, which stated that he had secured Wall's legs that day and placed him in leg irons. (Docket Item No. 85-15 at 5.) Also included is the Internal Incident Report completed by J. Williams, a canine officer, who responded to the A-1 pod upon hearing the 10-33 call. (Docket Item No. 85-15 at 6.)

Williams said that he and his canine, Bruno, escorted Wall to the B Building. Williams wrote, "No force was used." Also included is the Internal Incident Report completed by Sergeant T. Hall, who wrote that he removed Wall from five-point restraints in cell B-308, restrained him and escorted him to the intake area for transport to Wallens Ridge. (Docket Item No. 85-15 at 7.)

Upon remand, an additional evidentiary hearing was held in this matter on May 4-5, 2023. Wall testified that in August 2015 he was in VDOC custody, housed at Red Onion. Wall testified that on August 14, 2015, two officers attacked him in the A-600 pod vestibule. Wall said that, as he was escorted from the A Building to the B Building, he was "continuously abused en route to the B building until I was strapped down." (Transcript at 25.) Wall said that a booth officer, Officer Holbrook, called him to the booth to speak to him because Holbrook alleged that he saw Wall slide something under a cell door. Wall testified that his conversation with Holbrook was interrupted by Officer Rasnick shouting, "Shut the fuck up and lock down." (Transcript at 26.) Wall stated that he turned around and replied, "Fuck you" to Rasnick. (Transcript at 26.) Wall said the "other officer" told everyone to lock down, so he went to his cell to lock down, but his cell door did not open. He said that he walked back toward the control booth, and both officers met him in the middle of the pod. Wall said that he was given "another directive" to go to the vestibule area. (Transcript at 26.)

Wall said he then asked, "Why am I going to the vestibule? You told me to lock down." (Transcript at 26.) To which, he said, Rasnick made a comment that he needed to do something about Wall's mouth.  Wall said that he then walked about seven paces ahead of the officers to the pod door. He said that, when he got to the door, he turned around, and Officer Rasnick grabbed his left arm, punched him in the head and told him to shut up. Wall said that he put his hands up and stepped

back. He said that while he was "on the floor tussling with Officer Rasnick, or where he's tussling with me, I'm just trying to avoid his attack, Officer Hicks entered the fray." (Transcript at 30.) Wall said that Hicks took all three of them to the floor, and he "immediately" rolled onto his stomach and put his hands out to show he was not resisting. Wall said that he was never given any orders or directives from the officers. In particular, he said that he was never ordered to put his hands out to be restrained and not ordered to stop resisting.

Wall stated that he had "words before, run-ins before" with Rasnick. He said that was why Rasnick made the statement about doing something about Wall's mouth. Wall said about a week earlier he was downloading music at the pod kiosk when the pod was ordered to lock down. Wall said, because he took so long at the kiosk, Rasnick told him he would not be allowed to come out of his cell for the next recreation period. Wall said that he later was called into the office by Lieutenant Lyall and Sergeant Large and told to apologize to Rasnick. Wall said he refused to apologize.

Wall stated that he did not hit his head or face on the floor at any time. He specifically denied swinging either of his arms and hitting Officer Hicks. Wall stated, "During this whole altercation, I never threw a punch. My hands [were] up the whole time … retreating." (Transcript at 33.) Wall said that when he went to the floor, he attempted to roll to the left to get on his stomach, but he could not because Hicks was in the way. He said that he immediately then rolled right onto his stomach, put his hands behind his back, and his hands were restrained. He said the pod door then opened, and the responding officers, Lieutenant Lyall and Sergeant Large came in. He said that he was immediately "gassed and kicked in the face." (Transcript at 34.)

A portion of the Rapid-Eye video, entered into evidence at the earlier trial as Plaintiff's Exhibit No. 13, was played for Wall's review. Wall testified that at 4:00:59, this video showed Hicks's arm pulling back to strike him.  Wall testified that when Sergeant Large entered the pod, he was on his stomach on the bottom of the pile. Wall said that when Lieutenant Lyall entered the pod, he had already been gassed. Wall testified that he did not recall exiting the A Building because he was going in and out of consciousness. When asked why he was going in and out of consciousness, Wall stated that "when they came in, somebody hit me in the back of my head behind my ear, and I lost consciousness." Wall then stated that he went in and out of consciousness during the entire incident that day. Wall further testified that he was unconscious when the guards carried him out of the A Building, and he did not regain consciousness until he was in the recreation yard area right outside of the A Building door.

Wall said that "[t]o the best of [his] belief" he was being escorted by Officers Dockery and Gwinn, but he was accompanied by multiple officers. Wall denied making any threats toward the officers while being escorted from the A Building to the B Building. In fact, he stated that he did not make any comments to the officers, and he did not threaten any officer at any point during the events of August 14. Wall claimed that, if he had made threats that day to the officers, he would have been charged with a disciplinary code 212 violation, and he received no such charge.

Wall stated that, when he regained consciousness, someone was bending his hand and fingers, causing pain. He said that he was walking hunched over, and he said that he was "drove into a pole."  Wall said that he tried to follow the officers' directives to walk. He said that he was guided by the two officers escorting him, and one of the officers was pushing his head down. He said that, instead of moving

forward, the officers were moving him to the right or to the left, and he was run into several objects on his way to the B Building.

Wall testified that, to his knowledge, there was a surveillance camera on the outside corner of the A Building focused directly on the exit to the A Building. Wall stated that he was escorted through the A Building recreation yards, where there were additional surveillance cameras. Wall stated that the B Building was a mirror image of the A Building, with surveillance cameras similarly situated.

Wall stated that, as soon as he entered the B Building, he was placed against a wall in the B Building entryway. Wall said that someone from behind hit him in his side, and the escorting officers increased the pressure on the handcuffs, putting the handcuffs on as tight as they would go. He said that, while he stood against the wall, he was hit several times in his back and the side of his face. He said someone from behind rammed his face directly into the wall and started his nose bleeding. Wall said that he later learned that it was Officer Akers who pushed his face into the wall. He said that Akers pushed with all his force on the back of Wall's head and kept Wall's face pressed to the wall.  Wall said that he tried to turn his face to the left to keep some of the pressure off his nose, but he was told not to move. Wall testified that all this occurred after Unit Manager Collins asked his name.

Wall said that the officers kept him in the B Building entryway from 10 to 15 minutes before they walked him through the B-3 pod to a cell to be strapped down. Wall said he was escorted to cell B-308, a cell equipped with a camera, to be strapped down. Wall said that the B-3 pod also had three surveillance cameras inside the pod. Wall said, when he got to the cell, someone put a spit mask over his face, and he could not breathe so he lost consciousness again as he was being strapped down. He said that no one ever asked him if he needed or wanted to be decontaminated. Wall

said the next thing he remembered was he woke up strapped down when another inmate hollered in his vent asking him if he was alright. When questioned further, Wall admitted that while the officers were removing his clothing, he was "going in and out of consciousness from the head wound" before he "lost total consciousness."

Wall testified that, when he regained consciousness, he was experiencing pain in his head, face and wrist. He said that he thought his left wrist was broken. He testified that, at this point, he had not seen a nurse for his injuries. Wall said that he did not recall a nurse speaking to him and asking him if he had any complaints when he was strapped down. Wall testified that he requested medical treatment on several occasions, including asking Officer Addington, who was doing rounds while he was strapped down, to speak to medical. He said that he also asked to see medical when they took him out of four-point restraints. Wall said that Addington told him he was not going to call medical because he had assaulted officers.

Wall admitted that he did see Nurse Woods after he was removed from restraints.  He said that he asked her to examine his wrist because he thought it was broken. Wall said that Nurse Woods did not provide him with any treatment or medical care. Wall said, when he was removed from restraints, he was taken to a sally port transport area to be transported to Wallens Ridge. Wall said that he requested to be decontaminated when the officer came to tell him he was being transported to Wallens Ridge. He said the officer responded, "That's not what I'm here for. I'm here to transport you to Wallens Ridge." Wall said that he decontaminated himself by washing his face with water when he was placed in a holding cell before his transport to Wallens Ridge. He said that was when he first viewed the injuries to his face in the mirror.

A handheld video camera recording of Wall being removed from restraints was admitted into evidence as Plaintiff's Exhibit No. 42. Wall testified that, at the 2 minute and 57 second mark in the video he can hear himself ask to see medical. Wall said that he asked to see medical again at the 3 minute and 29 second mark on the video. At the 3 minute and 35 second mark on the video, Wall said, he told the officers he had not been decontaminated. At the 4 minute and 20 second mark, Wall said, he asked the officers if something was in his eye, and he told them he could not feel his hands at the 4 minute and 29 second mark. Between the 5 minute and 58 second mark and the 6 minute and 10 second mark, Wall testified, he asked a Red Onion officer if he could be decontaminated before he was transferred. He said that he told the officer he had been strapped down for four hours without being decontaminated. Wall said that he did not pay attention to the officer's response, but he said the officer denied his request and he was not decontaminated.

Wall testified that, at the 7 minute and 7 second mark on the video, he could see disfigurement to his eye, the back of his head, his lip and nose areas. At the 7 minute and 31 second mark, Wall said, the video shows a noticeable knot on the back of the right side of his head. Wall testified that the video showed that Nurse Woods came by at the 7 minute and 52 second mark. Wall said that he tried to get Nurse Woods to assess his wrist, and she told him that he had refused medical assessment earlier, which he said he did not recall. He said that Nurse Woods told him that she was there to assess him for transport.

Wall stated that the video showed him walking through the B Building vestibule and exiting the B Building. Wall said that, after he exited the building, the video showed him walking down a portion of the same route he was escorted down when he was taken earlier from the A Building to the B Building. He said that the video showed the metal poles that he was run into by the escorting officers. Wall

-44-

testified that the video showed a chain link fence attached to these poles outside the B Building, but he claimed the poles outside the A Building did not have chain link fence attached to them yet because it was still being installed.  Wall said the video, at the 13 minute and 45 second mark, showed him walking over to the sink in the holding cell and using the water to try to get the "gas out of [his] face and off [his] body."

Wall testified that, at the 9 minute and 28 second mark on the video, the A Building was shown to the right side of the video. Wall testified that, when he was escorted from the A Building to the B Building, he was walked up the sidewalk from the A Building and turned down the sidewalk to the B Building.

Wall testified that he arrived at Wallens Ridge at approximately 8:30 p.m. on the same day as the incident. Wall said that, before arriving at Wallens Ridge, he received no medical examination or evaluation of his injuries. When he arrived at Wallens Ridge, Wall said, Nurse Stanford observed his injuries, gave him some Tylenol and requested that he receive an x-ray of his head and wrist.

Wall said that, while housed in the medical unit at Wallens Ridge, he started the grievance process and requested the video recordings from the A and B Building recreation yards, the B Building entryway and the B-308 cell wall camera. Wall said that he requested this video evidence to show the excessive force that was used on him enroute to the B Building and that he was not decontaminated. Upon questioning, Wall admitted that neither his Informal Complaint nor his Grievance alleged that he was injured any further as he was walked from the A Building to the B Building, except for alleging the officer twisted his wrist or hand.

Wall read the following portion of the Informal Complaint he filed on or about
August 19, 2015, which was admitted at his bench trial as Plaintiff's Exhibit No. 23:

> This unnecessary use of force while I was restrained continued
> until I reached Bravo 300 pod. I was placed in five-point restraints for
> several hours without being decontaminated. Please review rapid eye
> video footage of Alpha 100 pod's three pod cameras at approximately
> 4 to 5, Alpha and Bravo recreation cameras at approximately 4:05,
> Bravo 1, 2 and 3 vestibule cameras at approximately 4:05 and Bravo
> cell cameras at approximately 4 to 5, and also any handheld camera for
> 5-point placement and removal of them…. This unnecessary use of
> force while I was restrained continued until I reached the Bravo 300
> pod.

(Transcript at 87.) Wall agreed that the only uses of force mentioned on this Informal
Complaint were being gassed, punched and kicked and having his fingers bent back.
Wall testified that he wrote out the Informal Complaint and the Regular Grievance
he filed with relation to the August 14, 2015, incident. On cross-examination Wall
agreed that neither the Informal Complaint nor the Regular Grievance contained any
reference to him being run into poles on the recreation yard or his head being
smashed into the wall of the B Building vestibule. He also agreed that these forms
contained no reference to any loss of consciousness or denial of medical treatment
after being placed in the B Building.

Wall said that he told Nurse Stanford that he had been assaulted, dragged and
"everything" when he arrived at Wallens Ridge. Wall said that he did not list that he
was rammed into metal poles while being escorted from the A Building to the B
Building because of the limited space provided on the form. Wall admitted that he
was well-versed in the VDOC's grievance procedures, and he knew that he could
not file a claim over an alleged assault that he did not grieve.

Wall testified that he met with Agent Wood from the SIU several times, beginning with a first meeting on August 25, 2015. Wall said that he told Agent Wood that he was assaulted in the A Building and while being escorted from the A Building to the B Building. Wall said that Wood told him to write down his statement, but his injury to his dominant left hand prevented him from doing so at his first meeting with Wood. Wall said that he did write out a five-page statement for Wood. This statement previously was admitted into evidence at Plaintiff's Exhibit No. 12.  After Wall was transferred back to Red Onion, Wall said, Wood met with him again and asked Wall to write out his statement again on a form that Wood provided. Wall said that Wood asked him to write out his statement because he did not receive the original statement Wall wrote. Wall said that he refused to write out his statement again, in part, because Wood claimed that Wall had said something that he did not say during their previous meeting.

Wall testified that he was charged with several disciplinary offenses as a result of the events of August 14, 2015. He said that he repeatedly requested video evidence in connection with those charges. These requests were admitted as Plaintiff's Exhibit Nos. 6, 7, 8 and 9. Wall said that he was never allowed to review any of the video evidence during the disciplinary proceedings, but he eventually reviewed the video evidence during his criminal prosecution related to the events of August 14, 2015. He said he reviewed the video evidence with his criminal attorney at the Wise County Courthouse on July 1, 2016, the day of his trial. Wall said that he recalled viewing the video recordings of the B Building vestibule surveillance cameras when he was up against the wall before being escorted to cell B-308 to be strapped down.  Wall said that he requested his attorney provide him with this video evidence, but his criminal attorney is deceased.

Wall's counsel represented to the court that counsel had contacted the office of Wall's criminal attorney to obtain the video evidence and was told that Wall's file was destroyed after the criminal charges against him were dropped. Counsel admitted that they did not contact the Wise County Commonwealth's Attorney's Office or the court in an effort to obtain the video evidence.

On cross-examination, Wall admitted that neither Hicks nor Rasnick accompanied him to the B Building. Wall also admitted that he knew the names of the officers who escorted him to the B Building from reviewing the Incident Reports provided in discovery.

Wall testified that Plaintiff's Exhibit No. 50 was the Level I Response to the Regular Grievance admitted as part of Plaintiff's Exhibit No. 23. Wall stated that he received this Level I Response on December 17, 2015, after he had been returned to Red Onion. He said that he filed his Level II appeal on the same day, December 17, 2015. Wall said he never received any response to his Level II appeal.

Wall again testified that, once he was taken to the ground, he did not resist, fight or throw any punches. Instead, he simply lay on the ground with his hands behind his back. He said that Large then came in and, without any warning, sprayed him with OC spray, and he was kicked and punched multiple times from multiple directions. He said he did not know how many blows hit him, but it was more than 10. He said one of the blows struck him in the back of his head, and he lost consciousness.

Wall also admitted that he had been involved in previous incidents with VDOC staff members.

Bentley also testified at the May 2023 evidentiary hearing. Bentley stated that he currently held the position of Intelligence Sergeant at Red Onion, but in August 2015 he worked as an intelligence officer at Red Onion. Bentley testified that Plaintiff's Exhibit No. 23 was the Informal Complaint filed by Wall initiating the grievance process regarding the incident at issue in this case. Bentley stated that he was the intelligence officer who responded to this Informal Complaint, but he could not remember who assigned him to respond to it. Bentley testified that, in August 2015, an investigator would usually handle this type of paperwork. He stated that it "somehow got forwarded to me to answer." Bentley said he would have gone to a supervisor to discuss how to answer this Informal Complaint.

As the intelligence officer assigned to respond to this Informal Complaint, Bentley said, he was responsible to provide the inmate with an answer. Since the matter had been referred to the SIU, Bentley said, he probably spoke with either the captain or the assistant warden about the Complaint before he answered it. He said that they probably provided him with some input on how to answer it, but he was not sure if that occurred. He said that Captain Still was over the Intelligence Department at Red Onion at that time because the Department did not have an investigator, and Hamilton was the assistant warden. Bentley said that it was his practice to speak to the supervisors over the Intelligence Department before responding to inmate complaints. He said that informal complaints alleging the use of force against an inmate would be assigned to the Intelligence Department or the assistant warden to respond by the grievance coordinator. Bentley testified that he would not have discussed this Informal Complaint with any of the individual defendants in this case before responding to the Complaint. On further questioning, Bentley admitted that, if Warden Barksdale had asked about this Informal Complaint, he probably would have discussed it with Barksdale, but he did not recall

if Barksdale ever asked him about it. Bentley said he did not know who referred this incident involving Wall to SIU, but he was aware that it had been referred.

Bentley testified that he would not have assisted the SIU in its investigation unless the SIU contacted him for assistance, and he did not recall if anyone from SIU contacted him for any assistance with this investigation. He did admit that his responsibilities as an intelligence officer included saving video footage for SIU investigations. Bentley said that he was trained by the previous investigator on how to save video recordings.  Bentley said he did not remember who downloaded and saved the video recordings of the A-1 pod surveillance cameras of this incident.

Bentley admitted that, in his Informal Complaint, Wall requested that the video recordings of the Rapid-Eye cameras from the A-100 pod, the A and B recreation yard cameras, the B-1, -2, -3 vestibule cameras, the cell B-308 cell camera and the handheld camcorder for his placement and removal from five-point restraints be viewed. Bentley said that he does not recall ever viewing or downloading the video recordings from the A or B recreation yards, the B vestibule, the B Building, the B-308 cell camera or the handheld video camera recordings regarding this case. Bentley said that downloaded video evidence is held on a stand-alone computer hard drive in the Intelligence Department that is available only to intelligence officers.

Bentley testified that VDOC OP 866.1, previously admitted as Plaintiff's Exhibit No. 48, applied to him and all Red Onion employees. Bentley testified that, as of September 25, 2014, OP 866.1 required: "If a grievance is received that references a specific audio or video recording, a copy of the recording shall be made and maintained at the facility." Bentley also testified that OP 866.1 required that "[e]mployees who are the subject of the issue being grieved would not be a respondent to a grievance but may offer information during the investigation of the

complaint," but allowed "[e]mployees who are the subject of the issue may respond to an informal complaint." Bentley testified that, because there was an open SIU investigation of Wall's allegations against the defendants in this case, he did not discuss Wall's Informal Complaint with the employees who were involved in the incident. Bentley said that OP 866.1 also required that "[c]opies of grievances, both regular and emergency, and audio/video recordings, if applicable, will be maintained at the unit for a minimum of three years following the final disposition of the grievance. Grievances concerning matters known to be under investigation or litigation will be maintained until completion of the investigation or litigation if that event exceeds the three-year timeframe." As the intelligence officer responsible for responding to Wall's Informal Complaint, Bentley admitted that he was responsible for ensuring that these operating procedures were followed, including saving and retaining the requested video evidence. Bentley said that he did not recall retaining any of the requested video evidence in this case. He also said that he could not recall that he had any further involvement in the investigation of this incident after responding to Wall's Informal Complaint.

On cross-examination, Bentley stated that OP 866.1 only required that video evidence referenced in a "grievance" be copied and maintained. Bentley said that a grievance was not the same as an Informal Complaint. Bentley also testified that the section of OP 866.1 that required video recordings to be maintained for three years only applied to video recordings referenced in grievances. Based on this reading, Bentley testified, he would not be responsible for saving and retaining the video evidence referenced by Wall in his Informal Complaint. Bentley further testified that no one ever instructed him not to download any of the video evidence relative to this incident. Upon further questioning, Bentley admitted that OP 866.1 defined a "grievance" as "[a]n unresolved issue filed and signed by an individual offender on

his or her own behalf concerning an issue which has affected him or her personally and meets intake criteria."

Bentley also testified that, if an inmate wanted to have video evidence preserved for purposes of litigation, the inmate could write a request for the video to be saved. Bentley said that, as an intelligence officer and sergeant, he receives written request forms from inmates asking for video recordings to be saved. He said that, unless a large amount of video evidence is requested, the video evidence is saved. Bentley said that he did not recall Wall ever filing a request form requesting that the video evidence related to this August 2015 incident be saved. Bentley stated that, once an investigation was turned over to SIU, the prison's Intelligence Department was "out of it except to assist them with whatever they need."

Bentley said that Wall's Informal Complaint, admitted as Plaintiff's Exhibit No. 23, asked only that the video evidence be reviewed.  Based on his reading of Wall's Informal Complaint, Bentley testified, he had no knowledge that Wall was claiming that officers had run him into poles while he was being escorted from the A to the B Building.  He also said that, based on Wall's Informal Complaint, he had no knowledge that Wall was claiming that an officer had smashed his head into the wall of the B Building vestibule. Bentley said he had no knowledge that Wall was claiming he had experienced any periods of unconsciousness. Bentley said if Wall had included these claims on his Informal Complaint, it probably would have affected what video evidence was retained. Bentley said that he did not recall whether cell B-308 actually had a camera in the cell. Bentley also testified that OP 866.1 stated that the institutional ombudsman or grievance coordinator was responsible for retaining records pertaining to grievance administration. Bentley said that he had never held either of these positions.

Joe Alan Fannin, who was employed as a correctional officer at Red Onion from 1998 to 2019, also testified at the May 2023 evidentiary hearing. While at Red Onion, Fannin testified that he held the positions of watch commander and building lieutenant, and he became the institutional investigator at Red Onion in October 2015.  During August 2015, Fannin said he held the position of watch commander on the night shift. As institutional investigator, Fannin said, he worked directly for the warden, investigating incidents that occurred at Red Onion. While Fannin stated that he received training before assuming the role of institutional investigator, he did not recall receiving any training with respect to responding to inmate grievances. He said he did receive training in retaining evidence in connection with his investigations.

Fannin testified that he had no responsibilities investigating the incident involving Wall that is the basis of this case because that investigation was turned over to SIU.

Fannin stated that, in August 2015, there were a number of surveillance cameras located around Red Onion, including cameras in the A and B Buildings and their vestibules and cameras located near the gun post outside of the A and B Buildings. He said that he did not recall whether cell B-308 had a camera in it. Fannin testified that VDOC OP 030.1, Evidence Collection and Preservation, previously admitted at Plaintiff's Exhibit No. 46, (Docket Item No. 152-6), governed the VDOC's evidence collections and preservation procedures as of June 1, 2015. Fannin stated that OP 030.1 included a section that reads:

> Each facility is provided digital storage folder on the DOC network for secure storage of digital documents and audio/video recordings that may be needed as evidence. This folder is suitable for storage of camera recordings and rapid eye clips related to incidents,

recordings of offender telephone calls, digital photographs of evidence, incoming and outgoing offender secure messages, any other evidence suitable for storage in a digital format.

It also includes a section that reads: "Files should be uploaded onto the facility's designated digital storage folder immediately after the incident is concluded. The successful upload must be confirmed before the recording is erased from the camera or other data storage device." Another section reads: "If a grievance is received that references a specific audio or video recording, a copy of the recording shall be saved in the digital storage folder." Fannin testified that, prior to September 1, 2016, another section of OP 030.1 required that digital evidence be retained for at least three years. Another section reads, "If a lawsuit is filed or an investigation is in progress, the digital evidence shall be retained until the investigation or lawsuit is completed."

Fannin testified that, under these Operating Procedures, correctional officers were never permitted to view or download video recordings. Fannin stated that anyone who worked in the Intelligence Department had the ability to review, download and save video recordings. He further testified that, under these Operating Procedures, "only CTSU staff with approval of the … regional operations chief can delete recordings." According to this, Fannin testified, if a video was destroyed without authorization from the regional operations chief, it violated these policies.

Fannin also testified that, in August 2015, the Rapid-Eye surveillance cameras stored approximately 90 days of recordings before they were recorded over, and this occurred routinely. Fannin stated that he has seen grievances requesting video evidence be preserved forwarded to intelligence staff. He also stated that, if a grievance was unclear about exactly what video evidence it was referencing, the intelligence staff could speak to an offender to clarify the request. Fannin said that

it was routine to review and retain video evidence as part of the investigations he conducted as institutional investigator.

Fannin also testified that the VDOC's Operating Procedure 420.1, ("OP 420.1"), on the use of force, previously admitted into evidence as Plaintiff's Exhibit No. 47, (Docket Item No. 152-14), includes a section that reads: "Camera recordings and rapid eye clips related to incidents shall be stored in the facility's designated video storage folder or other secure storage." It also includes a section that reads: "Recordings shall be given a file name consisting of the facility name abbreviation, date of the recording, offender number, and a sequential number added if there are multiple recordings related to the same offender on the same date." Another section of OP 420.1 reads: "Recordings should be uploaded onto the facility's designated video storage folder immediately after the incident is concluded. The successful upload must be confirmed before the recording is erased from the camera data storage device."

Fannin testified that OP 420.1 states that access to upload recordings to the facility's designated video storage folder was assigned to those "designated by the facility unit head, i.e., institutional investigator, shift commanders." Fannin said that the phrase "facility unit head" referred to the warden. Fannin said that he was not sure who the warden of Red Onion was in August 2015, but it could have been Warden Barksdale. Fannin said that he was not the institutional investigator at Red Onion in August 2015.   He said there were four shift commanders, or watch commanders, at Red Onion, one each for A Break day shift, A Break night shift, B Break day shift and B Break night shift. These shift commanders would be a lieutenant or a captain, not a correctional officer.   He stated that Lieutenant Lyall, Lieutenant Collins and Sergeant Large were not shift commanders in August 2015.

Fannin testified that OP 420.1 states that access to view video recordings was assigned to administrative duty officers, regional duty officers, SIU and others designated by the facility unit head. He said administrative duty officers could be the warden, assistant warden, majors, operations officers or unit managers. He said it did not include lieutenants, sergeants or correctional officers. He said the regional duty officers would be VDOC administrative personnel "above the warden." Fannin also testified that, in August 2015, the warden at Red Onion had designated lieutenants and higher-ranking officers to review camera recordings, which would have included Lieutenant Lyall and Lieutenant Collins. Fannin said that he was not aware of any instance where a correctional officer was given the ability to view video recordings. Fannin said he could not remember who the unit manager was of the A Building at Red Onion in August 2015.

Fannin testified that OP 420.1 states that the institutional investigator, information officer, the regional operations chief and those "designated by the facility unit head" had access to copy, download and send video recordings and that the "CTSU staff" had authority to delete video recordings. Fannin said that he was not sure who the "CTSU staff" members were unless it was referring to the VDOC's Information Technology Department staff. OP 420.1 also states:

> Cameras and data storage media must be carefully controlled and secured at all times to prevent unauthorized access to and misuse of recordings. … The recordings shall be maintained for a period of at least three years after the date of the incident. … If a lawsuit is filed or investigation is in progress, the recordings shall be retained until the investigation or lawsuit is completed.

Fannin testified that VDOC OP 866.1, previously admitted as Plaintiff's Exhibit No. 48, (Docket Item No. 152-7), states: "If a grievance is received that references a specific audio or video recording, a copy of the recording shall be made

and maintained at the facility." He said it also states: "Copies of grievances, both regular and emergency, and audio/video records, if applicable, will be maintained at the unit for a minimum, of three years following final disposition of the grievance. … Grievances concerning matters known to be under investigation or litigation will be maintained until completion of the investigation or litigation if that event exceeds the three year time frame."

Fannin stated that, if a correctional officer were accused of an unjustified use of force, and there was video evidence of the incident, he would save the video evidence whether the evidence confirmed or disputed the accusation.

Fannin testified that Plaintiff's Exhibit No. 23 clearly identified the video evidence that Wall was requesting be retained regarding this incident. Fannin also testified that he has no recollection of ever seeing this Regular Grievance before. Fannin also testified that, under the Inmate Grievance Procedure, informal complaints are filed with the grievance coordinator, and regular grievances go to the warden or the warden's designee for response. He agreed that, unless the warden sent a copy of a regular grievance to the Intelligence Department, the intelligence officers would not see it. Fannin was shown various documents suggesting that Barksdale was the warden at Red Onion at least until December 8, 2015. Fannin stated that he had no reason to dispute those documents, but he could not remember whether Barksdale was still the warden at Red Onion in October of 2015.

Fannin stated that he first saw Plaintiff's Exhibit No. 50, (Docket Item No. 152-9), the Level I Response to Wall's Regular Grievance regarding this incident, when defense counsel showed it to him as part of this litigation. He said he had no recollection of ever seeing this Regular Grievance previously. Fannin agreed that the response included the statement: "Investigation – this matter has been investigated

by the institutional investigator. Investigator Fannin advised he did not find any discrepancies while reviewing this incident," but he did not remember investigating the August 2015 incident involving Wall. Fannin said he also had no recollection of making a report that stated that "no unnecessary use of force was observed during this incident." He said that he also had no recollection of reviewing any video evidence concerning this incident or discussing the incident with any correctional officers.

Fannin testified that he was familiar with OP 038.1, Reporting Serious or Unusual Incidents, admitted as Plaintiff's Exhibit No. 45. (Docket Item No. 152-5.) He said OP 038.1, which was effective in September 2013, required the reporting of "any situation or event that involves the life, health, or safety of employees, volunteers, visitors, or offenders." He agreed that OP 038.1 also states: "Timely and accurate reporting of incidents that occur in the Department of Corrections is essential for proper management and administration. … Since incident reports are frequently used in litigation proceedings, the importance of writing clear, concise, factual, and complete reports cannot be overstated." He further agreed that OP 038.1 also states: "Qualifying incidents shall also be reported to the special investigations unit in accordance with the incident reporting to the special investigation unit section of this procedure. … The following incidents must be reported by telephone immediately following an incident or commencement of the incident." He agreed that one of the incidents listed requiring immediate reporting was "[s]erious injury to employee, volunteer, visitor or incarcerated offender." Fannin testified that all VDOC employees were required to comply with this policy.

On cross-examination, Fannin stated that he was not involved in the SIU investigation of the August 2015 incident involving Wall. He said that he had no knowledge of the SIU investigation at the time it was ongoing. Fannin stated that, if

an offender was walked from one housing unit to another, and nothing happened during that escort, he would not consider that an incident to be reported or investigated further or for the preservation of the video recording.

Fannin testified that, after he became institutional investigator at Red Onion in mid to late October 2015, no one ever came to him and asked him to delete any video evidence pertaining to Wall. Fannin said that SIU Investigator Wood never spoke to him regarding his investigation of the incident involving Wall, and he did not know to whom Investigator Wood spoke. Fannin said that, once SIU took over an investigation, the Intelligence Department or the institutional investigator would no longer be involved unless SIU requested assistance. He stated that, as institutional investigator, he would have no input into the final SIU report. He said that SIU would notify the warden of the prison of its final investigative report.

Fannin testified that when an offender files a regular grievance it goes to the grievance coordinator to review to determine if it will be accepted, assigned a number and logged into the CORIS database. Fannin said that, if the grievance is accepted, he does not know if the grievance coordinator forwards the actual grievance form to the warden or the warden's office or if she provides only the completed Level I grievance response for signature.  Fannin testified that it was his understanding that the grievance coordinator prepared the Level I responses to grievances and forwarded them to the warden's office for signature.  Although the Level I Response to Wall's Regular Grievance stated that the matter had been investigated by him, Fannin said this would be a violation of VDOC policy for him to investigate the incident since SIU had been involved in the investigation since at least September 8, 2015. He again stated that he had no recollection of conducting any investigation related to this incident.

Fannin testified that Wall's Regular Grievance, Plaintiff's Exhibit No. 23, stated that there was video evidence available to support his Grievance, but it did not request that the video evidence be retained. Based on his review of Wall's Regular Grievance, Fannin said, he would not have been aware that Wall was alleging that he had been repeatedly run into metal poles on the boulevard while being escorted. He said the Regular Grievance would not have alerted him that Wall was alleging that his head had been smashed against the wall in the B Building vestibule or that he had suffered from extended periods of unconsciousness after being placed in five-point restraints or that he was refused medical care after being taken to the B Building.

Jason D. Wood, a previous special agent with the VDOC SIU, also testified at the May 2023 hearing. Wood testified that he was a special agent with SIU from April 2015 to January 2020, working in the Western Region. Wood said that, prior to working as a special agent with SIU, he had worked for the Scott County Sheriff's Office, where he currently is the Criminal Investigation Division Commander. As an SIU special agent, Wood said, his responsibilities were to conduct criminal investigations that involved a staff member, inmate, probationer or parolee and administrative investigations involving staff. As an SIU special agent, Wood said, the only training he received was internal affairs training on investigating policy violations by staff or administrative issues with staff. To be hired as an SIU special agent, Wood said, he had to be a certified law enforcement officer in Virginia, which required graduation from a law enforcement academy.

Wood testified that OP 030.4, Special Investigations Unit, which was admitted at Plaintiff's Exhibit No. 43, (Docket Item No. 152-3), sets out the authority, responsibilities and duties of the VDOC SIU. He further testified that OP 030.4 states that the SIU is responsible for conducting investigation into all incidents

involving serious injury, including self-injury, that requires urgent and immediate medical attention and restricts the person's usual activity, including a loss of consciousness. Wood also testified that OP 030.4 states, "The organizational unit head or the individual in charge at the scene of a serious incident shall take appropriate action necessary to protect physical evidence and crime scenes until released to the responding agent." Wood said the unit head at Red Onion would be the warden. He said OP 030.4 also states:

> The organizational unit head shall ensure that all video recordings pertaining to cell extractions and other video recordings made to document activities of operations are maintained for three years. … Relevant rapid eye recordings should be duplicated for retention in compliance with this requirement. … Video recordings of incidents relevant to SIU investigations or incidents that warrant SIU inquiry will be properly secured until released to a special agent. … Destruction or disposal of video recordings relevant to SIU investigations will only be authorized upon approval of the respective SIU assistant chief, the chief of the SIU, or the director.

Wood testified that, when he worked as SIU Special Investigator, there was an SIU chief and three assistant chiefs, each over one of the three geographic regions – West, Central and Eastern. In 2015, Wood said, Ronald Hall was the Assistant SIU Chief over the Western Region, and Paul Haynes was the SIU Chief.  The Director of the VDOC at that time was Harold Clarke, he said. Wood testified that, under this policy in 2015, the destruction or disposal of video recordings of incidents relevant to SIU investigations could be authorized only by Hall, Haynes or Clarke. If video recordings or incidents relevant to SIU investigations were destroyed without approval from those individuals, Wood said, it would violate this policy.

Wood stated that, as an SIU Special Agent, he investigated the incident involving Wall, Hicks and Rasnick that occurred in August 2015. He said that he did

not have any independent recollection of his investigation other than what he documented in his report. Wood said that he was assigned the investigation by Hall, the Assistant Chief of the region. Wood said that, after being assigned an investigation, he would typically look at the evidence, interview the parties and witnesses and complete a report of investigation. In this case, Wood said, he was investigating two potential crimes: assault and battery against a correctional officer and abuse of an offender.  He said that Wall had reported an abuse case, and the correctional officers had reported being assaulted. Wood said he investigated both allegations. Wood said that he reviewed all of the internal incident reports to determine which witnesses to interview. Wood said that he also would review any video evidence before he interviewed the witnesses. Wood said that any witness statements he obtained in his investigation would be attached as an exhibit to his final report. Wood said that he did not write out the witness statements, but, rather, if he interviewed someone, he gave them the opportunity to provide him with a written statement. Wood said that, when he originally interviewed Wall, Wall was not able to provide him with a written statement. If anyone was present with him when he interviewed a witness, Wood said, he would list the person who accompanied him on the interview form.

Wood said that he could not recall anyone assisting him with his investigation of this incident, but that Bentley probably would have downloaded the video evidence for him. Wood said that he had no recollection of requesting certain videos from Bentley. Instead, Wood said, he usually would call an institution and tell them what day he was coming, and someone would have the relevant videos downloaded on a DVD for him when he got there. Wood did state that he had the ability to view and download the video evidence from his office computer. If he downloaded video evidence, Wood said, he usually just downloaded it into a case folder on his computer, but on occasion, he might save the evidence to a disk.  Wood testified that

each institution had a shared folder on the VDOC computer system. Any evidence that needed to be seen by an SIU agent could be placed in this shared folder and accessed by the agent.

Wood said he usually would review relevant video evidence before visiting the institution, and he would call the institution and tell an intelligence officer what specific video evidence he wanted downloaded. Wood said if someone at Red Onion downloaded specific video evidence with regard to his investigation of the incident with Wall, it would have been based on his specific instructions of what to download. Wood admitted that his report noted that handheld camera and Rapid-Eye surveillance video evidence, regarding this incident, had been saved to a disk. Wood said he did not know if this was a disk on which he had downloaded video evidence or whether someone at the prison had downloaded the video evidence onto the disk.

Wood said that his investigation focused on three subjects or suspects – Wall, Hicks and Rasnick. His report also listed all three – Wall, Hicks and Rasnick – as victims. Wood said that, when he was assigned an incident to investigate, he would be told the date, location and time frame of the incident. He also would review the internal incident report.

Wood said his report and all attached exhibits were sent to A. David Robinson because he was the Chief of Corrections Operations at the time, and all reports of SIU investigations went to him. He said he also forwarded his report and all exhibits to Michael H. Abbott, Wise County Commonwealth's Attorney, for his review in deciding whether to place any criminal charges against anyone. Wood said all the exhibits to his report also would have been attached to the report when it was forwarded to Robinson and Abbott. He said that he could not remember if Abbott ever contacted him to discuss his investigation. Wood said that the waiver of

Miranda rights form, attached to his report, states that Wall could not sign due to injury, but he could not recall the specific injury Wall suffered. He said that the form indicated that he met with Wall on August 19, 2015. Wood testified that any disk containing video evidence would have been provided to the Commonwealth's Attorney's Office with his report.

Wood testified that he did not remember receiving a copy of Wall's Informal Complaint as part of his investigation. Wood said he would not have been aware of Wall filing a grievance about the incident he was investigating. He said that, unless the grievance was filed against him personally, he would likely not see any grievance.

Wood testified that Plaintiff's Exhibit No. 12 had Wall's full written statement attached. Wood said that Wall's full written statement was attached to his report. Wood said Wall's statement was dated August 26, 2015, and notarized on August 27, 2015, but he did not recall when he received it. Wood testified that when he spoke to Wall, Wall reported that he claimed he was run into poles going from A Building to B Building and that his face was smashed into the wall while standing in the B Building vestibule. He said that Wall also included these allegations in his written statement. Wood said that he would have reviewed all relevant surveillance video recordings, including the video taken from the surveillance cameras outside of the A and B Buildings and the B Building vestibule cameras, even though that video evidence is no longer available. Wood agreed that, if he reviewed this video evidence, it should have been saved. According to his report, Wood admitted that, in addition to Wall, he interviewed only Hicks, Rasnick and Officers Hess and Holbrook.

Wood said that, during the course of his investigation, he did not discuss his investigation with anyone outside of SIU. He specifically denied discussing his investigation with the warden of Red Onion. He also said that he did not provide his report to the warden of Red Onion or anyone else at Red Onion. He said that he sent his report directly to VDOC Headquarters in Richmond, and someone at Headquarters would have mailed it to the Wise County Commonwealth's Attorney's Office. Wood said, when he left the employment of the VDOC in December 2019, he turned over everything that belonged to the state, including his work computer, to another agent. He said his work computer should have contained a folder pertaining to his investigation of this incident on it at the time he turned it over because he did not delete anything from his computer. Wood said he did not recall anyone from the Attorney General's Office ever contacting him while he was still employed by the VDOC to inquire whether he possessed any video evidence related to this incident. Wood further testified that he assumed the Attorney General's Office would not contact an SIU agent directly for evidence, but, rather, contacted SIU headquarters because he had never been contacted by the Attorney General's Office directly regarding one of his investigations. Wood also testified that he did not recall Headquarters ever asking him for any of the relevant video evidence.

On cross-examination, Wood testified that, according to his report, he reviewed Rapid-Eye surveillance video of the incident between Wall and Hicks and Rasnick, and the video was consistent with the officers' statement of events and did not support Wall's claims. Wood also stated that his report stated that he had reviewed "handheld camera video" of Wall being escorted to the B Building. When asked if it is possible that he reviewed Rapid-Eye surveillance video recordings of Wall's escort instead of a recording from a handheld camera, Wood said it was possible, but he did not remember. Either way, Wood said, he documented that he reviewed video evidence of Wall's escort from A Building to B Building, and the

video did not provide any evidence to support Wall's claims of abuse. Wood further testified that, if he reviewed video evidence that did not substantiate Wall's claim of being run into multiple poles between the A and B Buildings, he would not have gone any further to investigate that claim. He said that could be the explanation for why he never interviewed the officers who escorted Wall from the A Building to the B Building. Wood did admit, however, that, if he reviewed video evidence, it would have been saved regardless of what it showed or did not show. Wood said that he made no recommendation to the Commonwealth's Attorney's Office with regard to his investigation; he simply provided his report of investigation.

Wood said that, as an SIU agent, he was a sworn law enforcement officer, he was not a corrections officer. As a law enforcement officer, he operated independently of the corrections officers. Wood testified that, if, during the course of his investigation, he uncovered evidence that indicated that an inmate had been abused or maltreated or something had happened to the inmate, it was his sworn duty to ensure that justice was done.

## II. Analysis

Spoliation is "the destruction or material alteration of evidence or … the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). Furthermore, the Fourth Circuit has held that "[a] party seeking sanctions based on spoliation of evidence must establish … that the alleged spoliator had a duty to preserve material evidence" and that "[t]his duty arises 'not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.'" *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013) (quoting *Silvestri*, 271 F.3d at 591). Federal

-66-

Rules of Civil Procedure Rule 37(e) controls when sanctions may be imposed for a failure to preserve electronically stored information. *See Monzon v. Hall,* 2023 WL 22027, at *3 (W.D. Va. Jan. 3, 2023); *Jenkins v. Woody,* 2017 WL 362475, at *12-13 (E.D. Va. Jan. 21, 2017); *In re: Ethicon, Inc.*, 2016 WL 5869448, at *2 (S.D. W.Va. Oct. 6, 2016).  Rule 37(e) states:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>> (A) presume that the lost information was unfavorable to the party;
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>> (C) dismiss the action or enter a default judgment.

FED. R. CIV. P. 37(e). Thus, a number of requirements must be met before the court may sanction a party over the loss of electronically stored information, ("ESI"), such as the surveillance video recordings at issue here.[3] First, there must be a showing that the electronically stored information should have been preserved in the anticipation or conduct of litigation. Second, there must be a showing that the party who possessed the information failed to take reasonable steps to preserve the information. Third, the information must be lost and cannot be restored or replaced through additional discovery. If these requirements are met, and the moving party can show prejudice from the loss of the information, the court may order measures

---

[3] There is no dispute that the video surveillance system in use at Red Onion in August 2015 recorded and stored video footage electronically, and, therefore, qualified as ESI subject to Rule 37(e). *See Johns v. Gwinn*, 503 F. Supp. 3d 452, 461 (W.D. Va. 2020).

"no greater than necessary to cure the prejudice." FED. R. CIV. P. 37(e)(1); *see Muhammad v. Mathena*, 2016 WL 8116155, at *8 (W.D. Va. Dec. 12, 2016). The most severe penalties, an unfavorable inference presumption or instruction or default judgment, may be entered only upon a finding that the party who failed to preserve the information "acted with the intent to deprive another party of the information's use in the litigation." FED. R. CIV. P. 37(e)(2); *see Muhammad*, 2016 WL 8116155, at *8.

In this case, the parties agree that additional ESI in the form of additional video evidence relevant to Wall's claims from the Rapid-Eye cameras located outside of the A and B Buildings and in the B Building vestibule, once existed.[4] The parties further agree that the video evidence from the Rapid-Eye cameras located outside of the A and B Buildings and in the B Building vestibule has been lost and cannot be restored or replaced through additional discovery. The parties do not agree, however, that the lost video evidence should have been preserved.

There is no evidence before the court to show that anyone at Red Onion, including any of the Red Onion defendants, was aware that Wall was claiming he lost consciousness, was run into metal poles during the escort to B Building, had his face smashed into the wall of the B Building vestibule or was denied medical treatment until they were served with Wall's Complaint in late 2017.[5] Wall has admitted that his Informal Complaint and Regular Grievance forms did not mention any of these allegations. Instead, Wall admitted that the only allegations of abuse

---

[4] The parties do not agree that there was a working camera that recorded Wall after he was placed in cell B-308. However, the Pod Log Book, admitted as Plaintiff's Exhibit No. 31, shows that, after being placed in cell B-308, Wall was under "constant surveillance from video in booth." (Plaintiff's Exhibit No. 31 at 2.)

[5] This assumes that the Attorney General's Office, which accepted service on behalf of most of the VDOC defendants, provided these defendants with a copy of Wall's Complaint.

contained on his Informal Complaint and Regular Grievance forms were that he was gassed, punched and kicked, his fingers were bent back, and he was not allowed to decontaminate from the use of OC spray.

The evidence before the court, however, does show that Wall, on his Informal Complaint, (Plaintiff's Exhibit No. 23 at 1), requested that prison officials review video evidence from surveillance cameras in the A-1 pod, the A and B recreation yard, the B 1, 2 and 3 vestibule and cell B-308 and the handheld camera recording of him being placed in and removed from five-point restraints. It also shows that, on his Regular Grievance, Wall listed this same video evidence as supporting his allegations. (Plaintiff's Exhibit No. 23 at 2.) The evidence further shows that VDOC OP 866.1 required any video recording referenced in a grievance be copied and maintained for a minimum of three years or longer if the grievance concerned matters under investigation or in litigation. The evidence shows that VDOC OP 030.1 also required any video recording referenced in a grievance be copied and maintained for a minimum of three years or longer if the grievance concerned matters under investigation or in litigation. Thus, under the VDOC's own procedures, all of the video evidence referenced in Wall's Informal Complaint and Regular Grievance should have been downloaded and retained to date, since this litigation is still pending.

Pursuant to Rule 37(e), the question before the court is whether additional video evidence should have been preserved *in the anticipation or conduct of litigation*. "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591. This court has previously held that whether VDOC had a duty to preserve video evidence turned on "1) whether VDOC should have reasonably anticipated

litigation and 2) whether it should have known that the video might be relevant to such litigation." *Johns*, 503 F. Supp. 3d at 465.

On his Informal Complaint, Wall plainly alleged that he had been illegally abused. On his Regular Grievance, dated September 13, 2015, Wall, again, alleged he was the victim of a "use of excessive force & cruel and unusual punishment," and he wrote that he was seeking compensation in the amount of $25,000.00, monetary compensation that could be awarded only if Wall filed a civil suit and not through the VDOC's administrative remedies system. On his September 8, 2015, response to Wall's Informal Complaint, Bentley stated that the August 14, 2015, incident with Wall was being investigated by SIU. According to former SIU Agent Wood, he conducted his investigation of the August 14 incident to determine if anyone should be charged with a crime for his actions. Furthermore, Wall's formal statement to Wood, dated August 26, 2015, plainly alleged that he lost consciousness, was rammed into poles, doors and walls enroute to the B Building and was not allowed to decontaminate. Based on this evidence, I find that all of the video evidence listed by Wall on his Informal Complaint and Regular Grievance should have been preserved in anticipation of litigation.

Furthermore, the evidence before the court shows that at least some of the video evidence requested by Wall was preserved for some period of time. Wood's report notes that he reviewed the Rapid Eye surveillance video recordings taken by the A-1 pod cameras. His report also notes that he reviewed the "handheld camera video of Wall being escorted to B… Building."[6]  Wood's report also stated that the

---

[6] Wood admitted that this reference to "handheld camera video" of Wall being escorted to the B Building could be in error, in that he, perhaps, could have reviewed video evidence from the surveillance cameras on the outside of the A and B Buildings. There is evidence before the court showing that the handheld camera was retrieved only after Wall arrived in the B Building and the decision was made to place Wall in five-point restraints. *See* Plaintiff's Exhibit No. 31 at 2.

Rapid-Eye and handheld videos were "saved to disk and ... available for review upon request." Wood stated that he could not recall whether he or someone else had downloaded the video evidence onto a disk, but he admitted that Bentley probably would have downloaded the video evidence for him. Wood testified that he had no recollection of requesting certain videos from Bentley. Wood testified that he would have reviewed all the relevant video evidence, including video recordings taken by the surveillance cameras outside of the A and B Buildings and in the B Building vestibule. Wood further testified that he would have saved any video evidence that he viewed on his work computer in a folder pertaining to this investigation. He further testified that this evidence remained in this computer folder when he returned his work computer when he left VDOC employment in December 2019.

As stated above, the parties agree that this video evidence is lost and cannot be restored or replaced by additional discovery. The evidence before the court, however, does not establish when or how the evidence was lost. Nor does the evidence before the court establish that "a party," i.e., any named defendant, played a role in the loss of this evidence. The undisputed evidence before the court shows that none of the correctional officers under the level of lieutenant had any access to review and/or save videos taken by the Rapid-Eye surveillance camera system. According to Fannin, in 2015, the warden of Red Onion had designated lieutenants and higher-ranking officers to review camera recordings, which, at that time, would have included only defendants Lyall, Collins, Still, Warden Barksdale, Western Administrator Ponton and Director Clarke. The evidence also shows that Hearing Officers Franks and Hensley had access to view and save video evidence. Both Franks and Hensley testified that they never viewed or saved any of relevant video evidence concerning Wall's claims. According to Wood, VDOC OP 030.4 required the prison's warden to ensure that all video evidence was properly secured and turned over to the investigating SIU agent. Wood also said, under VDOC policy in

effect in 2015, only Assistant SIU Chief Hall, SIU Chief Haynes or VDOC Director Clarke could authorize the destruction or disposal of video recordings of incidents relevant to SIU investigations.  There is no evidence before the court that any VDOC official ever authorized the destruction or disposal, or, themselves, actually destroyed or disposed of, the video evidence at issue here.

From the evidence before the court, it appears that Bentley was likely involved in saving some of the video evidence to the prison's shared video evidence folder. It further appears that Bentley likely saved the video evidence still available for the court's review – the video recordings from the A Building and A Building vestibule surveillance cameras and the handheld camera video recordings. The evidence before the court also demonstrates that Wood viewed and saved other video evidence on his work laptop computer. It further appears that this video evidence was not properly preserved when Wood left VDOC's employment and returned his work laptop. The court was presented with no evidence with regard to VDOC's policies regarding preservation of evidence from an employee's electronic devices, such as laptop computers, upon an employee's termination of employment. Based on the above, the court finds that defendants Barksdale, Ponton and Clarke had both the obligation and the ability to properly preserve this video evidence, and it was lost because they failed to take reasonable steps to preserve it.

Much time was spent at the May 2023 hearing debating whether spoliation by one party, or by a nonparty, may be imputed to a party before the court. Regardless of the undersigned's opinion as to the fairness of this practice with regard to claims against line correctional officers, who do not possess the ability to preserve VDOC video evidence, it is clear under the relevant case law that, once spoliation of evidence has occurred, the court may impose sanctions on a party before it to remedy harm caused another party. *See Silvestri*, 271 F.3d at 591.   Furthermore, this court

has extended that concept to specifically hold that sanctions may be imposed upon a correctional officer defendant when the VDOC has failed in its duty to relevant preserve relevant video evidence based on the "special relationship" between the VDOC and its correctional officers. *See Johns*, 503 F. Supp. 3d at 462-65; *see also Muhammad*, 2016 WL 8116155, at *7-8; *Stanbro v. Westchester Cnty. Health Care Corp.*, 2021 WL 3863396, at *5-9 (S.D. N.Y. Aug. 27, 2021); *Taylor v. Null*, 2019 WL 4673426, at *5 (E.D. Mo. Sept. 25, 2019); *Mizzoni v. Nevada*, 2017 WL 4284597, at *6 (D. Nev. Sept. 27, 2017), report and recommendation adopted, 2018 WL 485873 (D. Nev. Jan. 19, 2018).  Under this practice, however, the court may consider the individual defendants' lack of culpability in the failure to preserve the video evidence in assessing the proper remedy to impose. *See Muhammad*, 2016 WL 8116155, at *8.

As stated above, under Rule 37(e) the harshest sanctions, such as an adverse inference, dismissal or entry of default judgment, may be imposed only in a case in which the court finds that the spoliating party "'acted with the intent to deprive another party of the information's use in the litigation.'" *Jenkins*, 2017 WL 362475, at *17 (quoting FED. R. CIV. P. 37(e)(2)). The Fourth Circuit has not addressed the level of intent that a court must find to impose the harshest sanctions under Rule 37(e)(2). *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 110 (E.D. Va. 2018). The rule, itself, however, states plainly that the harshest sanction may be imposed "only upon finding that the party acted with intent to deprive another party of the information's use in the litigation." FED. R. CIV. P. 37(e)(2). Merely negligent, or even grossly negligent, conduct is not a sufficient basis to impose sanctions under Rule 37(e)(2). *See* FED. R. CIV. P. 37(e)(2) advisory committee's note to 2015 amendment. Here, the court has found that that defendants Barksdale, Ponton and Clarke had the obligation and ability to preserve this video evidence, and they failed to take reasonable steps to preserve it. There is, however, no evidence before the

court from which the court could find that any of these defendants did so with the intent to deprive Wall of the use of the evidence in litigation.

To the contrary, the evidence before the court fails to show any concerted effort to deprive Wall of this video evidence. In fact, the evidence before the court shows that Wall, through his criminal defense counsel, was provided a copy of this video evidence. In fact, Wall testified that he reviewed the video evidence with his attorney at the Wise County Courthouse on July 1, 2016, the day of his trial. Wall said that he recalled viewing the video recordings of the B Building vestibule surveillance cameras when he was up against the wall before being escorted to cell B-308 to be strapped down. Wall said that he requested his criminal defense attorney provide him with this video evidence, but, by the time he made the request, this attorney was deceased. According to his attorney's office, Wall's file was destroyed after the criminal charges against him were dropped. Wall's counsel admitted, however, that they had not contacted the Wise County Commonwealth's Attorney's Office in an effort to obtain any video evidence.

The court, next, must consider whether Wall has been prejudiced by the loss of this video evidence. Rule 37(e)(1) states "upon finding prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice….." FED. R. CIV. P. 37(e)(1). Rule 37(e) does not define prejudice; nor does it place the burden of proving or disproving prejudice on one party or the other. *See* FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment. "Spoliation of evidence causes prejudice when, as a result of the spoliation, the party claiming spoliation cannot present evidence essential to its underlying claim." *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, 2020 WL 1809191, at *4 (D. Md. Apr. 9, 2020) (internal quotation omitted). "An evaluation of prejudice from the loss of information necessarily includes an

-74-

evaluation of the information's importance in the litigation." FED. R. CIV. P. 37(e)(1) advisory committee's note to 2015 amendment. The moving party cannot be expected to "demonstrate with certainty the content of the lost evidence," but the moving party must "demonstrate a likelihood that the lost evidence would have been favorable to the moving party's case." *See Johns*, 503 F. Supp. 3d at 470 (internal quotations omitted).

It is important to note that Wall did not testify as to what this missing video evidence showed. Wood, on the other hand, testified that he viewed all the relevant video evidence, and this video evidence did not support Wall's version of events. Wall's counsel argued that the missing video is relevant to Wall's claims that he was subjected to excessive force in the escort to the B Building and in the B Building vestibule and that the defendants were deliberately indifferent to his serious medical needs, in that he was not provided any medical treatment for his injuries. As more fully addressed in the Report and Recommendation issued this same date addressing Wall's substantive claims, Wall cannot pursue these claims because he failed to exhaust his administrative remedies. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, … until such administrative remedies as are available are exhausted."); *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)) ("The exhaustion requirement is mandatory, and courts lack the authority to waive that requirement."). Furthermore, the failure to exhaust a claim may impact whether the loss of video recordings prejudices a plaintiff. *See Carter v. Ely*, Case No. 7:20cv713, Memorandum Opinion (Docket Item No. 255 at 7) (W.D. Va. Sept. 22, 2023).

Wall, himself, admitted that his Informal Complaint and Regular Grievance forms did not mention his allegations that he was run into metal poles while being

escorted to the B Building, that an officer had smashed his head into the wall in the B Building vestibule, that he had lost consciousness or that he had been denied medical treatment. Wall admitted that the only allegations of abuse contained on his Informal Complaint and Regular Grievance forms were that he was gassed, punched and kicked during the initial encounter with Rasnick and Hicks and responding officers Lyall and Large, that he was not allowed to decontaminate and that his fingers were bent back by the officers who escorted him to the B Building. (Plaintiff's Exhibit No. 23 at 1.) Because Wall did not file any administrative remedy requests as to his claims that he was run into metal poles while being escorted to the B Building, that an officer had smashed his head into the wall in the B Building vestibule and that he was denied medical care after losing consciousness, he has not properly exhausted these claims, and he may not pursue them in this action.

Nonetheless, Wall argues that the missing video evidence would be relevant to the claims that he may pursue, in that it would show the extent of his injuries and that he was not given the opportunity to decontaminate from the use of OC spray. Wall has not been prejudiced by the loss of this evidence, insofar as it would have shown the extent of his injuries.  The handheld video of his removal from five-point restraints and his escort to the sally port area for transfer, (Plaintiff's Exhibit No. 42), shows the extent of Wall's injuries, as do the photographs of Wall, (Plaintiff's Exhibit No. 1), and the medical reports of his injuries documented upon his arrival at Wallens Ridge, (Plaintiff's Exhibit No. 2, Docket Item No. 84-2 at 4-5). Wall also argues that the missing video evidence is relevant, in that it would either corroborate or contradict the testimony of the defendants, impacting their credibility on the claims he may pursue. Video evidence of events can be the "best and most compelling evidence of what happened…." *Jenkins*, 2017 WL 362475, at *18. Thus, the court will find that the loss of the use of this video evidence to either corroborate or contradict the testimony of the defendants does prejudice Wall. *See Muhammad*,

2016 WL 8116155, at *9 (prejudice found where missing video evidence would be relevant to credibility of witnesses).

Upon finding prejudice, the court may order "measures no greater than necessary to cure the prejudice." FED. R. CIV. P. 37(e)(1). The court has broad discretion to choose the appropriate sanction for a party's spoliation. *See Turner*, 736 F.3d at 281; *Jenkins*, 2017 WL 362475, at *18; *Muhammad*, 2016 WL 8116155, at *9. Here, it appears the measure necessary to cure the prejudice is to exclude from evidence any reference to the contents of this missing video evidence. As stated above, Wood testified that he had reviewed all the relevant video evidence, and it did not support Wall's version of events. Wood also provided this information in his report. As a measure to cure the prejudice to Wall by the loss of this video evidence, the court will strike this evidence and not consider it in ruling on Wall's substantive claims.

An appropriate order will be entered.

**ENTERED:** November 13, 2023.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE