# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **GARY WALL,** | ) | |
| Plaintiff, | ) | Civil Action No.: 7:17cv00385 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **E. RASNICK, et al.,** | ) | |
| Defendants | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

The plaintiff, Gary Wall, ("Wall"), an inmate previously incarcerated at Red Onion State Prison, ("Red Onion"), brings this civil rights action pursuant to 42 U.S.C. § 1983, against 28 Virginia Department of Corrections, ("VDOC"), employees and officials. Wall's Second Amended Complaint, (Docket Item No. 42) ("Complaint"), raises a number of claims, including § 1983 claims based on allegations of excessive force, deliberate indifference to his serious medical needs, failure to intervene to protect him, violations of his substantive and procedural due process rights and conspiracy and Virginia state law claims for assault, abuse of process and negligence. Two of the defendants, Correctional Officers E. Rasnick and J. Hicks, filed counterclaims against Wall seeking damages based on state law assault and battery claims. (Docket Item No. 29) ("Counterclaims"). The matter is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).

In December 2018, Wall moved for discovery sanctions against the defendants, (Docket Item Nos. 75, 77) ("Motions"), including a request for sanctions based on spoliation of certain video recording evidence. These motions were set for hearing at the January 23-24, 2019, bench trial. By Order entered May 13, 2019, the Motions were denied. By Report and Recommendation filed May 17,

2019, the undersigned recommended that the court enter judgment in favor of the defendants on Wall's claims. The Report and Recommendation also recommended that the court enter judgment against Wall in favor of Rasnick and Hicks on their assault and battery claims and award each $20,000.00 in compensatory damages and $20,000.00 in punitive damages.

By motion filed January 28, 2020, (Docket Item No. 102), Wall appealed the order denying the Motions. Wall also filed objections to the Report and Recommendation. (Docket Item No. 91.) By Memorandum Opinion and Order entered March 23, 2021, the district court overruled Wall's objections, adopted in part and denied in part the Report and Recommendations and entered judgment for all defendants and the counter-plaintiffs. (Docket Item Nos. 109, 110.) The Memorandum Opinion, however, did not address Wall's appeal of the May 13, 2019, order denying the Motions. Wall appealed the court's decision, and, by Memorandum Opinion entered July 25, 2022, the Fourth Circuit vacated this court's decision and remanded Wall's claims to the court with instructions to hold an evidentiary hearing on Wall's objections to the denial of spoliation sanctions.

By Order entered August 23, 2022, (Docket Item No. 135), Wall's claims were recommitted to the undersigned to conduct further proceedings, including, if necessary, preparation of amended findings and recommendation, including reopening, and recommitting Wall's Motions for further consideration. Upon remand, Wall's appellate counsel entered an appearance on his behalf and requested a further evidentiary hearing. This evidentiary hearing was held on May 4-5, 2023.

By Memorandum and Opinion entered this same date, the undersigned has granted the Motions under Federal Rules of Civil Procedure Rule 37(e), finding

that certain video evidence that should have been preserved in anticipation of litigation has been lost and cannot be restored because defendants E. Barksdale, ("Barksdale"), former Red Onion Warden, H. Ponton, ("Ponton"), Western Regional Administrator and H. Clarke, ("Clarke"), former VDOC Director, failed to take reasonable steps to preserve this video evidence. Upon a finding of prejudice to Wall, the undersigned sanctioned the defendants by ruling that the court should not consider any evidence of the contents of the missing video evidence. In particular, the undersigned ruled that the court would not consider the testimony or any reports of VDOC Special Investigations Unit, ("SIU"), Special Agent Jason D. Wood, ("Wood"), stating that he had reviewed the missing video evidence and that it did not support Wall's claims.

## I. Facts

At the January 2019 bench trial, Wall testified that, on August 14, 2015,[1] while incarcerated at Red Onion, in the A-1 pod, he was tackled to the floor by Hicks and beaten and kicked by Rasnick, Hicks, J. Lyall and T. Large for no reason. Wall said the incident started when he placed an empty jar of peanut butter on the floor outside of his cell door during pod recreation. He said the control booth officer, C. Holbrook, got his attention and told him to come near the control booth to speak to him. Wall said that, when he approached the control booth, Holbrook told him to lock down in his cell because Holbrook claimed that he saw Wall place something in someone else's cell. Wall said he was attempting to explain what Holbrook saw when Rasnick interrupted by yelling at Wall from the top tier, "Shut the fuck up." Wall admits that he then responded, "Fuck you," to Rasnick, and Rasnick replied, "No, fuck you."

---

[1] Wall testified that this incident occurred on August 15, 2015, but VDOC documents show that it occurred on August 14, 2015.

Wall said that Defendant Hicks then ordered everyone in the pod to lock down. Wall said he started to walk toward his cell, when Hicks ordered him to go to the pod vestibule. Wall said that, when he arrived at the vestibule door, it did not open. He said that he turned around to ask why, and Rasnick grabbed his left arm. On cross-examination, Wall said Rasnick told him to "shut up." Wall said that he stepped to his right with his hands up and open. He denied throwing any punches at anyone. Instead, Wall said that he was attempting to get down on the floor when Hicks tackled him, knocking him to the floor. Wall said that Hicks placed his left hand in cuffs and then he, Wall, put his right hand behind his back so that Hicks could cuff it. He said that he heard someone place a "10-33" call, an officer needs assistance call. Wall said that the vestibule door then opened and Defendants J. Lyall and T. Large entered the pod. He said that Large immediately used OC, (oleoresin capsicum), spray on him. Wall said that he could not see anything when someone hit him in the back of his head and side of his face, and he lost consciousness.

Wall said that he regained consciousness as he was being escorted through the recreation yard with officers bending his hands back. Wall said that his left hand was extremely painful. He said that he was escorted from the A Building by Defendants C. Dockery and E. Gwinn, but he did not know which officer was on which side. Wall said that these officers purposefully ran him into steel fencing poles every few feet apart. Wall said that, as they entered the B Building vestibule, the officers told him to stand and face the wall, and he complied. Someone then asked his name. He also said that Dockery and Gwinn were replaced by Defendants B. Akers and S. Taylor. Wall said that these officers immediately tightened the cuffs, cutting his wrists. He said that Akers then rammed his face into the wall by placing both of his hands on the back of Wall's head. He said he was in this position for five to 10 minutes while correctional officers were coming by and

hitting him. He said that he could not see who hit him because he was facing the wall.

Wall said that he was taken to cell B-308 without being decontaminated from the OC spray. Wall said that his clothes were taken from him, a spit mask was placed on his face, and he was placed in restraints. He said that he lost consciousness again. Wall said that he woke up some time later when another inmate yelled through the vent to ask him if he was okay. Wall said that he had intense pain in his left hand. He said he thought it was broken because it was swelled to twice its normal size. Wall said that he asked Defendant M. Addington, who was making rounds, if he could see a nurse.

Wall said that he was released from restraints at 7:45 p.m. He said that Nurse Woods was present and looked at his hand. He said that he was then walked to the sally port area, wearing only a safety smock, and placed in a holding cell. He said he used the sink in the cell to clean the OC spray from his face. He said that Officer Hall then gave him some inmate clothes to change into. He said he was placed in a transport van and taken to Wallens Ridge State Prison, ("Wallens Ridge").

Wall said that, when he arrived at Wallens Ridge, he requested medical attention and was examined by Nurse Stanford. Wall said that Stanford noted and took pictures of his injuries. Wall said that he had knots on his head, scars on his chest, his wrists were swollen and cut, and his ankles were cut. He said that Stanford treated his wounds and obtained x-rays of his left wrist. He said he then was placed in a cell in the Medical Unit at Wallens Ridge.

Wall testified that he was never given an Institutional Classification Authority, ("ICA"), hearing regarding his transfer. Wall said that, some time later, he did have an ICA hearing to change his security level to segregation. Wall said that cursing an officer was not sufficient justification for placing him in segregation. Wall said that, the day after being transferred to Wallens Ridge, he was served with notice that he had been charged with four disciplinary infractions based on the events of the previous day at Red Onion. He said that Holbrook charged him with a 201 offense code for disobeying an order and a 229 offense code for being in an unauthorized area, and Hicks charged him with a 129 offense code for approaching others in a threatening manner and a 105A offense code for assault. Wall said that he was served with notice on August 17, 2015, that Defendant D. Still had charged him with a 105A offense code for assaulting Rasnick.

Wall said that he was held in the Medical Unit at Wallens Ridge for approximately four weeks. He said that he was held without any of his property for approximately two weeks. He said that, after the "first few days," there was no reason for him to be held in Medical. Wall said that he was later transferred to cell D-102 at Wallens Ridge, and he remained in that cell until he was transferred back to Red Onion on November 17, 2015.

Wall said that he asked for an advisor to assist him in preparing for his disciplinary offense hearings because he could barely see or write due to his injuries. He said that he also requested that prison officials review the video surveillance recordings of the incident. Wall said that Defendant Counselor O. Rose acted as his advisor. He said that he asked Rose how he could defend charges written against him at another prison.

Wall said that Defendant C. Franks was the disciplinary hearings officer for his first disciplinary hearing on the 229 offense code charge for being in an unauthorized area. He said that he requested that Franks look at earlier video recordings to see that inmates routinely crossed the red line during pod recreation to place items in front of their cell doors. Wall conceded that he was instructed that inmates could not be in the area outlined in red during pod recreation when he arrived at Red Onion. Wall said that he was found guilty of this disciplinary charge.

Wall testified that his next disciplinary hearing, which he believes was held later that same day, was for the 201 offense code charge written by Holbrook for disobeying an order. He said that defendant W. Hensley was the disciplinary hearings officer for this charge. He said that Holbrook claimed that he ignored Holbrook's order to lock down. He said that he asked Hensley to review the pod surveillance video recordings because they would show that he put a finger up and his hand up to his ear to indicate that he could not hear Holbrook. Wall testified that he filled out requests for documentary evidence, asking that someone review the pod surveillance video recordings. He said that Hensley told him that he would have to convince him at the hearing to review the video evidence. Wall said that he was allowed to serve a questionnaire on Holbrook prior to the hearing, on which Holbrook falsely stated that Wall refused his order to lock down and demanded to see the sergeant. Wall said that he also was found guilty of this disciplinary charge.

Wall testified that Franks, on the following day, heard the 105A offense code disciplinary charge that Still wrote against him, alleging that he had assaulted Rasnick. Wall said that he, again, requested that Franks review the pod surveillance video. Wall said that he was informed that he was being criminally charged for the assault, and he was afraid that anything he said would be used

against him on those state charges. Wall said that he was found guilty of this charge and was sentenced to a loss of 90 days of good-time credit.

Wall stated that, because Hicks was off work for a while after this incident, the offense charges he placed against Wall were not heard until September 8, 2015. When the assault charge was heard, Wall said, Hicks claimed that Wall had turned around and swung his fist at him. Wall said, "It never happened." Wall said that this assault charge was heard by Hensley. Wall said that Hicks claimed that Wall struck him in the eye. Wall said that he again requested Hensley to review the surveillance video. Wall said he was found guilty of this charge and sentenced to a loss of 180 days of good-time credit.

Wall submitted into evidence a number of photocopies of photographs taken of him when he was placed in restraints at Red Onion on August 14, 2015. (Plaintiff's Exhibit No. 1, Docket Item No. 84-1.) At least two of these photos appear to show injuries Wall sustained in the incident. One appears to show blood and/or cuts on Wall's left wrist, (Docket Item No. 84-1 at 4), and one appears to show injuries to Wall's face, (Docket Item No. 84-1 at 6). Medical records submitted into evidence show that, when Wall was placed in restraints, Defendant Nurse J. Deel noted that Wall had been involved in an altercation and had "scattered [ecchymosis] scattered over body" with "no active bleeding at [that] time." (Plaintiff's Exhibit No. 2, Docket Item No. 84-2 at 1.)

Wall's medical records also show that he was examined by Nurse M. Stanford upon his arrival at Wallens Ridge later that day. (Docket Item No. 84-2 at 4-5.) Stanford noted that there was swelling around Wall's right eye with bright purple discoloration, but no bleeding, and swelling and bright purple discoloration over Wall's right brow. Stanford also noted swelling across the bridge of Wall's

nose and some discoloration on his left eyelid and outer aspect of his eye. She also noted bright purple discoloration on Wall's left cheek and right side of his face. She noted that Wall's lips were swollen and that his upper lip was discolored dark purple. She also noted three well-defined red marks on the left side of his neck, approximately three-quarters of an inch in width. Stanford also noted swelling to the right back side of Wall's head and red areas on his left flank, with redness noted on his left lateral rib area, left upper arm, right shoulder, both clavicles, middle of his chest and right shoulder. She noted abrasions in the middle of his right clavicle and on his right shoulder. She noted that Wall's wrists were swollen with abrasions, and he complained of pain and tenderness in his left wrist and left fifth finger and tenderness in the back of his left hand. Stanford also noted small red areas on his left hip and both knees. X-rays taken of Wall's facial bones, skull and left hand and wrist were all normal except for a small chip fracture at the base of the fifth distal phalanx with mild displacement, but no dislocation. (Docket Item No. 84-2 at 29-32.)

Wall also submitted the Disciplinary Offense Reports for the disciplinary offenses with which he was charged on August 14, 2015, and numerous related documents into evidence. (Plaintiff's Exhibit Nos. 6-10, Docket Item Nos. 84-6 to 84-10.) Disciplinary Offense Report No. ROSP-2015-1481 showed that Wall was charged with offense code 105A for aggravated assault upon a non-offender on August 14, 2015, by J. Hicks. (Docket Item No. 84-6 at 1.) Under the Description of Offense section, Hicks wrote:

> On the above date and approximate time while trying to place restraints on Offender G. Wall …, offender spun around and tried to strike me. This resulted in trying to gain control of the offender Wall at which point Offender Wall did strike me in my eye with his right fist.

(Docket Item No. 84-6 at 1.) This Report noted that it was served on Wall on August 16, 2015, at which time Wall requested the services of an advisor, documentary evidence and witnesses. (Docket Item No. 84-6 at 1.) Wall also was served with a Penalty Offer of an $8 fine, which he did not accept. (Docket Item No. 84-6 at 3.) This Report reflected that this charge against Wall was heard by Defendant Hensley on September 8, 2015. Wall pleaded not guilty to the charge, and Hensley found him guilty of the charge and imposed a penalty of a loss of 180 days of good-time credit. (Docket Item No. 84-6 at 2.) Under the Reason for Decision section, Hensley wrote:

> Officer Hicks stated that he was attempting to cuff Offender Wall to take him to segregation and he then was assaulted by Offender Wall. He stated that Offender Wall struck him in the eye with his fist requiring three stitches. During the hearing Offender Wall stated that he was the one who was assaulted and if he struck Officer Hicks he did not mean to. Offender Wall struck Officer Hicks with a closed fist. Therefore I find Offender Wall Guilty of aggravated assault upon a non-offender.

(Docket Item No. 84-6 at 2.)

Attached to this Report was a Request for Documentary Evidence form from Wall requesting that the Hearings Officer review the A-100 pod Rapid-Eye security cameras on August 14, 2015, from approximately 4 to 5 p.m. Wall wrote, "This requested evidence will show I never approached Officer Hicks while at the vestibule door nor tried to strike him…. Simply ask[ed] him about his unusual directive to 'Go into the Vestibule' after I was [going to cell] door to lock down." Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons such as video and audio

recordings" or "information is not written documentation." (Docket Item No. 84-6 at 6.) A second attached Request for Documentary Evidence form from Wall sought any written policy, memorandum or directive governing a population offender's movement. (Docket Item No. 84-6 at 7.) Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons…." Also attached was a Witness Request Form asking for the A-100 pod Control Booth officer provide a statement regarding the disciplinary charge. (Docket Item No. 84-6 at 8.) In the Witness Statement section of the form, Defendant E. Hess wrote: "I could not see anything due to where the incident happened." Hearings Officer Hensley found Hess's statement not relevant to the offense. (Docket Item No. 84-6 at 8.)

Wall appealed his conviction of the 105A offense code to the Facility Unit Head. (Docket Item No. 84-6 at 10-11.) In his appeal, Wall claimed that his due process rights were violated, in that he did not receive an ICA hearing within 15 days of his transfer from general population at Red Onion to pre-hearing detention at Wallens Ridge, he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage, and adequate investigation could not be done by staff at Wallens Ridge since the incident occurred at Red Onion. (Docket Item No. 84-6 at 10-11.) Defendant Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-6 at 13-18.) Wall appealed Warden Fleming's decision to the Regional Administrator, (Docket Item No. 84-6 at 19-21), and Defendant Regional Administrator Henry Ponton upheld Wall's conviction on this charge. (Docket Item No. 84-6 at 22-23.)

Disciplinary Offense Report No. ROSP-2015-1503 showed that Wall was charged with offense code 105A for aggravated assault upon a non-offender on

August 14, 2015, by Captain D. Still. (Docket Item No. 84-7 at 1.) Under the
Description of Offense section, Still wrote:

> On August 14, 2015 at approximately 4:05 pm offender G.
> Wall did assault Officer E. Rasnick by [punching] him repeatedly
> resulting in injuries to the officer that were treated outside Red Onion
> State Prison by Mountain View Regional Medical Center. The basis
> of the charge is the result of an investigation completed August 17,
> 2015. Interviews of the victims and a review of security footage were
> completed and provided the factual knowledge in writing this charge.

(Docket Item No. 84-7 at 1.) This Report noted that it was served on Wall on
August 17, 2015, at which time Wall requested the services of an advisor,
documentary evidence and witnesses. (Docket Item No. 84-7 at 1.) Wall also was
served with a Penalty Offer of a loss of all accumulated good time, which he did
not accept. (Docket Item No. 84-7 at 3.) This Report reflected that this charge
against Wall was heard by Defendant Franks on August 25, 2015. Wall pleaded not
guilty to the charge, and Franks found him guilty of the charge and imposed a
penalty of loss of 90 days of good-time credit. (Docket Item No. 84-7 at 2.) In the
Reason for Decision section, Franks wrote:

> Offender Wall said that he did not hit anyone. Captain Still
> testified that he investigated the altercation between offender Wall
> and officer Rasnick. The video showed officer Rasnick coming to the
> aid of another officer that was having trouble with offender Wall and
> that in the process the officers ended up on the floor. Captain also said
> that as a result of the altercation officer Rasnick had to be treated at an
> off site medical facility (Mountain View Regional Medical Center) for
> his knee and a mark under his eye that looked like it was caused by a
> blow. Officer Rasnick has not yet returned to work because of the
> altercation. Offender Wall was found guilty on the reporting
> officer['s] testimony about what was viewed on the video, along with
> the injuries that officer Rasnick received.

(Docket Item No. 84-7 at 2.)

Attached to this Report was a Request for Documentary Evidence form from Wall requesting that the Hearings Officer obtain the statements obtained by Still when he interviewed Rasnick and Hicks. (Docket Item No. 84-7 at 4.) Wall wrote that this evidence would show inconsistencies with the video footage. (Docket Item No. 84-7 at 4.) Hensley responded on August 18, 2015, that the requested information would not be obtained because it was "from an outside source, restricted for security reasons such as video and audio recordings." (Docket Item No. 84-7 at 4.) Also attached to the Report was a Request for Documentary Evidence form from Wall requesting that the Hearings Officer obtain the Rapid-Eye security camera video recordings from August 14, 2015, for the A-1 pod from approximately 4 to 5 p.m. Wall wrote:

> Reporting Officer Captain D. A. Still says review of the security video footage provided the factual knowledge in writing this charge. Since I never hit, punched, or attacked either officer as alleged to initiate this confrontation, so if there is ANY irrefutable video footage available showing I hit Officer Rasnick repeatedly, it should be provided.

(Docket Item No. 84-7 at 5.) Again, Hensley responded on August 18, 2015, that the requested information would not be obtained because it was "from an outside source, restricted for security reasons such as video and audio recordings." (Docket Item No. 84-7 at 5.)

Wall appealed his conviction of the 105A offense code charge to the Facility Unit Head. (Docket Item No. 84-7 at 7-8.) In his appeal, Wall claimed that his due process rights were violated, in that he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage,

and an adequate investigation could not be done by staff at Wallens Ridge since the incident occurred at Red Onion. (Docket Item No. 84-7 at 7-8.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-7 at 9-16.) Wall appealed Warden Fleming's decision to the Regional Administrator, (Docket Item No. 84-7 at 17-20), and Regional Administrator Ponton upheld Wall's conviction on this charge. (Docket Item No. 84-7 at 21.)

Disciplinary Offense Report No. ROSP-2015-1480 showed that Wall was charged with offense code 129 for gathering around/approaching any person in a threatening/intimidating manner on August 14, 2015, by Hicks. (Docket Item No. 84-8 at 1.) Under the Description of Offense section, Hicks wrote:

> On the above date and approximate time as I C/O Hicks was escorting Offender [W]all to the vestibule to speak with a Supervisor. As we reach the vestibule door He turned and approached me in an intimidating and threatening manner, Resulting in an assault on me.

(Docket Item No. 84-8 at 1.) This Report noted that it was served on Wall on August 16, 2015, at which time Wall requested the services of an advisor, documentary evidence and witnesses. (Docket Item No. 84-8 at 1.) Wall also was served with a Penalty Offer of a loss of good time of 90 days, which he did not accept. (Docket Item No. 84-8 at 3.) This Report reflected that this charge against Wall was heard by Defendant Hensley on September 8, 2015. Wall pleaded not guilty to the charge, and Hensley found him guilty of the charge and imposed a penalty of 30 days disciplinary segregation. (Docket Item No. 84-8 at 2.) In the Reason for Decision section, Hensley wrote:

> Officer Hicks stated that he instructed Offender Wall to place his hands on the wall to be cuffed and Offender Wall complied. When he attempted to cuff Offender Wall … he turned and stated I [am] not fucking doing it and squared off and then an assault occurred. During the Hearing[,] Offender Wall denied approaching Officer Hicks and stated that he was assaulted by Officer Rasnick and Officer Hicks.

> The testimony from Officer Hicks was [m]ore convincing [than] the
> testimony from Offender Wall. Therefore I find Offender Wall guilty
> of approaching any person in a threatening or intimi[d]ating manner.

(Docket Item No. 84-8 at 2.)

Attached to this Report was a Request for Documentary Evidence form from
Wall requesting that the Hearings Officer obtain the A-100 pod Log Book entry
from approximately 4 p.m. on August 14, 2015, as evidence. (Docket Item No. 84-
8 at 6.) Wall wrote that this evidence would show "when a Supervisor's assistance
was requested by either working officer as alleged for offender to go speak
with…." (Docket Item No. 84-8 at 6.) Franks responded on August 17, 2015, that
the requested information would not be obtained because it was "restricted for
security reasons such as video and audio recordings." (Docket Item No. 84-8 at 6.)
Another Request for Documentary Evidence form from Wall also was attached to
the Report requesting Rapid-Eye security camera video recording from August 14,
2015, from approximately 4 to 5 p.m. Wall wrote, "This requested evidence will
show [me] at the vestibule door. I never approached Officer Hicks nor tried to
strike him. Simply ask[ed] him about his unusual directive to 'Go into the
Vestibule' when I was at my door to lock down." (Docket Item No. 84-8 at 7.)
Franks responded on August 17, 2015, that the requested information would not be
obtained because it was "restricted for security reasons such as video and audio
recordings" or "information is not written documentation." (Docket Item No. 84-8
at 7.) A third attached Request for Documentary Evidence form from Wall sought
any written policy, memorandum or directive governing a population offender's
movement. (Docket Item No. 84-8 at 8.) Again, Franks responded on August 17,
2015, that the requested information would not be obtained because it was
"restricted for security reasons…." Also attached was a Witness Request Form
asking for the A-100 pod Control Booth officer to provide a statement regarding

the disciplinary charge. (Docket Item No. 84-8 at 9.) In the Witness Statement section of the form, Hess wrote: "I could not see anything due to where the incident happened." Hensley found Hess's statement not relevant to the offense. (Docket Item No. 84-8 at 9.)

Wall appealed his conviction of the 129 offense code charge to the Facility Unit Head. (Docket Item No. 84-8 at 11-12.) In his appeal, Wall claimed that his due process rights were violated, in that he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage, and an adequate investigation could not be done by staff at Wallens Ridge since the incident occurred at Red Onion. (Docket Item No. 84-8 at 11-12.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-8 at 13-19.) Wall appealed Warden Fleming's decision to the Regional Administrator, (Docket Item No. 84-8 at 20-22), and Regional Administrator Ponton upheld Wall's conviction on this charge. (Docket Item No. 84-8 at 23-24.)

Disciplinary Offense Report No. ROSP-2015-1483 showed that Wall was charged with offense code 201 for disobeying an order on August 14, 2015, by Holbrook. (Docket Item No. 84-9 at 1.) Under the Description of Offense section, Holbrook wrote:

> On 08-14-2015 at approx. 4:00 PM, I officer Holbrook was observing pod recreation in A-1 pod. I officer Holbrook gave offender G. Wall … a direct order to return to his cell and lock down, offender Wall refused.

(Docket Item No. 84-9 at 1.) This Report noted that it was served on Wall on August 16, 2015, at which time Wall requested the services of an advisor,

documentary evidence and witnesses. (Docket Item No. 84-9 at 1.) Wall also was served with a Penalty Offer of 15 days disciplinary segregation, which he did not accept. (Docket Item No. 84-9 at 3.) This Report stated that this charge against Wall was heard by Defendant C. W. Franks on August 24, 2015. Wall pleaded not guilty to the charge, and Franks found him guilty of the charge and imposed a penalty of 15 days disciplinary segregation. (Docket Item No. 84-9 at 2.) In the Reason for Decision section, Franks wrote:

> Offender Wall said that he did not refuse to go back to his cell, that he just did not understand what was said. Reporting Officer Holbrook said that offender refused an order to return to his cell, and approached the control booth asking to speak to a sergeant. Officer Holbrook also said that offender Wall started toward his cell and once again turned around and ask[ed] for a sergeant. Offender Wall was found guilty on the preponderance of the evidence.

(Docket Item No. 84-9 at 2.)

Attached to this Report was a Reporting Officer Response Form containing Holbrook's answers to several questions posed to him by Wall. (Docket Item No. 84-9 at 4.) In response to "was your directive 'heard' or 'understood' by Offender Wall," Holbrook wrote: "When Offender Wall heard me say to lock down he refused my order and approached the control room and demanded to speak to a [sergeant]." In response to Wall's question, "Did Offender Wall, at any time after your directive was understood, return to his cell to lock-down," Holbrook wrote, "After several direct orders he began to approach his cell, then turned and once again demanded to speak with a [sergeant]." In response to Wall's question, "Why wasn't Offender Wall locked in his cell as directed," Holbrook wrote, "After orders were given to lock down your continued disruptive behavior during pod recreation you were being escorted by staff to speak with a [sergeant]."

A Request for Documentary Evidence form from Wall was attached to the Report requesting the Rapid-Eye recordings from the three security cameras in the A-100 pod on August 14, 2015, from approximately 4 to 5 p.m. (Docket Item No. 84-9 at 5.) Wall wrote, "This requested evidence will show after the directive was 'heard' and 'understood,' I did comply." (Docket Item No. 84-9 at 5.) Franks responded on August 17, 2015, that the requested information would not be obtained because it was "restricted for security reasons such as video and audio recordings" or "information is not written documentation." (Docket Item No. 84-9 at 5.)

Wall appealed his conviction of the 201 offense code charge to the Facility Unit Head. (Docket Item No. 84-9 at 7-8.) In his appeal, Wall claimed that his due process rights were violated, in that he was not allowed the assistance of an advisor as he had requested, and the hearings officer did not review the requested video footage. (Docket Item No. 84-9 at 7-8.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-9 at 9-13.)

Disciplinary Offense Report No. ROSP-2015-1485 showed that Wall was charged with offense code 229 for being in an unauthorized area on August 14, 2015, by Holbrook. (Docket Item No. 84-10 at 1.) Under the Description of Offense section, Holbrook wrote:

> On 08-14-2015 at approximately 4:00 PM[,] I officer Holbrook was observing pod recreation, and saw offender G. Wall … cross the red line in front of the cell doors in A-1 pod during pod recreation, this area is unauthorized to be in during pod recreation.

(Docket Item No. 84-10 at 1.) This Report noted that it was served on Wall on August 16, 2015, at which time Wall requested the services of an advisor,

documentary evidence and witnesses. (Docket Item No. 84-10 at 1.) Wall also was served with a Penalty Offer of a loss of telephone privileges for 30 days, which he did not accept. (Docket Item No. 84-10 at 3.) This Report reflected that this charge against Wall was heard by Defendant Franks on August 24, 2015. Wall pleaded not guilty to the charge, and Franks found him guilty of the charge and imposed a penalty of a $5 fine. (Docket Item No. 84-10 at 2.) In the Reason for Decision section, Franks wrote:

> Offender Wall said that this is not a charge that most officer[s] write. Officer Holbrook stated that he saw offender Wall cross that red line in front of cell A106, and was in an unauthorized area. This was where Offender Wall was housed. Offender Wall was found guilty on the preponderance of the evidence.

(Docket Item No. 84-10 at 2.)

Attached to this Report are two Reporting Officer Response Forms containing Holbrook's answers to several questions posed to him by Wall. (Docket Item No. 84-10 at 5-6.) In response to, "What cell is Offender Wall assigned to in Alpha-100 pod," Holbrook wrote: "A-106." In response to Wall's question, "When you observed Offender Wall cross the 'red-line,' what cell was he in front of," Holbrook wrote, "A-106." In response to Wall's question, "What was Offender Wall doing," Holbrook wrote, "I don't know I just saw offender Wall cross the red line 'in an unauthorized area' and slide something under A106." In response to Wall's question, "What happened next, after you observed this," Holbrook wrote, "Offender Wall was ordered to lock down but refused." In response to Wall's question, "Is it [Red Onion's] custom to terminate an Offender['s] [recreation] for placing items in front of his cell door and/or to charge him with being in an

unauthorized area in the past," Holbrook wrote, "I can not speak for the past, but on this day I saw you in an unauthorized [area]."

Wall appealed his conviction of the 229 offense code charge to the Facility Unit Head. (Docket Item No. 84-10 at 8-9.) In his appeal, Wall claimed that his due process rights were violated, in that he was not allowed to meet with an advisor as he had requested, the hearings officer did not review the requested video footage, and an adequate investigation could not be done by staff at Wallens Ridge since the incident occurred at Red Onion. (Docket Item No. 84-10 at 8-9.) Warden Fleming upheld this disciplinary offense conviction on appeal. (Docket Item No. 84-10 at 10-15.)

Wall testified that, on August 19, 2015, he told Special Investigations Unit, ("SIU"), Investigator J. Wood that he had been assaulted at Red Onion and could not write. He said that he later mailed a notarized statement to Wood. (Plaintiff's Exhibit No. 12, Docket Item No. 84-12 at 11-15.) Wall testified that, when Wood returned to speak with him a second time, Wood was saying that he had said "things I did not say." He said that he spoke to Wood a third time in November 2015, after he had been transferred back to Red Onion. Wall submitted a copy of the SIU case file of its investigation of this incident for the limited purpose of showing that both the Rapid-Eye and handheld video recordings of this incident were saved and reviewed by Wood. (Docket Item No. 84-12.)

Wall also testified that VDOC Operating Procedure, ("OP"), 861.1 was revised in February 2016. Nonetheless, Wall said that his disciplinary hearings that occurred in August and September 2015 were conducted pursuant to the new policy that was not yet in effect.

Later in Wall's testimony, he stated that Rasnick, on August 14, 2015, kept saying, "We got to do something about your mouth." Wall did not, however, testify to these statements when he testified earlier regarding the events of that day, and he did not state when Rasnick made these statements.

The Rapid-Eye surveillance video recording from the A-1 pod, taken on August 14, 2015, at the relevant time, was admitted into evidence at Plaintiff's Exhibit No. 13. This video evidence shows that an inmate crosses the red line in the A-1 pod and appears to place something on the floor outside of cell 106. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:58:47 to 3:58:55.) Wall testified that this video recording showed that he crossed the red line and approached his cell at this time. The video shows that Wall then returned to a table in the middle of the pod with other inmates before walking toward the control booth end of the pod. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:59:03 to 3:59:14.) Wall then can be seen speaking to someone and gesturing with his hands, although the surveillance video contains no audio. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:59:14 to 3:59:39.) Wall then turned to his left, as if someone spoke to him, and he turned and walked back toward a table in the middle of the pod, picked up something and went and stood in front of his cell door. (Plaintiff's Exhibit No. 13, A1 Pod Left at 3:59:39 to 4:00:13.) As the other inmates return to their cells, it appears that Wall set something down on the floor in front of his cell and then walked toward two officers in the middle of the pod. (Plaintiff's Exhibit No. 13, A1 Pod Left at 4:00:18 to 4:00:31.) Wall and the two officers then walked toward the control booth end of the pod. (Plaintiff's Exhibit No. 13, A1 Pod Left at 4:00:35 to 4:00:46.) The three passed out of the view of this recording.

A few seconds later, a recording from another surveillance camera shows that a scuffle occurred on the pod side of the A-1 door. (Plaintiff's Exhibit No. 13,

A123 Vestibule at 4:00:51.) As the A-1 door opens, the video shows that the two officers were struggling with Wall, who is on his feet. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:03.) The officers were still struggling with Wall, who was then on the floor, when a third officer entered the pod through the opened door, (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:11), then a fourth officer followed. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:14.) It appears that all four officers then struggled with Wall. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:16 to 4:01:35.) A canine handler and canine then entered the pod with several other responding officers. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:36.) An officer, who appears to be bleeding from his face, then exited the pod with the assistance of other officers, and walked through the vestibule. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:57 to 4:02:01.) An additional canine handler and canine and additional officers responded and entered the vestibule. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:02:08.)

After these additional officers arrived, it appears that officers stood Wall up, and Wall was visible in the A-1 doorway. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:02:23.) Wall, however, testified that he was lapsing in and out of consciousness at this point. It appears that several of the officers continued to struggle with Wall as they entered the vestibule with him and leave the A Building. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:02:23 to 4:02:42.)

The video recording taken by an additional surveillance camera shows Wall on the ground with at least three officers over him. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:30.) By the time this camera focuses in on the disturbance, four officers were kneeling over Wall, and the first canine handler and canine were entering the A-1 pod. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:38.) From this view, it appears that the four officers struggled with Wall, who appears to be

lying on his stomach on the floor, for a few seconds until they were able to place both his hands behind his back and restrain him. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:38 to 4:01:52.) As the court watched the video, Wall testified that Hicks and Rasnick had him restrained before the first two responding officers, Lyall and Large, arrived. At this point, the video recording shows that an officer leaned against the wall who was bleeding from his right eye area. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:01:53.) That officer then got up and exited the pod with assistance. The officers then stood Wall up on his feet and escorted him from the pod. (Plaintiff's Exhibit No. 13, A1 Pod PTZ at 4:02:20.) The video recording from another surveillance camera in the A-1 Building Entrance shows officers escorting Wall from the building. (Plaintiff's Exhibit No. 13, A123 Entrance at 4:02:53 to 4:02:57.) The video evidence shows that, from the time the scuffle began, approximately one minute elapsed before Wall was restrained, and, within two minutes, Wall was being escorted from the building.

A handheld camera video recording taken on August 14, 2015, was admitted into evidence as Plaintiff's Exhibit No. 14. This recording begins with Wall against the wall with officers surrounding him in the B Building vestibule. Defendant Collins is seen and heard asking who the offender is and then yells, "What is your fucking name?" (Plaintiff's Exhibit No. 14 at 00:15.) Other officers can be heard telling Wall to "face the wall" and, later, telling Wall "don't move again." Wall is not visible through much of this recording due to the number of officers surrounding him. When officers began moving Wall, Wall's face is not visible on the video except for one brief moment, but Wall clearly was walking under his own power. (Plaintiff's Exhibit No. 14 at 5:23.) During his testimony, Wall stated that, for the brief moment his face was visible, he could see blood on his nose and shirt. He said that the blood was a result of his face being rammed into the wall. Wall did admit that he walked of his own power from the B Building vestibule to

cell B-308 to be placed in restraints. Once Wall was escorted into a cell, an officer can be heard asking another officer to bring a spit mask. (Plaintiff's Exhibit No. 14 at 6:29.) The video shows that officers placed Wall on a bed, removed his clothing and placed him in a safety smock and restraints. Again, Wall is not visible during much of this time. At one point, the video shows Wall sitting up so his shirt can be removed, and blood is clearly visible on his shirt. (Plaintiff's Exhibit No. 14 at 10:27.) After Wall is placed in restraints, two nurses came into the cell and checked the restraints. (Plaintiff's Exhibit No. 14 at 16:10.) While the nurses are present, it sounds like defendant Collins asked Wall, "Do you have any complaints for the nurse?" (Plaintiff's Exhibit No. 14 at 16:40.) Wall does not respond. One of the nurses spoke to Wall at one point, but what she says is not audible. (Plaintiff's Exhibit No. 14 at 17:13.) Collins can then be heard saying, "Wall, the nurse is here." (Plaintiff's Exhibit No. 14 at 17:16.) It does not appear that Wall responds.

The video recordings do not show any medical treatment being offered to Wall, and they do not show that he was ever offered or received decontamination from OC spray.

During cross-examination, Wall stated that, after Rasnick grabbed his left arm, Rasnick swung his fist and hit Wall in the right side of his head. Wall said that he then put his hands up to block Rasnick's punches while Rasnick was holding his right arm. Wall said that he was trying to get down on the ground when Officer Hicks tackled them, and they all fell to the floor. Wall said that he ended up on his back on the floor. He said that he attempted to roll over onto his stomach, but when he rolled one way, Hicks was in his way, so he rolled the other way. Wall said that, after he rolled onto his stomach, Hicks grabbed his left hand, and he then put his right hand behind his back so it could be restrained. Wall said, while he was lying on his stomach restrained, with Hicks and Rasnick on top of him, the

vestibule door opened, and "I got gassed" as Lyall and Large came into the pod. Wall said that he also was kicked and punched in the head while restrained. Wall said that on the way from the A Building to the B Building, the escorting officers purposefully ran him into fence poles, doors and entryways. Wall admitted that he did not tell the nurses he needed any medical treatment, but he claimed this was because he was unconscious when the nurses inspected his restraints.

Correctional Officer Holbrook testified that he had worked for the VDOC at Red Onion for eight years. Holbrook said that he was working as the gun officer in the control booth of the Red Onion A Building 1, 2, 3 side on August 14, 2015, when he saw Wall cross the red line and appear to slide something under a cell door during pod recreation. He said that he yelled at Wall and asked him to step to the control booth so he could talk with Wall. When Wall approached the control booth, Holbrook said, he asked Wall what he had done. Holbrook said that he told Wall to return to his cell. He said that Wall asked to speak to a sergeant and kept telling Holbrook that he was not going to his cell.

Holbrook said that he saw Officers Rasnick and Hicks come down from the top tier of the pod and tell everyone to return to their cells to lock down. Otherwise, Holbrook said that he did not hear any of the conversation between these officers and Wall. Holbrook said that he saw Wall and the officers walk toward the vestibule door, which was underneath the control booth. Holbrook said that, after the three disappeared from his view out of the control booth window, he "heard a commotion" that sounded like a "physical altercation" beneath the control booth, and he called a code 10-33, officers need assistance, in the A-1 pod on the prison radio. Holbrook said that he stepped back and looked through a clear portion of the control booth floor and saw Wall, Rasnick and Hicks lying on the floor. He said that numerous other officers then responded, and all he could see

was a "jumble" of officers below. Holbrook testified that Officer Hess was working in the control booth with him that day, and Hess opened the A-1 door.

Holbrook said that he completed an Internal Incident Report regarding what he witnessed. This Internal Incident Report was admitted into evidence as Plaintiff's Exhibit No. 15. (Docket Item No. 84-13.) On this Internal Incident Report, Holbrook wrote:

> On 08-14-2015 at approximately 4:05 PM, I officer C. Holbrook was observing pod recreation in A-1 pod, and saw Offender G. Wall cross the red line and approach cell A-106[] and slide something under the door. The control room officer[] and I gave a direct order to the bottom tier to lock down[] and return to their cells, all offenders complied except offender [W]all. After the bottom tier was locked down offender [W]all started walking towards the control room saying he would like to speak with a sergeant. Officer[s] Hicks and Rasnick came off the top tier to escort offender [W]all to speak with a sergeant, at this time the offender, [O]fficers Hicks, and Rasnick were out of my view at the A-1 door, I officer Holbrook heard a commotion at the A-1 door, and called for assistance from staff.

(Docket Item No. 84-13.)

Holbrook testified that he also wrote out a statement for Investigator Wood from the SIU. This statement, written on a form entitled "Investigative Interview," was admitted into evidence as Plaintiff's Exhibit No. 16. (Docket Item No. 84-14.) On this form, Holbrook wrote:

> On 8-14-15 at approximat[e]ly 4:00 PM[,] I Officer Holbrook saw offender Wall slide an object under cell A106. I Officer Holbrook gave offender Wall a direct order to lock down for being in an unauthorized area, Offender Wall refused and began walking to the

control room cursing at me refusing to lock down. Once the bottom tier was locked down[,] Officer Hicks and Officer Rasnick were attempting to escort offender Wall to speak with the supervisor at this time offender Wall and officers Hicks and Rasnick were out of my sight at the A1 pod door. I officer Holbrook [heard] a strange noise at the door and concluded that the officers were [attempting] to gain control of offender Wall. I officer Holbrook called for assistance from staff. Staff entered and escorted offender Wall out of the building.

(Docket Item No. 84-14 at 1-3.) This statement was dated August 24, 2015.

Holbrook also testified that he completed the Reporting Officer Response Form, admitted into evidence as Plaintiff's Exhibit No. 9. (Docket Item No. 84-9 at 4.) He stated that he answered Wall's questions contained on this Form based on his recollections, and he did not give any untrue information to the hearings officer. Holbrook further testified that he completed the Reporting Officer Response Form, admitted into evidence in Plaintiff's Exhibit No. 10. (Docket Item No. 84-10 at 5-6.) Again, he said that he did not provide any untrue information on this Form and that the information he provided accurately reflected what had occurred. He further testified that he completed the Disciplinary Offense Reports, admitted into evidence in Plaintiff's Exhibit Nos. 9 and 10, on the day after the incident, August 15, 2015.

Correctional Officer Hess testified that he was working in the control booth with Holbrook on August 14, 2015, when he heard Holbrook tell Wall to lock down. Hess stated that Wall responded "fuck you" to Holbrook. Hess said that he opened all cell doors in the A-1 pod, except for Wall's cell. Hess admitted that he had provided the answers to interrogatories, admitted into evidence at Plaintiff's Exhibit No. 17, (Docket Item No. 84-15), in which he stated that he did not open Wall's cell door because Wall was refusing to lock down. Hess also stated that he

provided the written statement to Investigator Wood, admitted into evidence as Plaintiff's Exhibit No. 18. In this statement, Hess wrote:

> I, C/O Hess, was the control room officer during the incident in A1 pod. I heard C/O Holbrook give inmate G. Wall a direct order to lock down. Inmate Wall said "fuck you" and refused to lockdown. C/O Rasnick also gave inmate Wall a direct order to lockdown. I could not see any of the altercation between Inmate Wall and C/Os Rasnick and Hicks.

(Docket Item No. 84-16.) Hess stated that he did not hear Wall ask to speak to a supervisor.

Hess admitted that he wrote an entry in the A-1 Control Log Book on August 14, 2015, that described the incident between Wall and Officers Rasnick and Hicks and that was admitted into evidence as Defense Exhibit No. 1. (Docket Item No. 84-21 at 5.) Nonetheless, Hess admitted that he did not see the altercation between Wall and the officers. Hess admitted that he provided statements on Witness Request Forms, admitted into evidence in Plaintiff's Exhibit Nos. 6 and 8. On these forms, Hess wrote: "I could not see anything due to where the incident happened." (Docket Item Nos. 84-6 at 8, 84-8 at 9.)

Defendant and Counter-Claimant Rasnick testified that, on August 14, 2015, his attention was drawn to Wall when he heard Wall tell Holbrook, "fuck you I am not locking down." He said when he heard that, he and Hicks went down from the top tier of the pod. He said that one of them told the other offenders to lock down, but he did not remember who told them. He said that he and Hicks then approached Wall and told him to "cuff up." He said that Wall responded, "fuck you." Rasnick said that he grabbed Wall's right wrist, and Wall jerked away from

him. Rasnick said that he then tried to grab Wall around the waist and take him to the ground to control him. He said that all three men went to the ground.

Rasnick admitted that he did not see Wall hit Hicks in the face, but he did see that Hicks's face was bloody after the incident. Rasnick said that he and Hicks did not butt heads during the incident. Rasnick said that he injured his right knee by tearing the meniscus in it during the incident. He said that, because of his injury, he was relieved by other officers before they removed Wall from the pod. Rasnick admitted that he did not see Wall as he was escorted out of the A-1 pod or from the A Building. Rasnick said that he was never able to come back to work at the prison after his injury. He said that the injury to his knee required surgery and that he was out of work until the middle of December that year. Rasnick said that Captain Still came and spoke to him about the incident later that day while he was at the hospital emergency department seeking treatment for his injury.

Rasnick testified that Defense Exhibit No. 2 was a copy of his medical records for the treatment of the injury to his knee. (Docket Item No. 84-22.) Rasnick said that he was taken to the emergency department at Mountain View Regional Hospital after the incident, where an x-ray was performed on his knee. He said the emergency department physician told him to see his primary physician so he could be referred to an orthopedic specialist. Rasnick said that he eventually was referred to Dr. Wells with Watauga Orthopedics, who ordered an MRI of his knee and performed surgery to repair the torn meniscus in September 2015. Rasnick testified that, since his injury was work-related, he had incurred no out-of-pocket expenses related to his medical treatment. Rasnick stated that he still experienced pain and that his right knee would give out on occasion. He said this was the first time he had ever had an altercation with an inmate while working for the VDOC and that it was one of the reasons he quit working for the VDOC.

Rasnick testified that he took Wall to the floor in an effort to gain control of him. He said once all three of the men were on the floor, Wall "was fighting to try to get loose." Rasnick said that Defendants Large and Lyall entered the pod. He said that he did not recall anyone using any OC pepper spray on Wall. Rasnick said that he did not push, kick or hit Wall, and he used only that amount of force necessary to gain control of Wall. Rasnick said that he did not know if Wall ever lost consciousness while on the floor, but he said that Wall was never just passively lying on the floor during the incident.

Rasnick admitted that Plaintiff's Exhibit No. 19, (Docket Item No. 84-17 at 1-2), was a written statement he gave to Investigator Wood regarding the incident. On this Investigative Interview form, Rasnick wrote:

> On 8/14/15 at approximately 4:00 PM I C/O Rasnick and C/O J. Hicks [were] talking with offenders at the phone. Then I C/O E. Rasnick heard C/O Holbrook tell offender G. Wall … to go back to his cell[.] The offender Wall stated to C/O Holbrook "fuck you I ain't doing shit." C/O Hicks gave offender G. Wall a direct order to lock down[,] he then stated "fuck you I ain't locking down." Then C/O Hicks and myself C/O Rasnick told the rest of the pod to lock down[;] they complied. C/O Hicks then gave G. Wall an order to go [to] the [vestibule] at which time he went in that direction. When myself C/O Rasnick and offender Wall was near the wall and under the gun we then gave him a direct order to cuff up. Offender Wall then walked to the wall[.] I C/O Rasnick [grabbed] his hand and [Wall] pull[ed] from me and said "Get your fucking hands off me." Then C/O Hicks and myself [grabbed] offender Wall and got him to the ground to get control of his hands[.] Offender Wall struck C/O Hicks in the right eye[,] cutting it. I C/O Rasnick twisted my right knee, then responding staff entered the pod and control of offender was gained. I then went to medical for treatment[.]

(Docket Item No. 84-17 at 1-2.)

Rasnick testified that he did not recall experiencing any problems with Wall before this incident, and he held no negative feelings toward Wall on August 14, 2015. Rasnick specifically denied telling Wall, "Shut the fuck up and get the fuck in your cell." He said that he did not use profanity toward Wall.

Red Onion Intelligence Officer Bentley testified that he assisted the SIU in its investigation of this incident. Bentley testified that one of the tasks he performed was to save the video recording from the A-1 pod from the day of the incident. Bentley testified that, unless the video recording was downloaded and saved as a separate file, the Rapid-Eye surveillance camera system would record over an incident within about 90 days time. Bentley said that, to save a recording, he would go to the specific cameras at issue and download the video recording in a digital format and save it on his desktop computer. He would then copy the recording to DVDs or CDs for counsel. Bentley said that there were three Rapid-Eye surveillance cameras operating in the A-1 pod on August 14, 2015.

Bentley testified that Plaintiff's Exhibit No. 23 was an Informal Complaint that Wall filed on August 20, 2015, asking that the Warden review the surveillance video recordings from the A-1 pod cameras, the A and B recreation yard, the B 1, 2 and 3 vestibule and the cell B-308 camera recordings for August 14, 2015, as well as the recordings made by the handheld video camera that day. (Docket Item No. 85-1.) Bentley said that he responded to this Informal Complaint by informing Wall that the incident was being investigated by the SIU.

Bentley testified that he did not know if any Operating Procedures required that video of such an incident be saved. He also said that he did not know how to alter any of the video recordings he downloaded and saved from the Rapid-Eye surveillance cameras. He said that, at the time of this incident, the Rapid-Eye

surveillance system was password protected and that a person had to have authority to access the system with a password to retrieve video recordings. Bentley said that he could not specifically recall if he was the officer who actually downloaded and saved the recordings of this incident from the Rapid-Eye surveillance system, but he knew that he did not alter the recordings because he did not know how to alter the recordings.

Defendant and Counter-Claimant Hicks testified that he was working as a correctional officer at Red Onion on August 14, 2015, when he and Rasnick entered the A-1 Pod at Red Onion and heard Wall talking with the officers in the control booth. Hicks said that Rasnick told Wall to "lock down." He said that Wall responded, "Fuck you, I'm doing nothing." He said that Wall said for them to get a sergeant. Hicks said that he then told Wall, "This is a direct order. You will lock down." Hicks said that Wall did not obey him and just threw his hand up in the air. Hicks said that he then gave the order for all the inmates in the pod to lock down.

Hicks said that Wall walked over to his cell door, but Hicks told him to go to the vestibule. He said that Wall responded, "Fuck you." He said that he gave Wall a second order to go to the vestibule. Hicks testified that he wanted Wall to go to the vestibule to speak with a sergeant to settle him down. Hicks said that he wanted to restrain Wall before entering the vestibule, so he told him to get on the wall and Rasnick told Wall to "cuff up." Hicks said that Wall walked toward the wall and was standing about two feet from the wall with his hands by his side. Hicks said that as he reached for Wall's left arm and Rasnick reached for Wall's right arm, Wall turned around and swung his arm at him and said, "Don't fucking touch me." Hicks said that he and Rasnick then took Wall to the floor, where Wall "was fighting hard." Hicks said that, while he had Wall lying on his left side with his left arm pinned, he looked down to try to gain control of Wall's right arm, and Wall

struck him in the right eye with his right fist. Hicks said that he and Rasnick continued to struggle to control Wall until Lyall and Large responded and helped them gain control. He said that Wall continued to fight the officers even after they got Wall on his stomach. Hicks said that he never placed handcuffs on Wall and that handcuffs were not placed on Wall until after Lyall and Large responded.

Hicks admitted that he could not identify the precise moment on the video recordings that showed Wall hitting him in his eye. Hicks stated that Plaintiff's Exhibit No. 24, (Docket Item No. 85-2), was an Internal Incident Report he prepared the day after this incident. On this Report, Hicks wrote:

> On the above date and approximate time I C/O J. Hicks along with C/O E. Rasnick were on the top tier of Alpha 1 speaking with the offenders below us on the phone. I C/O Hicks heard C/O Holbrook who was the gunman give offender G. Wall … a direct order to lockdown. At that point offender G. Wall screamed, "Fuck you I ain't gotta do shit. Get the Sgt." At this point I C/O Hicks along with C/O Rasnick both gave offender Wall orders to comply and lockdown to [which] his answer was, "fuck y'all I ain't doin[g] shit." I C/O Hicks gave all offenders the order to lockdown immediately at which point they complied. I then told Offender Wall to proceed to the vestibule at which point he walked up to me in a[n] intimidating manner at which point I gave him another order to proceed to the vestibule. Offender Wall turned and then began to walk towards the vestibule. When we were close to the wall I gave offender Wall the order to be restrained when I tried to place the first cuff on him he spun around and swung at me and yelled, "don't fucking touch me." [A]t this point I grabbed offender Wall to gain control. Myself and offender and C/O Rasnick went to the floor and struggled with offender to gain control. Offender Wall['s] right fist struck [me] in the right eye causing me to bleed. Other C/Os arrived and offender was brought under control.

Hicks said that he was taken to the emergency department at a local hospital after this incident for treatment of the injuries he had sustained. In addition to the

injury to his eye, Hicks said that his right hand was swollen after the incident. X-rays showed that he had fractured his hand near his wrist. Hicks said that he did not strike, hit or kick Wall during the incident, and he did not see anyone else do so. Hicks said that Plaintiff's Exhibit No. 26, (Docket Item No. 85-4), contained three photographs of his injuries taken that day by Captain Still. One was a photograph of the cut above his right eye before it was treated, and the other two were photographs of his hand. Hicks said that Plaintiff's Exhibit No. 27, (Docket Item No. 85-5), contained the medical records of the treatment he received at Mountain View Regional Hospital.

Hicks said that he still had a visible 1½-inch scar over his right eye. He also said that he suffered from post-traumatic stress disorder, in part, as a result of this incident. As a result, he said that he left his job with the VDOC. Hicks said that the day of trial was the first day he had been out of his house in six to seven months.

Hicks testified that, when he and Rasnick took Wall to the ground, Wall fell onto the right side of his body. He said that he was not sure when Wall's face was injured in the incident. Hicks also testified that he never observed Wall lose consciousness and said, "I would have noticed that." Hicks said that, if Wall had ever been unconscious, Wall would have stopped fighting. Wall "never stopped fighting," he said. Hicks said that, once Wall swung at him, Wall was being aggressive, and this needed to be controlled, so they took him to the floor. Hicks also said that, to the best of his knowledge, he gave accurate information to the hearings officer. He said that he never gave the hearings officer any false information.

Defendant and Red Onion Lieutenant J. Lyall testified that he responded to the incident with Wall on August 14, 2015, along with Large. Lyall said that Large

went through the door first. He said that, when he entered the pod, Wall, Hicks and Rasnick were all on the floor. Lyall said that Wall was resisting and being very combative. He said that Wall was not in handcuffs when he arrived. He said that he and Large also got down on the floor to try to regain control of Wall. Lyall said that he thought that he and Large put the handcuffs on Wall. He said that he believed that leg restraints were placed on Wall's ankles before he was moved. Lyall said that he believes he was the officer who stood Wall up against the wall after he was restrained. Lyall said that Wall was still struggling and still combative after being placed in restraints and walked into the vestibule.

Lyall said that he did not see anyone punch, kick or hit Wall. He said that he did not see any officer use any force greater than necessary, and he did not use any force greater than necessary. He also said that he never saw Wall lose consciousness that day. He said that he did not accompany Wall to the B Building. He said that he did not recall if Wall had visible injuries to his face because he did not look at Wall's face that day.

Lyall said that he was the A Building lieutenant on that day. He said that he had not been told that Wall wanted to speak to him, but that it was normal procedure to take offenders to the building vestibule to speak with supervisors.

Lyall said that Plaintiff's Exhibit No. 28 was the Incident Report that he prepared. (Docket Item No. 85-6.) Lyall admitted that he wrote that Wall "sustained only minor injuries" on the second page of the Report. (Docket Item No. 85-6 at 2.) He said he got this information from the nurse's report. Lyall testified, "I wasn't looking for injuries when I arrived. When I arrived I was focusing on restraining [Wall]." Lyall testified that he prepared the Incident Report

after reviewing the Internal Incident Reports. Lyall said that the time of the incident listed was the approximate time that the incident was reported.

In this Incident Report, Lyall wrote:

On Friday, August 14, 2015 at approximately 4:05 pm, the offenders housed on the bottom tier of the A-1 Pod were participating in pod recreation. Officer Holbrook, working as the A-1 Control Gun Officer, observed offender Wall cross over the red boundary line and pass something under A-106 Cell Door. Officer Holbrook ordered the offender to return to his cell but the offender refused stating, "Fuck you, I ain't gotta do shit."

Officer Hicks and Officer Rasnick were presnt in the pod observing pod recreation. Officer Hicks gave offender Wall several orders to lock down but he refused, again stating "Fuck you" to the Officer. At this point the staff ordered all other offenders in the pod to return to their cells. Offender Wall initially moved towards his cell, but stopped and again approached the Officers. All other offenders complied and did return to their cells.

Offender Wall stated to Officer Holbrook that he wanted to speak to a Sergeant. Officer Hicks and Officer Rasnick approached the offender to restrain him, so that he could be taken out of the pod. As Officer Hicks was in the process of placing the offender in handcuffs, offender Wall spun around and swung at Officer Hicks yelling, "Don't fucking touch me," striking the Officer above his right eye.

The Officers began to struggle with the offender, falling to the floor while attempting to gain control. Officer Holbrook announced the situation over the radio and requested immediate assistance. Officer Holbrook did not have a direct line of sight of the altercation and was not able to use the 40 MM to aid the Officers.

Lieutenant Lyall (A Building Supervisor) and Sergeant Large (A Building Sergeant) responded to the pod and observed the Officers in the struggle with the offender. Lieutenant Lyall and Sergeant Large assisted the Officers in gaining control of the offender. Sergeant Large administered a ½ to 1 second burst of OC Spray in an attempt to bring

the offender under control. Staff were able to gain control of offender Wall's hands and place him in handcuffs as other responding staff were able to place him in leg irons. While attempting to remove the offender from the pod, he continued to be combative with staff and had to be placed on the floor several times to maintain control. The offender was removed from A-building and escorted to B-building by Officer Dockery and Officer Gwinn and several other staff.

K-9 Officers responded to the pod but did not engage as the offender was being restrained by several staff.

Lieutenant Collins (B Building Supervisor) with Officer Taylor, Officer Akers and Officer Bishop, placed the offender into 5-point restraints, per orders of Warden Barksdale, after he refused decontamination for OC Pepper Spray exposure.

Nurse J. Deel assessed the offender with the following noted, "Placed in five point restraints, able to place 2 fingers under each restraint. Involved in altercation, scattered ecchymosis over body, no active bleeding at this time. Follow up with Medical as needed."…

(Docket Item No. 85-6 at 2-3).

Defendant L. Collins testified that he was a lieutenant at Red Onion on August 14, 2015, when he responded to the officers in need of assistance, or 10-33 call, on the radio. Collins stated that Plaintiff's Exhibit No. 29, (Docket Item No. 85-7), was the Internal Incident Report that he completed. He said that Plaintiff's Exhibit No. 30, (Docket Item No. 85-8), was a copy of his Answers to Plaintiff's Interrogatories. On the Internal Incident Report, Collins wrote:

On Friday, August 14, 2015, at approximately 4:00 pm, I Lieutenant Collins responded to a 10-33 in A-1 pod involving offender G. Wall. Once staff restrained offender G. Wall, he was escorted to B-3 pod. I asked offender Wall if he needed to be placed in the shower for O.C. pepper spray decontamination. Offender Wall refused to answer me. Offender Wall made several statements that he

was going to harm more staff members. I contacted Warden Barksdale about offender Wall's statements. Warden Barksdale approved the use of five-point restraints to prevent offender Wall from harming staff. Myself, Officer Taylor, Officer Akers, and Officer Bishop placed offender Wall in five-point restraints in B-308 without incident. Nurse Deel assessed offender Wall. There were no injuries to myself and there were no injuries reported to me [by] staff.

(Docket Item No. 85-7.)

Collins said that he walked with Wall to the B Building, but he did not physically touch Wall. He said that he heard Wall continue to threaten to hurt staff. He said that, while walking to the B Building, Wall made several statements that he was planning to harm more staff members. He said the officers stopped in the B Building vestibule with Wall while he contacted Warden Barksdale to gain permission to place Wall in five-point restraints. He said that Wall made threats to harm staff while standing in the vestibule. Collins said that he placed Wall in cell B-308 in five-point restraints with 15-minute watches. Collins said that Plaintiff's Exhibit No. 31 was the pod Log Book that showed that the 10-33 call went out on the radio at 4:04 p.m. and that restraints and the handheld video camera were handed down from the control booth to use while placing Wall in five-point restraints. (Docket Item No. 85-9 at 2.) Collins said that he authorized placing a spit mask on Wall because Wall had just assaulted officers, and he did not like leaving an offender's mouth uncovered while he was in five-point restraints.

Collins said that he offered to decontaminate Wall by asking if he needed to be placed in the shower. He said that Wall refused to answer. Collins said that he did not remember which officers escorted Wall from the A Building to the B Building that day. He also said that he did not see anyone walk him into any poles, walls or door frames. Collins admitted that he saw Wall's face, but he said he did

not remember any injuries. Collins admitted that he asked Wall when he arrived in the B Building, "What's your fucking name?"

Collins testified that Plaintiff's Exhibit No. 32 was an Internal Incident Report prepared by Correctional Officer B. Akers. (Docket Item No. 85-10.) On this Report, Akers wrote:

> [O]n 08-14-15 @ 4:04pm I C/O B. Akers responded to a 10[-]33. [W]hen I arrived inside B 123 side, I relieved C/O Gwinn and helped maintain control of Offender G. Wall .... Also helped escort Offender G. Wall from B-123 vestibule to Cell B-308 where Offender Wall made several comments about how he was going to continue harming staff. Once inside Cell B-308 I helped Lt. Collins, C/O Taylor, and C/O Bishop place Offender G. Wall into 5-point [restraints], no injury to myself at this time.

(Docket Item No. 85-10.)

Collins testified that Plaintiff's Exhibit No. 33 was an Internal Incident Report filed by Defendant Correctional Officer S. Taylor. (Docket Item No. 85-11.) On this Report, Taylor wrote:

> On August 14 2015 at approximately 4:05 PM I responded to a 10-33 called in Alpha 1 upon arriving at the building Offender Wall was being brought out the front door. At this time I observed Offender Wall was being very disruptive and combative toward staff stating "You haven't seen the last of me I am going to continue to hurt everyone of you motherfuckers". At this time I helped escort Offender Wall to Bravo 308 where I assisted Lt. Collins in placing Offender Wall in 5-Point Restraints.

(Docket Item No. 85-11.)

Collins said he knew that he asked Wall if he wanted to be placed in the shower to decontaminate because he noted so on his Internal Incident Report. Collins said that he would not have noted that he asked Wall if he wanted to decontaminate if he had not done so.

Collins said that Wall walked erect from Building A to Building B that day. He said that Wall did not make any complaints about injury to his wrists or his wrists hurting while walking to B Building or after being placed in restraints. Collins said that, if Wall had voiced any complaints, he would have documented those complaints.

Collins specifically said that he did not see Defendant Akers slam Wall's face into the wall. He said that he did not see anyone punch or hit Wall that day. Collins said that he did not see anyone use any greater force than necessary to gain control of Wall that day. Collins said that he helped placed Wall in five-point restraints. He said that he did not see any injuries to the portion of Wall's face that he could see. Collins said that he did not recall if Wall had the spit mask on his face when the nurse assessed him. Collins said that, if Wall had reported that he was injured, he would have allowed the nurse to examine Wall. Collins also testified that, to his knowledge, Wall never lost consciousness that day.

Collins admitted that the handheld video recording showed that Wall and the escorting officers stopped in the middle of the B pod for a moment. He said that he did not recall why they stopped, but it was possible that this could have been one of the times that Wall said something threatening.

Defendant T. Large testified that he worked as a Correctional Sergeant at Red Onion for the A-1 Building on August 14, 2015. Large said that he was not

notified that Wall had wanted to talk to him on August 14, 2015. Large said that he was in the office in the building vestibule when he heard the 10-33 call on the radio. Large said that he entered the pod and used OC pepper spray on Wall. Large said that, when he entered the pod, Wall was on the floor "squirming from side to side" and "twisting" his arms and elbows. Large said that Wall's arms were not completely free, but he was slinging his elbows and resisting. Large said that he came around the side of Wall and administered OC spray to Wall's head area. Large said that he then helped restrain Wall. Large said that, after Wall was restrained, he asked Wall if he needed decontamination from the OC spray. He said that Wall did not respond.

Large testified that Plaintiff's Exhibit No. 34, (Docket Item No. 85-12), was a copy of the Internal Incident Report he prepared on the August 14, 2015, incident with Wall. On this Report, Large wrote:

> On 8-14-15 at approximately 405p I Sergeant Large responded to a 10-33 in the A-1 pod. As I entered the vestibule Officers E Rasnick and J Hicks were in the floor in a scuffle, [b]eing assaulted by Offender G Wall. At that time I utilized a one half to one second burst of OC pepper spray from the MK9 to the facial area of Offender Wall in an attempt to Stop the assault. Myself and Lieutenant Lyall then attempted to pull the offender off of the officers, he was still resisting and striking staff with his fists. We managed to apply the handcuffs, assisting staff arrived and placed leg irons on the offender. As offender Wall was being escorted out of the pod he continued to be combative and had to be placed on the floor several times by assisting staff, to maintain control. Sgt L Collins, Officer Dockery, Officer Gwinn and several other assisting staff escorted the offender to B building to be placed in 5 point restraints by orders of Warden Barksdale. Video camera was started by Officer Bryant as soon as possible and remained on until offender was placed in 5 point restraints. OC decontamination started as soon a[s] the offender exited the building into fresh air he refused to respond when asked if he needed water to decontaminate. Offender was assessed by Nurse Deel.

(Docket Item No. 85-12.)

Large testified that, once Wall was in the building vestibule, he looked directly at Wall and asked Wall if he wanted to decontaminate. He said that Wall did not respond. In fact, he said that Wall did not respond to "anything" after he was restrained. Large said that he used OC spray on Wall because he was continuing to assault the officers trying to restrain him. Large said that OC spray did not do any damage to an offender, but it caused temporary burning and disorientation. He said that Wall was resisting, combative and still struggling when he used OC spray on him. Large said that he told Wall to "Stop!" before he sprayed him with OC spray. He said that he used the OC spray on Wall to try to gain control of Wall to get him in restraints. Large said that Wall's actions made it clear to him that Wall was not going to comply. After using the OC spray, Large said, Wall calmed down enough to allow Lyall to grab his arm, and he and Lyall placed handcuffs on Wall.

Large said that he never saw any correctional officer punch or kick Wall. He said that it was Wall who was thrashing from side to side and hitting officers when he entered the pod. In describing what occurred, Large said, "I am responding to an assault." He said, "We are fighting for our lives, you are in fight or flight mode just trying to defend ourselves." He said that Wall continued being combative after being placed in restraints, and he had to be taken to the floor a couple of times as they attempted to take him out to the A-1 vestibule. Large said that he did not see anyone slam Wall against any door frame. Large said that, after Wall was standing up in restraints, Wall would bend over and lunge forward, as if he was trying to throw himself on the ground.

Large also testified that it was common knowledge among the offenders that they were not allowed to cross the red line into unauthorized areas while on pod recreation because it was explained to them at orientation when they arrived at Red Onion.

Defendant J. Deel, a licensed practical nurse who works at Red Onion, testified that she assessed Wall's injuries and the restraints placed on him on August 14, 2015. As a result of her assessment, she said, she noted that Wall had scattered bruises and bleeding. Deel said that Plaintiff's Exhibit No. 2, (Docket Item No. 84-2 at 1), contained an Inmate Accident/Injury Report Form that she completed on Wall on August 14, 2015. On this Report, Deel wrote:

> Placed in 5 point restraints able to place 2 fingers under each restraint[.] Involved in altercation … [ecchymosis] scattered over body[.] No active bleeding at this time. … No bleeding when nurse arrived.

(Docket Item No. 84-2 at 1.) Deel said that she recalled seeing Wall's entire face, but did not recall if he had a spit mask on or not when she saw him. Deel said that she "charted" that Wall had suffered from a nose bleed, but there was no active bleeding when she arrived. (Docket Item No. 84-2 at 3.) Deel said that, if at any time she had thought Wall was unconscious, she would have summonsed medical assistance. Deel stated that Wall did not speak to her, did not complain about any injury and did not request decontamination. She said that, if she had thought that Wall needed decontamination, she would have asked the officers to do it.

Deel said that Wall had bruising above his right eye and on the bridge of his nose. She said that she had no indication of and did not note any injury to Wall's wrist, knuckles or right hand. Deel said that the injuries she observed on Wall that

day were consistent with an offender struggling with officers on the floor. She also admitted that these injuries were consistent with being struck in the face.

Deel testified that it was possible for a person to break bones in his hands by striking someone or something with his hand. Deel also said that restraints used on Wall's wrist were made of leather and that she has seen these restraints chafe offenders' wrists in the past. Deel said that she did not see any officer do anything inappropriate toward Wall that day. She said that, if she had seen an officer mistreat Wall, she would have asked the officer to stop and reported the officer.

Defendant Correctional Officer E. Gwinn testified that he was working in the A 4, 5 and 6 pod at Red Onion on August 14 when he heard the 10-33 call over the prison radio. Gwinn said that when he arrived at the scene, Wall was being escorted through the inner vestibule and into the outer vestibule of the building. Gwinn said that he was one of the officers who was responsible for controlling Wall inside the B Building vestibule. Gwinn testified that Plaintiff's Exhibit No. 35, (Docket Item No. 85-13), was the Internal Incident Report he prepared. He agreed that this Report stated that Gwinn escorted Wall from the A Building to the B Building. Gwinn said that he could not recall whether he actually had his hands on Wall while escorting him or whether he simply assisted and accompanied other officers.

Gwinn said that he did recall that, while being escorted, Wall would bend forward and move from side to side. Gwinn said that, if he had seen any officers ram Wall into fence poles or into walls, he would have documented it and reported it. In addition to recognizing himself in the handheld video footage taken in the B Building vestibule, Gwinn said that he recognized Officers Akers, Stevens and Duncan as assisting in the video recording.

Gwinn said that, when he had control of Wall that day, Wall did not try to pull away from him. Gwinn stated that, most of the time that Wall was in the B Building vestibule, he simply stood there with the officers. Gwinn specifically denied seeing any officer push Wall's head toward the wall that day.

Defendant and VDOC Hearings Officer C. Franks testified that he heard three of the disciplinary charges placed against Wall on August 14, 2015. Franks said that these hearings occurred at Wallens Ridge. Franks admitted that, on the Disciplinary Offense Report for the offense code 201 charge for disobeying an order, Wall had requested documentary evidence. (Docket Item No. 84-9 at 1.) He admitted that Wall filed a Request for Documentary Evidence form, (Docket Item No. 84-9 at 5), asking that the hearings officer review the video recordings from the A-1 pod Rapid-Eye surveillance cameras for the date and time of this incident. This form states on it: "This form shall not be used to obtain information … restricted for security reasons such as video … recordings…." (Docket Item No. 84-9 at 5.) A box on this form is checked stating that the requested information would not be obtained "due to being from an outside source, restricted for security reasons such as video and audio recordings, information is not written documentation, or is otherwise restricted to the offender." (Docket Item No. 84-9 at 5.) Franks said that he explained to Wall the proper way to request that surveillance camera video recordings be considered, which was to request the hearings officer to review the video recordings at the disciplinary hearing.

Franks said that he had authority to obtain and view surveillance video recordings, but he did not review the video evidence on this charge. He said he did not review the video because he determined it was not necessary because the order Wall disobeyed was verbal, and the surveillance cameras did not record sound. Franks testified that he found Wall guilty of the charge based on Holbrook's

-45-

testimony that, after giving Wall the order to lock down, Wall walked toward his cell and, then, turned and approached Holbrook, again, asking to see a sergeant.

Franks further admitted that, on the Disciplinary Offense Report for the offense code 105A charge for aggravated assault upon a non-offender, Wall also had requested documentary evidence. (Docket Item No. 84-7 at 1.) He admitted that Wall filed a Request for Documentary Evidence form, (Docket Item No. 84-7 at 5), asking that the hearings officer review the video recordings from the A-1 pod Rapid-Eye surveillance cameras for the date and time of this incident. Again, a box was checked indicating that the requested information would not be obtained. Franks testified that he did not view the surveillance video in this case because Captain Still had reviewed it and testified to what the video recordings showed. Franks said that he did not review video footage if a witness viewed the video and testified to what it showed.

Franks agreed that, according to Still's statement on the Disciplinary Offense Report, the video footage showed Wall punched Rasnick repeatedly. (Docket Item No. 84-7 at 1.) He further conceded that, from viewing the Rapid-Eye video footage of the incident in court, it was hard to tell if Wall punched anyone.

Franks said that he did not come into these hearings with any preconceived idea that Wall was guilty of the disciplinary offenses. He said that he listened fairly to all the evidence and found Wall guilty based on the evidence presented. Franks testified that, if he had reviewed the Rapid-Eye video, the video recordings would not have changed his mind about Wall's guilt to these charges.

Franks testified that Wall's hearings at Wallens Ridge were heard under the policy that was in effect until February 2016, which required disciplinary hearings to be held wherever the offender was being housed. Franks said that this policy changed in February 2016 to require disciplinary offenses be heard at the prison where the offense occurred. Franks said that this disciplinary charge against Wall was handled under the policy in effect prior to February 2016. Franks conceded that Wall appealed the findings of guilt on these disciplinary offense charges, and the appeals went to the Warden of Wallens Ridge.

Defendant and VDOC Hearings Officer R. Hensley testified that he heard the two remaining disciplinary offense charges against Wall for offense code 105A for aggravated assault on Officer Hicks and offense code 129 for failing to obey Hicks's order. Hensley said that hearings on these charges were conducted on September 8, 2014. Hensley said that Wall requested that he view the video evidence and the pod Log Book on the 105A offense code charge. He said that he rejected both requests. Hensley said that Wall used the wrong form to request that he obtain the video recordings of the incident, and he said that he could not recall if Wall verbally requested that he review the video at the hearing. Hensley said that he did not review the video because "I saw no reason to review the video."

Hensley said that he had never met Wall prior to the date of these disciplinary hearings. Hensley said that he had no preconceived thoughts of Wall's guilt. He said that he rendered his decisions to the best of his ability. He said that he would not have reached a different conclusion if he had reviewed the surveillance system video recordings.

Defendant Captain D. Still testified that he investigated the 105A offense code charges placed against Wall. Still said that he took statements from Hicks and

Rasnick while they were at the hospital emergency departments being treated for their injuries on the date of the incident. Still said that these statements were the basis of the 105A charge he wrote against Wall and contained in Plaintiff's Exhibit No. 7, (Docket Item No. 84-7 at 1.) Still said that Rasnick told him that Wall swung his arm and started throwing punches, and he, Rasnick, took Wall to the floor. Still said that he was not at Red Onion when this incident occurred, but was at home. He said that he was called and told to go to the hospital emergency department and interview Hicks and Rasnick. Still testified that he turned his notes from these interviews over to Investigator Wood with SIU.

Still testified that he was not sure where J. B. Hall had obtained the information that Wall had struck Rasnick in the face, contained in the Disciplinary Offense Report and admitted as Plaintiff's Exhibit No. 37, (Docket Item No. 85-14). Still said that this Disciplinary Offense Report was never served on Wall.

Still said that the information he provided during his investigation, and his testimony at Wall's disciplinary hearings, was accurate to his knowledge. He specifically denied that he had lied at Wall's disciplinary hearings. He also testified that he never conspired with anyone to charge Wall with additional charges.

Wall also submitted into evidence, as Plaintiff's Exhibit No. 38, a number of Internal Incident Reports concerning the August 14, 2015, incident. These Reports included an Internal Incident Report from Defendant L. Bryant stating that he relieved Officer Taylor of running the video camera in the B 1, 2 and 3 vestibule. (Docket Item No. 85-15 at 1.) Bryant stated that he operated the video camera while Wall was placed in five-point restraints without incident. Also included is the Internal Incident Report completed by Defendant C. Dockery, which stated that he responded to the 10-33 call in A-1 and found Wall already restrained. (Docket

Item No. 85-15 at 2.) Dockery said that he assisted in escorting Wall from the A Building to the B Building. Also included is the Internal Incident Report completed by Defendant C. Bishop, which stated that he assisted Collins, Taylor and Akers place Wall in five-point restraints. (Docket Item No. 85-15 at 3.) Also included is that Internal Incident Report completed by Defendant A. Mullins, which stated that he relieved the officers who had restrained Wall and escorted Wall to the B Building. (Docket Item No. 85-15 at 4.) Also included is the Internal Incident Report completed by Defendant J. Testerman, which stated that he had secured Wall's legs that day and placed him in leg irons. (Docket Item No. 85-15 at 5.) Also included is the Internal Incident Report completed by J. Williams, a canine officer, who responded to the A-1 pod upon hearing the 10-33 call. (Docket Item No. 85-15 at 6.) Williams said that he and his canine, Bruno, escorted Wall to the B Building. Williams wrote, "No force was used." Also included is the Internal Incident Report completed by Sergeant T. Hall, who wrote that he removed Wall from five-point restraints in cell B-308, restrained him and escorted him to the intake area for transport to Wallens Ridge. (Docket Item No. 85-15 at 7.)

Upon remand, an additional evidentiary hearing was held in this matter on May 4-5, 2023. Wall testified that in August 2015 he was in VDOC custody, housed at Red Onion. Wall testified that on August 14, 2015, two officers attacked him in the A-600 pod vestibule. Wall said that, as he was escorted from the A Building to the B Building, he was "continuously abused en route to the B building until I was strapped down." Wall said that a booth officer, Officer Holbrook, called him to the booth to speak to him because Holbrook alleged that he saw Wall slide something under a cell door. Wall testified that his conversation with Holbrook was interrupted by Officer Rasnick shouting, "Shut the fuck up and lock down." Wall stated that he turned around and replied, "Fuck you" to Rasnick. Wall said the "other officer" told everyone to lock down, so he went to his cell to lock down,

but his cell door did not open. He said that he walked back toward the control booth, and both officers met him in the middle of the pod. Wall said that he was given "another directive" to go to the vestibule area.

Wall said he then asked, "Why am I going to the vestibule? You told me to lock down." To which, he said, Rasnick made a comment that he needed to do something about Wall's mouth. Wall said that he then walked about seven paces ahead of the officers to the pod door. He said that, when he got to the door, he turned around, and Officer Rasnick grabbed his left arm, punched him in the head and told him to shut up. Wall said that he put his hands up and stepped back. He said that while he was "on the floor tussling with Officer Rasnick, or where he's tussling with me, I'm just trying to avoid his attack, Officer Hicks entered the fray." Wall said that Hicks took all three of them to the floor, and he "immediately" rolled onto his stomach and put his hands out to show he was not resisting. Wall said that he was never given any orders or directives from the officers. In particular, he said that he was never ordered to put his hands out to be restrained and not ordered to stop resisting.

Wall stated that he had "words before, run-ins before" with Rasnick. He said that was why Rasnick made the statement about doing something about Wall's mouth. Wall said about a week earlier he was downloading music at the pod kiosk when the pod was ordered to lock down. Wall said, because he took so long at the kiosk, Rasnick told him he would not be allowed to come out of his cell for the next recreation period. Wall said that he later was called into the office by Lieutenant Lyall and Sergeant Large and told to apologize to Rasnick. Wall said he refused to apologize.

Wall stated that, on August 14, 2015, he weighed approximately 150 pounds. He estimated that Officer Hicks weighed approximately 250 pounds. Wall stated that he did not hit his head or face on the floor at any time. He specifically denied swinging either of his arms and hitting Officer Hicks. Wall stated, "During this whole altercation, I never threw a punch. My hands [were] up the whole time … retreating." Wall said that when he went to the floor, he attempted to roll to the left to get on his stomach, but he could not because Hicks was in the way. He said that he immediately then rolled right onto his stomach, put his hands behind his back, and his hands were restrained. He said the pod door then opened, and the responding officers, Lieutenant Lyall and Sergeant Large came in. He said that he was immediately "gassed and kicked in the face."

A portion of the Rapid-Eye video, entered into evidence at the earlier trial as Plaintiff's Exhibit No. 13, was played for Wall's review. Wall testified that at 4:00:59 this video showed Hicks's arm pulling back to strike him.  Wall testified that when Sergeant Large entered the pod, he was on his stomach on the bottom of the pile. Wall said that when Lieutenant Lyall entered the pod, he had already been gassed. Wall testified that he did not recall exiting the A Building because he was going in and out of consciousness. When asked why he was going in and out of consciousness, Wall stated that "when they came in, somebody hit me in the back of my head behind my ear, and I lost consciousness." Wall then stated that he went in and out of consciousness during the entire incident that day. Wall further testified that he was unconscious when the guards carried him out of the A Building, and he did not regain consciousness until he was in the recreation yard area right outside of the A Building door.

Wall said that "[t]o the best of [his] belief" he was being escorted by Officers Dockery and Gwinn, but he was accompanied by multiple officers. Wall

denied making any threats toward the officers while being escorted from the A Building to the B Building. In fact, he stated that he did not make any comments to the officers, and he did not threaten any officer at any point during the events of August 14. Wall claimed that, if he had made threats that day to the officers, he would have been charged with a disciplinary code 212 violation, and he received no such charge.

Wall stated that, when he regained consciousness, someone was bending his hand and fingers, causing pain. He said that he was walking hunched over, and he said that he was "drove into a pole." Wall said that he tried to follow the officers' directives to walk. He said that he was guided by the two officers escorting him, and one of the officers was pushing his head down. He said that, instead of moving forward, the officers were moving him to the right or to the left, and he was run into several objects on his way to the B Building.

Wall testified that, to his knowledge, there was a surveillance camera on the outside corner of the A Building focused directly on the exit to the A Building. Wall stated that he was escorted through the A Building recreation yards, where there were additional surveillance cameras. Wall stated that the B Building was a mirror image of the A Building, with surveillance cameras similarly situated.

Wall stated that, as soon as he entered the B Building, he was placed against a wall in the B Building entryway. Wall said that someone from behind hit him in his side, and the escorting officers increased the pressure on the handcuffs, putting the handcuffs on as tight as they would go. He said that, while he stood against the wall, he was hit several times in his back and the side of his face. He said someone from behind rammed his face directly into the wall and started his nose bleeding. Wall said that he later learned that it was Officer Akers who pushed his face into

the wall. He said that Akers pushed with all his force on the back of Wall's head and kept Wall's face pressed to the wall. Wall said that he tried to turn his face to the left to keep some of the pressure off his nose, but he was told not to move. Wall testified that all this occurred after Unit Manager Collins asked his name.

Wall said that the officers kept him in the B Building entryway from 10 to 15 minutes before they walked him through the B-3 pod to a cell to be strapped down. Wall said he was escorted to cell B-308, a cell equipped with a camera, to be strapped down. Wall said that the B-3 pod also had three surveillance cameras inside the pod. Wall said, when he got to the cell, someone put a spit mask over his face, and he could not breathe so he lost consciousness again as he was being strapped down. He said that no one ever asked him if he needed or wanted to be decontaminated. Wall said the next thing he remembered was he woke up strapped down when another inmate hollered in his vent asking him if he was alright. When questioned further, Wall admitted that while the officers were removing his clothing, he was "going in and out of consciousness from the head wound" before he "lost total consciousness."

Wall testified that, when he regained consciousness, he was experiencing pain in his head, face and wrist. He said that he thought his left wrist was broken. He testified that, at this point, he had not seen a nurse for his injuries. Wall said that he did not recall a nurse speaking to him and asking him if he had any complaints when he was strapped down. Wall testified that he requested medical treatment on several occasions, including asking Officer Addington, who was doing rounds while he was strapped down, to speak to medical. He said that he also asked to see medical when they took him out of four-point restraints. Wall said that Addington told him he was not going to call medical because he had assaulted officers.

Wall admitted that he did see Nurse Woods after he was removed from restraints.  He said that he asked her to examine his wrist because he thought it was broken. Wall said that Nurse Woods did not provide him with any treatment or medical care. Wall said, when he was removed from restraints, he was taken to a sally port transport area to be transported to Wallens Ridge. Wall said that he requested to be decontaminated when the officer came to tell him he was being transported to Wallens Ridge. He said the officer responded, "That's not what I'm here for. I'm here to transport you to Wallens Ridge." Wall said that he decontaminated himself by washing his face with water when he was placed in a holding cell before his transport to Wallens Ridge. He said that was when he first viewed the injuries to his face in the mirror.

A handheld video camera recording of Wall being removed from restraints was admitted into evidence as Plaintiff's Exhibit No. 42. (Docket Item No. 152-2.) Wall testified that, at the 2 minute and 57 second mark in the video he can hear himself ask to see medical. Wall said that he asked to see medical again at the 3 minute and 29 second mark on the video. At the 3 minute and 35 second mark on the video, Wall said, he told the officers he had not been decontaminated. At the 4 minute and 20 second mark, Wall said, he asked the officers if something was in his eye, and he told them he could not feel his hands at the 4 minute and 29 second mark. Between the 5 minute and 58 second mark and the 6 minute and 10 second mark, Wall testified, he asked a Red Onion officer if he could be decontaminated before he was transferred. He said that he told the officer he had been strapped down for four hours without being decontaminated. Wall said that he did not pay attention to the officer's response, but he said the officer denied his request, and he was not decontaminated.

Wall testified that, at the 7 minute and 7 second mark on the video, he could see disfigurement to his eye, the back of his head, his lip and nose areas.  At the 7 minute and 31 second mark, Wall said, the video shows a noticeable knot on the back of the right side of his head. Wall testified that the video showed that Nurse Woods came by at the 7 minute and 52 second mark. Wall said that he tried to get Nurse Woods to assess his wrist, and she told him that he had refused medical assessment earlier, which he said he did not recall. He said that Nurse Woods told him that she was there to assess him for transport.

Wall stated that the video showed him walking through the B Building vestibule and exiting the B Building. Wall said that, after he exited the building, the video showed him walking down a portion of the same route he was escorted down when he was taken earlier from the A Building to the B Building. He said that the video showed the metal poles that he was run into by the escorting officers. Wall testified that the video showed a chain link fence attached to these poles outside the B Building, but he claimed the poles outside the A Building did not have chain link fence attached to them yet because it was still being installed. Wall said the video, at the 13 minute and 45 second mark, showed him walking over to the sink in the holding cell and using the water to try to get the "gas out of [his] face and off [his] body."

Wall testified that, at the 9 minute and 28 second mark on the video, the A Building was shown to the right side of the video. Wall testified that, when he was escorted from the A Building to the B Building, he was walked up the sidewalk from the A Building and turned down the sidewalk to the B Building.

Wall testified that he arrived at Wallens Ridge at approximately 8:30 p.m. on the same day as the incident. Wall said that, before arriving at Wallens Ridge,

he received no medical examination or evaluation of his injuries. When he arrived at Wallens Ridge, Wall said, Nurse Stanford observed his injuries, gave him some Tylenol and requested that he receive an x-ray of his head and wrist.

Wall said that, while housed in the medical unit at Wallens Ridge, he started the grievance process and requested the video recordings from the A and B Building recreation yards, the B Building entryway and the B-308 cell wall camera. Wall said that he requested this video evidence to show the excessive force that was used on him enroute to the B Building and that he was not decontaminated. Upon questioning, Wall admitted that neither his Informal Complaint nor his Grievance alleged that he was injured any further as he was walked from the A Building to the B Building, except for alleging the officer twisted his wrist or hand.

Wall read the following portion of the Informal Complaint he filed on or about August 19, 2015, which was admitted at his bench trial as Plaintiff's Exhibit No. 23:

> This unnecessary use of force while I was restrained continued until I reached Bravo 300 pod. I was placed in five-point restraints for several hours without being decontaminated. Please review rapid eye video footage of Alpha 100 pod's three pod cameras at approximately 4 to 5, Alpha and Bravo recreation cameras at approximately 4:05, Bravo 1, 2 and 3 vestibule cameras at approximately 4:05 and Bravo cell cameras at approximately 4 to 5, and also any handheld camera for 5-point placement and removal of them…. This unnecessary use of force while I was restrained continued until I reached the Bravo 300 pod.

Wall agreed that the only uses of force mentioned on this Informal Complaint were being gassed, punched and kicked and having his fingers bent back. Wall testified

that he wrote out the Informal Complaint and the Regular Grievance he filed with relation to the August 14, 2015, incident. On cross-examination Wall agreed that neither the Informal Complaint nor the Regular Grievance contained any reference to him being run into poles on the recreation yard or his head being smashed into the wall of the B Building vestibule. He also agreed that these forms contained no reference to any loss of consciousness or denial of medical treatment after being placed in the B Building.

Wall said he told Nurse Stanford that he had been assaulted, dragged and "everything" when he arrived at Wallens Ridge. Wall said he did not list that he was rammed into metal poles while being escorted from the A Building to the B Building because of the limited space provided on the form. Wall admitted he was well-versed in the VDOC's grievance procedures, and he knew that he could not file a claim over an alleged assault that he did not grieve.

Wall testified that he met with Agent Wood from the SIU several times, beginning with a first meeting on August 25, 2015. Wall said he told Agent Wood that he was assaulted in the A Building and while being escorted from the A Building to the B Building. Wall said that Wood told him to write down his statement, but his injury to his dominant left hand prevented him from doing so at his first meeting with Wood. Wall said that he did write out a five-page statement for Wood. This statement previously was admitted into evidence at Plaintiff's Exhibit No. 12. After Wall was transferred back to Red Onion, Wall said, Wood met with him again and asked Wall to write out his statement again on a form that Wood provided. Wall said that Wood asked him to write out his statement because he did not receive the original statement Wall wrote. Wall said that he refused to write out his statement again, in part, because Wood claimed that Wall had said something that he did not say during their previous meeting.

Wall testified that he was charged with several disciplinary offenses as a result of the events of August 14, 2015. He said that he repeatedly requested video evidence in connection with those charges. These requests were admitted as Plaintiff's Exhibit Nos. 6, 7, 8 and 9. Wall said that he was never allowed to review any of the video evidence during the disciplinary proceedings, but he eventually reviewed the video evidence during his criminal prosecution related to the events of August 14, 2015. He said he reviewed the video evidence with his criminal attorney at the Wise County Courthouse on July 1, 2016, the day of his trial. Wall said that he recalled viewing the video recordings of the B Building vestibule surveillance cameras when he was up against the wall before being escorted to cell B-308 to be strapped down. Wall said that he requested his attorney provide him with this video evidence, but his criminal attorney is deceased.

Wall's counsel represented to the court that counsel had contacted the office of Wall's criminal attorney to obtain the video evidence and was told that Wall's file was destroyed after the criminal charges against him were dropped. Counsel admitted that they did not contact the Wise County Commonwealth's Attorney's Office or the court in an effort to obtain the video evidence.

On cross-examination, Wall admitted that neither Hicks nor Rasnick accompanied him to the B Building. Wall also admitted that he knew the names of the officers who escorted him to the B Building from reviewing the Incident Reports provided in discovery.

Wall testified that Plaintiff's Exhibit No. 50 was the Level I Response to the Regular Grievance admitted as part of Plaintiff's Exhibit No. 23. (Docket Item No. 152-9.) Wall stated that he received this Level I Response on December 17, 2015, after he had been returned to Red Onion. He said that he filed his Level II appeal

on the same day, December 17, 2015. Wall said he never received any response to his Level II appeal.

Wall again testified that, once he was taken to the ground, he did not resist, fight or throw any punches. Instead, he simply lay on the ground with his hands behind his back.  At another point in his cross-examination, Wall admitted that he laid hands on Rasnick, trying to push Rasnick off of him before Hicks took them both to the floor. He said that, once on the floor, Large then came in and, without any warning, sprayed him with OC spray, and he was kicked and punched multiple times from multiple directions. He said he did not know how many blows hit him, but it was more than 10. He said one of the blows struck him in the back of his head, and he lost consciousness.

Wall also admitted that he had been involved in previous incidents with VDOC staff members.

Bentley also testified at the May 2023 evidentiary hearing.  Bentley stated that he currently held the position of Intelligence Sergeant at Red Onion, but in August 2015 he worked as an intelligence officer at Red Onion. Bentley testified that Plaintiff's Exhibit No. 23 was the Informal Complaint filed by Wall initiating the grievance process regarding the incident at issue in this case. Bentley stated that he was the intelligence officer who responded to this Informal Complaint, but he could not remember who assigned him to respond to it. Bentley testified that, in August 2015, an investigator would usually handle this type of paperwork. He stated that it "somehow got forwarded to me to answer." Bentley said he would have gone to a supervisor to discuss how to answer this Informal Complaint.

As the intelligence officer assigned to respond to this Informal Complaint, Bentley said, he was responsible to provide the inmate with an answer. Since the matter had been referred to the SIU, Bentley said, he probably spoke with either the captain or the assistant warden about the Complaint before he answered it. He said that they probably provided him with some input on how to answer it, but he was not sure if that occurred. He said that Captain Still was over the Intelligence Department at Red Onion at that time because the Department did not have an investigator, and Hamilton was the assistant warden. Bentley said that it was his practice to speak to the supervisors over the Intelligence Department before responding to inmate complaints. He said that informal complaints alleging the use of force against an inmate would be assigned to the Intelligence Department or the assistant warden to respond by the grievance coordinator. Bentley testified that he would not have discussed this Informal Complaint with any of the individual defendants in this case before responding to the Complaint. On further questioning, Bentley admitted that, if Warden Barksdale had asked about this Informal Complaint, he probably would have discussed it with Barksdale, but he did not recall if Barksdale ever asked him about it. Bentley said he did not know who referred this incident involving Wall to SIU, but he was aware that it had been referred.

Bentley testified that he would not have assisted the SIU in its investigation unless the SIU contacted him for assistance, and he did not recall if anyone from SIU contacted him for any assistance with this investigation. He did admit that his responsibilities as an intelligence officer included saving video footage for SIU investigations. Bentley said that he was trained by the previous investigator on how to save video recordings.  Bentley said he did not remember who downloaded and saved the video recordings of the A-1 pod surveillance cameras of this incident.

Bentley admitted that, in his Informal Complaint, Wall requested that the video recordings of the Rapid-Eye cameras from the A-100 pod, the A and B recreation yard cameras, the B-1, -2, -3 vestibule cameras, the cell B-308 cell camera and the handheld camcorder for his placement and removal from five-point restraints be viewed. Bentley said that he does not recall ever viewing or downloading the video recordings from the A or B recreation yards, the B vestibule, the B Building, the B-308 cell camera or the handheld video camera recordings regarding this case. Bentley said that downloaded video evidence is held on a stand-alone computer hard drive in the Intelligence Department that is available only to intelligence officers.

Bentley testified that VDOC OP 866.1, previously admitted as Plaintiff's Exhibit No. 48, (Docket Item No. 152-7), applied to him and all Red Onion employees. Bentley testified that, as of September 25, 2014, OP 866.1 required: "If a grievance is received that references a specific audio or video recording, a copy of the recording shall be made and maintained at the facility." Bentley also testified that OP 866.1 required that "[e]mployees who are the subject of the issue being grieved would not be a respondent to a grievance but may offer information during the investigation of the complaint," but allowed "[e]mployees who are the subject of the issue may respond to an informal complaint." Bentley testified that, because there was an open SIU investigation of Wall's allegations against the defendants in this case, he did not discuss Wall's Informal Complaint with the employees who were involved in the incident. Bentley said that OP 866.1 also required that "[c]opies of grievances, both regular and emergency, and audio/video recordings, if applicable, will be maintained at the unit for a minimum of three years following the final disposition of the grievance. Grievances concerning matters known to be under investigation or litigation will be maintained until completion of the investigation or litigation if that event exceeds the three-year

timeframe." As the intelligence officer responsible for responding to Wall's Informal Complaint, Bentley admitted that he was responsible for ensuring that these operating procedures were followed, including saving and retaining the requested video evidence. Bentley said that he did not recall retaining any of the requested video evidence in this case. He also said that he could not recall that he had any further involvement in the investigation of this incident after responding to Wall's Informal Complaint.

On cross-examination, Bentley stated that OP 866.1 required only that video evidence referenced in a "grievance" be copied and maintained. Bentley said that a grievance was not the same as an Informal Complaint. Bentley also testified that the section of OP 866.1 that required video recordings to be maintained for three years applied only to video recordings referenced in grievances. Based on this reading, Bentley testified, he would not be responsible for saving and retaining the video evidence referenced by Wall in his Informal Complaint. Bentley further testified that no one ever instructed him not to download any of the video evidence relative to this incident. Upon further questioning, Bentley admitted that OP 866.1 defined a "grievance" as "[a]n unresolved issue filed and signed by an individual offender on his or her own behalf concerning an issue which has affected him or her personally and meets intake criteria."

Bentley also testified that, if an inmate wanted to have video evidence preserved for purposes of litigation, the inmate could write a request for the video to be saved. Bentley said that, as an intelligence officer and sergeant, he receives written request forms from inmates asking for video recordings to be saved. He said that, unless a large amount of video evidence is requested, the video evidence is saved. Bentley said that he did not recall Wall ever filing a request form requesting that the video evidence related to this August 2015 incident be saved.

Bentley stated that, once an investigation was turned over to SIU, the prison's Intelligence Department was "out of it except to assist them with whatever they need."

Bentley said that Wall's Informal Complaint, admitted as Plaintiff's Exhibit No. 23, asked only that the video evidence be reviewed.  Based on his reading of Wall's Informal Complaint, Bentley testified, he had no knowledge that Wall was claiming that officers had run him into poles on the exterior boulevard of Red Onion while he was being escorted from the A to the B Building.  He also said that, based on Wall's Informal Complaint, he had no knowledge that Wall was claiming that an officer had smashed his head into the wall of the B Building vestibule. Bentley said he had no knowledge that Wall was claiming he had experienced any periods of unconsciousness. Bentley said if Wall had included these claims on his Informal Complaint, it probably would have affected what video evidence was retained. Bentley said that he did not recall whether cell B-308 actually had a camera in the cell. Bentley also testified that OP 866.1 stated that the institutional ombudsman or grievance coordinator was responsible for retaining records pertaining to grievance administration. Bentley said that he had never held either of these positions.

Joe Alan Fannin, who was employed as a correctional officer at Red Onion from 1998 to 2019, also testified at the May 2023 evidentiary hearing. While at Red Onion, Fannin testified that he held the positions of watch commander and building lieutenant, and he became the institutional investigator at Red Onion in October 2015.  During August 2015, Fannin said he held the position of watch commander on the night shift. As institutional investigator, Fannin said, he worked directly for the warden, investigating incidents that occurred at Red Onion. While Fannin stated that he received training before assuming the role of institutional

investigator, he did not recall receiving any training with respect to responding to inmate grievances. He said he did receive training in retaining evidence in connection with his investigations.

Fannin testified that he had no responsibilities investigating the incident involving Wall that is the basis of this case because that investigation was turned over to SIU.

Fannin stated that, in August 2015, there were a number of surveillance cameras located around Red Onion, including cameras in the A and B Buildings and their vestibules and cameras located near the gun post outside of the A and B Buildings. He said that he did not recall whether cell B-308 had a camera in it. Fannin testified that VDOC OP 030.1, Evidence Collection and Preservation, previously admitted at Plaintiff's Exhibit No. 46, (Docket Item No. 152-6), governed the VDOC's evidence collections and preservation procedures as of June 1, 2015. Fannin stated that OP 030.1 included a section that reads:

> Each facility is provided digital storage folder on the DOC network for secure storage of digital documents and audio/video recordings that may be needed as evidence. This folder is suitable for storage of camera recordings and rapid eye clips related to incidents, recordings of offender telephone calls, digital photographs of evidence, incoming and outgoing offender secure messages, any other evidence suitable for storage in a digital format.

It also includes a section that reads: "Files should be uploaded onto the facility's designated digital storage folder immediately after the incident is concluded. The successful upload must be confirmed before the recording is erased from the camera or other data storage device." Another section reads: "If a grievance is received that references a specific audio or video recording, a copy of the recording

shall be saved in the digital storage folder." Fannin testified that, prior to September 1, 2016, another section of OP 030.1 required that digital evidence be retained for at least three years. Another section reads, "If a lawsuit is filed or an investigation is in progress, the digital evidence shall be retained until the investigation or lawsuit is completed."

Fannin testified that, under these Operating Procedures, correctional officers were never permitted to view or download video recordings. Fannin stated that anyone who worked in the Intelligence Department had the ability to review, download and save video recordings. He further testified that, under these Operating Procedures, "only CTSU staff with approval of the … regional operations chief can delete recordings." According to this, Fannin testified, if a video was destroyed without authorization from the regional operations chief, it violated these policies.

Fannin also testified that, in August 2015, the Rapid-Eye surveillance cameras stored approximately 90 days of recordings before they were recorded over, and this occurred routinely. Fannin stated that he has seen grievances requesting video evidence be preserved forwarded to intelligence staff. He also stated that, if a grievance was unclear about exactly what video evidence it was referencing, the intelligence staff could speak to an offender to clarify the request. Fannin said that it was routine to review and retain video evidence as part of the investigations he conducted as institutional investigator.

Fannin also testified that the VDOC's Operating Procedure 420.1, ("OP 420.1"), on the use of force, previously admitted into evidence as Plaintiff's Exhibit No. 47, (Docket Item No. 152-14), includes a section that reads: "Camera recordings and rapid eye clips related to incidents shall be stored in the facility's

designated video storage folder or other secure storage." It also includes a section that reads: "Recordings shall be given a file name consisting of the facility name abbreviation, date of the recording, offender number, and a sequential number added if there are multiple recordings related to the same offender on the same date." Another section of OP 420.1 reads: "Recordings should be uploaded onto the facility's designated video storage folder immediately after the incident is concluded. The successful upload must be confirmed before the recording is erased from the camera data storage device."

Fannin testified that OP 420.1 states that access to upload recordings to the facility's designated video storage folder was assigned to those "designated by the facility unit head, i.e., institutional investigator, shift commanders." Fannin said that the phrase "facility unit head" referred to the warden. Fannin said that he was not sure who the warden of Red Onion was in August 2015, but it could have been Warden Barksdale. Fannin said that he was not the institutional investigator at Red Onion in August 2015.  He said there were four shift commanders, or watch commanders, at Red Onion, one each for A Break day shift, A Break night shift, B Break day shift and B Break night shift. These shift commanders would be a lieutenant or a captain, not a correctional officer.   He stated that Lieutenant Lyall, Lieutenant Collins and Sergeant Large were not shift commanders in August 2015.

Fannin testified that OP 420.1 states that access to view video recordings was assigned to administrative duty officers, regional duty officers, SIU and others designated by the facility unit head. He said administrative duty officers could be the warden, assistant warden, majors, operations officers or unit managers. He said it did not include lieutenants, sergeants or correctional officers. He said the regional duty officers would be VDOC administrative personnel "above the warden."  Fannin also testified that, in August 2015, the warden at Red Onion had

designated lieutenants and higher-ranking officers to review camera recordings, which would have included Lieutenant Lyall and Lieutenant Collins. Fannin said that he was not aware of any instance where a correctional officer was given the ability to view video recordings. Fannin said he could not remember who the unit manager was of the A Building at Red Onion in August 2015.

Fannin testified that OP 420.1 states that the institutional investigator, information officer, the regional operations chief and those "designated by the facility unit head" had access to copy, download and send video recordings and that the "CTSU staff" had authority to delete video recordings. Fannin said that he was not sure who the "CTSU staff" members were unless it was referring to the VDOC's Information Technology Department staff. OP 420.1 also states:

> Cameras and data storage media must be carefully controlled and secured at all times to prevent unauthorized access to and misuse of recordings. … The recordings shall be maintained for at least three years after the date of the incident. … If a lawsuit is filed or an investigation is in progress, the recordings shall be retained until the investigation or lawsuit is completed.

Fannin testified that VDOC OP 866.1, previously admitted as Plaintiff's Exhibit No. 48, (Docket Item No. 152-7), states: "If a grievance is received that references a specific audio or video recording, a copy of the recording shall be made and maintained at the facility." He said it also states: "Copies of grievances, both regular and emergency, and audio/video records, if applicable, will be maintained at the unit for a minimum, of three years following final disposition of the grievance. … Grievances concerning matters known to be under investigation or litigation will be maintained until completion of the investigation or litigation if that event exceeds the three year time frame."

Fannin stated that, if a correctional officer were accused of an unjustified use of force, and there was video evidence of the incident, he would save the video evidence whether the evidence confirmed or disputed the accusation.

Fannin testified that Plaintiff's Exhibit No. 23 clearly identified the video evidence that Wall was requesting be retained regarding this incident. Fannin also testified that he has no recollection of ever seeing this Regular Grievance before. Fannin also testified that, under the Inmate Grievance Procedure, informal complaints are filed with the grievance coordinator, and regular grievances go to the warden or the warden's designee for response. He agreed that, unless the warden sent a copy of a regular grievance to the Intelligence Department, the intelligence officers would not see it. Fannin was shown various documents suggesting that Barksdale was the warden at Red Onion at least until December 8, 2015. Fannin stated that he had no reason to dispute those documents, but he could not remember whether Barksdale was still the warden at Red Onion in October of 2015.

Fannin stated that he first saw Plaintiff's Exhibit No. 50, (Docket Item No. 152-9), the Level I Response to Wall's Regular Grievance regarding this incident, when defense counsel showed it to him as part of this litigation. He said he had no recollection of ever seeing this Regular Grievance previously. Fannin agreed that the response included the statement: "Investigation – this matter has been investigated by the institutional investigator. Investigator Fannin advised he did not find any discrepancies while reviewing this incident," but he did not remember investigating the August 2015 incident involving Wall. Fannin said he also had no recollection of making a report that stated that "no unnecessary use of force was observed during this incident." He said that he also had no recollection of

reviewing any video evidence concerning this incident or discussing the incident with any correctional officers.

Fannin testified that he was familiar with OP 038.1, Reporting Serious or Unusual Incidents, admitted as Plaintiff's Exhibit No. 45. (Docket Item No. 152-5.) He said OP 038.1, which was effective in September 2013, required the reporting of "any situation or event that involves the life, health, or safety of employees, volunteers, visitors, or offenders." He agreed that OP 038.1 also states: "Timely and accurate reporting of incidents that occur in the Department of Corrections is essential for proper management and administration. … Since incident reports are frequently used in litigation proceedings, the importance of writing clear, concise, factual, and complete reports cannot be overstated." He further agreed that OP 38.1 also states: "Qualifying incidents shall also be reported to the special investigations unit in accordance with the incident reporting to the special investigation unit section of this procedure. … The following incidents must be reported by telephone immediately following an incident or commencement of the incident." He agreed that one of the incidents listed requiring immediate reporting was "[s]erious injury to employee, volunteer, visitor or incarcerated offender." Fannin testified that all VDOC employees were required to comply with this policy.

On cross-examination, Fannin stated that he was not involved in the SIU investigation of the August 2015 incident involving Wall. He said that he had no knowledge of the SIU investigation at the time it was ongoing. Fannin stated that, if an offender was walked from one housing unit to another, and nothing happened during that escort, he would not consider that an incident to be reported or investigated further or for the preservation of the video recording.

Fannin testified that, after he became Institutional Investigator at Red Onion in mid to late October 2015, no one ever came to him and asked him to delete any video evidence pertaining to Wall. Fannin said that SIU Investigator Wood never spoke to him regarding his investigation of the incident involving Wall, and he did not know to whom Investigator Wood spoke. Fannin said that, once SIU took over an investigation, the Intelligence Department or the institutional investigator would no longer be involved unless SIU requested assistance. He stated that, as institutional investigator, he would have no input into the final SIU report. He said that SIU would notify the warden of the prison of its final investigative report.

Fannin testified that when an offender files a regular grievance it goes to the grievance coordinator to review to determine if it will be accepted, assigned a number and logged into the CORIS database. Fannin said that, if the grievance is accepted, he does not know if the grievance coordinator forwards the actual grievance form to the warden or the warden's office or if she provides only the completed Level I grievance response for signature. Fannin testified that it was his understanding that the grievance coordinator prepared the Level I responses to grievances and forwarded them to the warden's office for signature. Although the Level I Response to Wall's Regular Grievance stated that the matter had been investigated by him, Fannin said this would be a violation of VDOC policy for him to investigate the incident since SIU had been involved in the investigation since at least September 8, 2015. He again stated that he had no recollection of conducting any investigation related to this incident.

Fannin testified that Wall's Regular Grievance, Plaintiff's Exhibit No. 23, stated that there was video evidence available to support his Grievance, but it did not request that the video evidence be retained. Based on his review of Wall's Regular Grievance, Fannin said, he would not have been aware that Wall was

alleging that he had been repeatedly run into metal poles on the boulevard while being escorted. He said the Regular Grievance would not have alerted him that Wall was alleging that his head had been smashed against the wall in the B Building vestibule or that he had suffered from extended periods of unconsciousness after being placed in five-point restraints or that he was refused medical care after being taken to the B Building.

Jason D. Wood, a previous special agent with the VDOC SIU, also testified at the May 2023 hearing. Wood testified that he was a special agent with SIU from April 2015 to January 2020, working in the Western Region. Wood said that, prior to working as a special agent with SIU, he had worked for the Scott County Sheriff's Office, where he currently is the Criminal Investigation Division Commander. As an SIU special agent, Wood said, his responsibilities were to conduct criminal investigations that involved a staff member, inmate, probationer or parolee and administrative investigations involving staff. As an SIU special agent, Wood said, the only training he received was internal affairs training on investigating policy violations by staff or administrative issues with staff. To be hired as an SIU special agent, Wood said, he had to be a certified law enforcement officer in Virginia, which required graduation from a law enforcement academy.

Wood testified that OP 030.4, Special Investigations Unit, which was admitted at Plaintiff's Exhibit No. 43, (Docket Item No. 152-3), sets out the authority, responsibilities and duties of the VDOC SIU. He further testified that OP 030.4 states that the SIU is responsible for conducting investigation into all incidents involving serious injury, including self-injury, that requires urgent and immediate medical attention and restricts the person's usual activity, including a loss of consciousness. Wood also testified that OP 030.4 states, "The organizational unit head or the individual in charge at the scene of a serious

incident shall take appropriate action necessary to protect physical evidence and crime scenes until released to the responding agent." Wood said the unit head at Red Onion would be the warden. He said OP 030.4 also states:

> The organizational unit head shall ensure that all video recordings pertaining to cell extractions and other video recordings made to document activities of operations are maintained for three years. … Relevant rapid eye recordings should be duplicated for retention in compliance with this requirement. … Video recordings of incidents relevant to SIU investigations or incidents that warrant SIU inquiry will be properly secured until released to a special agent. … Destruction or disposal of video recordings relevant to SIU investigations will only be authorized upon approval of the respective SIU assistant chief, the chief of SIU, or the director.

Wood testified that, when he worked as SIU Special Investigator, there was an SIU chief and three assistant chiefs, each over one of the three geographic regions – West, Central and Eastern. In 2015, Wood said, Ronald Hall was the Assistant SIU Chief over the Western Region, and Paul Haynes was the SIU Chief.  The Director of the VDOC at that time was Harold Clarke, he said. Wood testified that, under this policy in 2015, the destruction or disposal of video recordings of incidents relevant to SIU investigations could be authorized only by Hall, Haynes or Clarke. If video recordings or incidents relevant to SIU investigations were destroyed without approval from those individuals, Wood said, it would violate this policy.

Wood stated that, as an SIU special agent, he investigated the incident involving Wall, Hicks and Rasnick that occurred in August 2015. He said that he did not have any independent recollection of his investigation other than what he documented in his report. Wood said that he was assigned the investigation by Hall, the Assistant Chief of the region. Wood said that, after being assigned an investigation, he would typically look at the evidence, interview the parties and

witnesses and complete a report of investigation. In this case, Wood said, he was investigating two potential crimes: assault and battery against a correctional officer and abuse of an offender.  He said that Wall had reported an abuse case, and the correctional officers had reported being assaulted. Wood said he investigated both allegations. Wood said that he reviewed all of the internal incident reports to determine which witnesses to interview. Wood said that he also would review any video evidence before he interviewed the witnesses. Wood said that any witness statements he obtained in his investigation would be attached as an exhibit to his final report. Wood said that he did not write out the witness statements, but, rather, if he interviewed someone, he gave them the opportunity to provide him with a written statement. Wood said that, when he originally interviewed Wall, Wall was not able to provide him with a written statement. If anyone was present with him when he interviewed a witness, Wood said, he would list the person who accompanied him on the interview form.

Wood said that he could not recall anyone assisting him with his investigation of this incident, but that Bentley probably would have downloaded the video evidence for him. Wood said that he had no recollection of requesting certain videos from Bentley. Instead, Wood said, he usually would call an institution and tell them what day he was coming, and someone would have the relevant videos downloaded on a DVD for him when he got there. Wood did state that he had the ability to view and download the video evidence from his office computer. If he downloaded video evidence, Wood said, he usually just downloaded it into a case folder on his computer, but on occasion, he might save the evidence to a disk.  Wood testified that each institution had a shared folder on the VDOC computer system. Any evidence that needed to be seen by an SIU agent could be placed in this shared folder and accessed by the agent.

Wood said he usually would review relevant video evidence before visiting the institution, and he would call the institution and tell an intelligence officer what specific video evidence he wanted downloaded. Wood said if someone at Red Onion downloaded specific video evidence with regard to his investigation of the incident with Wall, it would have been based on his specific instructions of what to download. Wood admitted that his report noted that handheld camera and Rapid-Eye surveillance video evidence, regarding this incident, had been saved to a disk. Wood said he did not know if this was a disk on which he had downloaded video evidence or whether someone at the prison had downloaded the video evidence onto the disk.

Wood said that his investigation focused on three subjects or suspects – Wall, Hicks and Rasnick. His report also listed all three – Wall, Hicks and Rasnick – as victims. Wood said that, when he was assigned an incident to investigate, he would be told the date, location and time frame of the incident. He also would review the internal incident report.

Wood said his report and all attached exhibits were sent to A. David Robinson because he was the Chief of Corrections Operations at the time, and all reports of SIU investigations went to him. He said he also forwarded his report and all exhibits to Michael H. Abbott, Wise County Commonwealth's Attorney, for his review in deciding whether to place any criminal charges against anyone. Wood said all the exhibits to his report also would have been attached to the report when it was forwarded to Robinson and Abbott. He said that he could not remember if Abbott ever contacted him to discuss his investigation. Wood said that the waiver of Miranda rights form, attached to his report, states that Wall could not sign due to injury, but he could not recall the specific injury Wall suffered. He said that the form indicated that he met with Wall on August 19, 2015. Wood testified that any

disk containing video evidence would have been provided to the Commonwealth's Attorney's Office with his report.

Wood testified that he did not remember receiving a copy of Wall's Informal Complaint as part of his investigation. Wood said he would not have been aware of Wall filing a Grievance about the incident he was investigating. He said that, unless the Grievance was filed against him personally, he likely would not see any Grievance.

Wood testified that Plaintiff's Exhibit No. 12 had Wall's full written statement attached. Wood said that Wall's full written statement was attached to his report. Wood said Wall's statement was dated August 26, 2015, and notarized on August 27, 2015, but he did not recall when he received it. Wood testified that when he spoke to Wall, Wall reported that he claimed he was run into poles going from A Building to B Building and that his face was smashed into the wall while standing in the B Building vestibule. He said that Wall also included these allegations in his written statement. Wood said that he would have reviewed all relevant surveillance video recordings, including the video taken from the surveillance cameras outside of the A and B Buildings and the B Building vestibule cameras, even though that video evidence is no longer available. Wood agreed that, if he reviewed this video evidence, it should have been saved. According to his report, Wood admitted that, in addition to Wall, he interviewed only Hicks, Rasnick and Officers Hess and Holbrook.

Wood said that, during the course of his investigation, he did not discuss his investigation with anyone outside of SIU. He specifically denied discussing his investigation with the warden of Red Onion. He also said that he did not provide his report to the warden of Red Onion or anyone else at Red Onion. He said that

he sent his report directly to VDOC Headquarters in Richmond, and someone at Headquarters would have mailed it to the Wise County Commonwealth's Attorney's Office. Wood said, when he left the employment of the VDOC in December 2019, he turned over everything that belonged to the state, including his work computer, to another agent. He said his work computer should have contained a folder pertaining to his investigation of this incident on it at the time he turned it over because he did not delete anything from his computer. Wood said he did not recall anyone from the Attorney General's Office ever contacting him while he was still employed by the VDOC to inquire whether he possessed any video evidence related to this incident. Wood further testified that he assumed the Attorney General's Office would not contact an SIU agent directly for evidence, but, rather, contacted SIU Headquarters because he had never been contacted by the Attorney General's Office directly regarding one of his investigations. Wood also testified that he did not recall Headquarters ever asking him for any of the relevant video evidence.

On cross-examination, Wood testified that, according to his report, he reviewed Rapid-Eye surveillance video of the incident between Wall and Hicks and Rasnick, and the video was consistent with the officers' statements of events and did not support Wall's claims. Wood also stated that his report stated that he had reviewed "handheld camera video" of Wall being escorted to the B Building. When asked if it is possible that he reviewed Rapid-Eye surveillance video recordings of Wall's escort instead of a recording from a handheld camera, Wood said it was possible, but he did not remember. Either way, Wood said, he documented that he reviewed video evidence of Wall's escort from A Building to B Building, and the video did not provide any evidence to support Wall's claims of abuse. Wood further testified that, if he reviewed video evidence that did not substantiate Wall's claim of being run into multiple poles between the A and B

Buildings, he would not have gone any further to investigate that claim. He said that could be the explanation for why he never interviewed the officers who escorted Wall from the A Building to the B Building. Wood did admit, however, that, if he reviewed video evidence, it would have been saved regardless of what it showed or did not show. Wood said that he made no recommendation to the Commonwealth's Attorney's Office with regard to his investigation; he simply provided his report of investigation.

Wood said that, as an SIU agent, he was a sworn law enforcement officer, he was not a corrections officer. As a law enforcement officer, he operated independently of the corrections officers. Wood testified that, if, during the course of his investigation, he uncovered evidence that indicated that an inmate had been abused or maltreated or something had happened to the inmate, it was his sworn duty to ensure that justice was done.

## II. Analysis

As stated above, Wall's Complaint raises a number of claims, including §1983 claims based on allegations of excessive force, deliberate indifference to his serious medical needs, failure to intervene to protect him, violations of his substantive and procedural due process rights and conspiracy and Virginia state law claims for assault, abuse of process and negligence. Wall's Complaint, however, contained no allegations against Defendants Bryant and Rose. Therefore, I recommend that the court enter judgment in their favor. Furthermore, Wall has presented no evidence against the Defendants B. Hughes, a lieutenant at Wallens Ridge, or VDOC Director Harold Clarke. Therefore, I also recommend that the court enter judgment in favor of these defendants.

Based on my review of Wall's Complaint, it raises the following § 1983 claims against the following defendants:

1. A claim based on allegations of the use of excessive force by Defendants Rasnick, Hicks, Lyall and Large for the August 14, 2015, altercation and use of OC pepper spray;

2. A claim based on allegations of the use of excessive force and/or deliberate indifference and/or bystander liability by Defendants Lyall, Large, Akers, Collins, Taylor, Bishop, Testerman, Addington, Dockery, Gwinn and Mullins during the escort from A Building to B Building and being placed in restraints without decontamination;

3. A claim based on allegations of cruel and unusual punishment by Collins, Bishop, Akers, Taylor, Deel and Barksdale for placing Wall in restraints for four hours without medical attention;

4. A claim against Barksdale, Fleming and Ponton for allowing pervasive constitutional violations;

5. A claim alleging deliberate indifference to serious medical needs by Collins, Bishop, Akers, Taylor, Deel and Barksdale for placing Wall in restraints for four hours without medical attention;

6. A claim alleging a violation of substantive due process rights by Hicks, Holbrook and Still for filing false disciplinary charges;

7. A claim alleging violation of procedural due process rights by Franks, Hensley, Fleming and Ponton by failing to retrieve the video evidence for his disciplinary charge hearings; and

8. A claim alleging that Rasnick, Hicks, Collins, Akers and Taylor conspired to use excessive force against him.

Wall's Complaint also raises the following state law claims against the following defendants:

1. A claim under Virginia state law alleging an assault by Rasnick, Hicks, Large, Lyall, Collins, Taylor, Akers, Bishop, Dockery and Gwinn based on the use of excessive force and placing him in restraints;

> 2. A claim under Virginia state law alleging abuse of process by McCoy and Church based on their generating disciplinary reports for Red Onion after Wall's transfer to Wallens Ridge; and
>
> 3. A claim under Virginia state law against all defendants alleging negligence and willful and wanton negligence.

Both Hicks and Rasnick have filed counterclaims under state law for common law assault and battery against Wall.

In their Answer to Wall's Complaint, (Docket Item No. 44) ("Answer"), the defendants asserted that, to the extent that Wall had not exhausted his administrative remedies, his claims were barred under 42 U.S.C. § 1997e(a). *See* 42 U.S.C.A. § 1997e(a) (West 2012) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, … until such administrative remedies as are available are exhausted."); *Graham v. Gentry*, 413 F. App'x 660, 662-63 (4th Cir. 2011) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)) ("The exhaustion requirement is mandatory, and courts lack the authority to waive that requirement."). "…[F]ailure-to-exhaust is an affirmative defense that the defendant must raise." *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)).

At the May 2023 evidentiary hearing, defense counsel argued that the evidence before the court showed that many of Wall's claims were barred because he had failed to exhaust his administrative remedies. VDOC OP 866.1, admitted into evidence at Plaintiff's Exhibit No. 48, states: "An offender meets the exhaustion of remedies requirement only when a Regular Grievance has been carried through the highest eligible level of appeal without satisfactory resolution of the issue." (Docket Item No. 152-7 at 6.) OP 866.1 also requires an inmate to make "a good faith effort to resolve the issue informally" by filing an Informal

Complaint regarding an issue before submitting a Regular Grievance. (Docket Item No. 152-7 at 6.) If the prison's response to the inmate's Informal Complaint fails to resolve the issue, or if the prison fails to respond within 15 days, the inmate may submit a Regular Grievance regarding the issue within 30 days of the date of occurrence or incident. (Docket Item No. 152-7 at 6-7.) OP 866.1 also states that issues regarding disciplinary hearing decisions, penalties and/or procedural errors are not grievable, but must be appealed in accordance with OP 861.1 regarding Offender Discipline. (Docket Item No. 152-7 at 5.)

The undisputed evidence before the court shows that Wall did not fully exhaust his administrative remedies as to any grievable claims other than his § 1983 claims based on allegations of the use of excessive force by Defendants Rasnick, Hicks, Lyall and Large for the August 14, 2015, altercation and use of OC pepper spray and for his fingers being bent back during his escort and his state law assault claims based on these uses of force and his deliberate indifference claim for being placed in restraints without decontamination. Wall, himself, admitted that his Informal Complaint and Regular Grievance forms did not mention his allegations that he was run into metal poles while being escorted to the B Building, that an officer had smashed his head into the wall in the B Building vestibule, that he had lost consciousness or he had been denied needed medical treatment. Wall admitted that the only allegations of abuse contained on his Informal Complaint and Regular Grievance forms were that he was gassed, punched and kicked during the initial encounter with Rasnick and Hicks and responding officers Lyall and Large, that he was not allowed to decontaminate and that his fingers were bent back by the officers who escorted him to the B Building. (Plaintiff's Exhibit No. 23.) Because Wall did not file any administrative remedy requests as to his claims that he was run into metal poles while being escorted to the B Building, that an officer had smashed his head into the wall in the B Building

vestibule and that he was denied medical care after losing consciousness, he has not properly exhausted these claims, and he may not pursue them in this action. Therefore, I will recommend the court enter judgment for the defendants on these claims.

Turning my attention to the exhausted and/or the non-grievable claims, the plaintiff asserting a § 1983 claim has the burden of proof. *See Oliver v. Powell*, 250 F. Supp. 2d 593, 598 (E.D. Va. 2002). Wall's Complaint attempts to assert a claim under § 1983 against Red Onion Warden Barksdale, Wallens Ridge Warden Fleming and VDOC Western Regional Administrator Ponton because they "'knew or should have known' of the continued pervasive and unreasonable Constitutional injuries being practiced at Red Onion State Prison and Wallens Ridge State Prison because Grievances and Disciplinary appeals were appealed to finality in complete 'specifics' and upheld the unfounded decision(s), failing to [remedy] plaintiff's Constitutional injury did constitute cruel and unusual punishment (deliberate indifference) in violation of the [Eighth] Amendment of the United States Constitution…." (Complaint at 13.) To prevail against a defendant on a § 1983 claim, a plaintiff must show that the defendant acted personally in the deprivation of the plaintiff's rights. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (citing *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). The doctrine of respondeat superior has no application to § 1983 claims. *See Vinnedge*, 550 F.2d at 928.

Other than Warden Barksdale's approval of placing Wall in restraints, the entirety of the evidence Wall presented against these defendants at trial pertains to Fleming's and Ponton's decisions upholding Wall's convictions on the five disciplinary offenses with which he was charged as a result of the events of August 14, 2015. Wall testified, and the Disciplinary Offense records showed, (Plaintiff's

Exhibit Nos. 6-10; Docket Item Nos. 84-6 to 84-10), that Wall appealed each of his disciplinary offense code convictions and that his appeals were considered by Fleming, who upheld each of the convictions. Wall then appealed Fleming's decisions to Ponton, who upheld Fleming's decisions.

As interpreted by the court, Wall's Complaint contains both procedural and substantive due process claims based on his disciplinary offense convictions. Prisoners may not be deprived of life, liberty or property without due process of law. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Nonetheless, prison disciplinary proceedings are not a criminal prosecution, and, therefore, "the full panoply of rights due a defendant in such proceedings does not apply." *Wolff*, 418 U.S. at 556. Courts have held that small monetary penalties and penalties that do not impose restraint do not impose atypical and significant hardship on a prisoner in relation to the ordinary incidents of prison life and are not constitutionally protected interests under the Due Process Clause. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (holding that disciplinary segregation did not present the type of atypical, significant deprivation in which a state might create a liberty interest); *Bratcher v. Mathena*, 2016 WL 4250500, at *1 (W.D. Va. Aug. 10, 2016) (finding $12 fine did not pose an atypical and significant hardship on the plaintiff in comparison to the ordinary incidents of prison life). When, however, state prison regulations create a system by which prisoners earn good-time credit resulting in reduction of their sentences, such system creates a liberty interest under the Fourteenth Amendment that may not be arbitrarily abrogated. *See Wolff*, 418 U.S. at 557-58.

To provide constitutionally sufficient procedural due process, a disciplinary proceeding must provide the following: (1) advance written notice of a claimed violation at least 24 hours before any disciplinary hearing; (2) the ability of the

prisoner to call witnesses and present documentary evidence at the disciplinary hearing; and (3) a written statement of the evidence relied upon by the factfinder and the reasons for the disciplinary action taken. *See Dilworth v. Adams*, 841 F.3d 246, 253 (4th Cir. 2016) (citing *Wolff*, 418 U.S. at 563-66). To provide constitutionally sufficient substantive due process, a disciplinary offense finding must be "supported by some evidence in the record." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985). Prisoners, however, may not bring suit under § 1983 for relief that, if granted, would imply the invalidity of the prisoner's disciplinary offense conviction, unless the conviction has been overturned. *See Edwards v. Balisok*, 520 U.S. 641, 645-48 (1997); *see also Thompson v. Clarke*, 2018 WL 4764294, at *4 (W.D. Va. Sept. 30, 2018).

In this case, Wall seeks recovery under § 1983 for violation of his due process rights by Barksdale, Fleming, Ponton, Hicks, Holbrook, Still, Franks and Hensley. Since only two of Wall's disciplinary offense convictions, ROSP-2015-1481 and ROSP-2015-1503 for aggravated assault upon a non-offender, imposed losses of good-time credit, they are the only ones that involved constitutionally protected liberty interests. The 105A offense code charge, contained in ROSP-2015-1481, was written by Defendant Hicks, heard by Defendant Hensley and appealed to Defendants Fleming and Ponton. The 105A offense code charge, contained in ROSP-2015-1503, was written by Defendant Still, heard by Defendant Franks and appealed to Defendants Fleming and Ponton. Therefore, I will recommend that the court find in favor of Defendants Barksdale and Holbrook on these claims because Wall has produced no evidence that these defendants took any action to impair Wall's constitutionally protected liberty interests.

On both of these disciplinary charges, the evidence presented at trial showed that Wall was provided written notice of the charges against him more than 24

hours before his disciplinary hearings, he was allowed to request witnesses and documentary evidence,[2] and he was provided written statements of the evidence relied upon by the factfinder and the reasons for the disciplinary actions taken. Also, the evidence presented at trial showed that there was "some evidence" in the record to support the Hearings Officers' decisions. Nevertheless, it is not necessary to reach a decision on the merits of Wall's due process claims against Still, Hicks, Franks, Hensley, Fleming and Ponton. Wall claims that his substantive due process rights were violated because these two aggravated assault charges were false charges, in that he did not assault Hicks or Rasnick, but rather, was the victim of their assault. He also claims that he was wrongly convicted of these disciplinary offenses because the proper procedures were not followed, in that the charges were pursued at Wallens Ridge, the Hearings Officers did not obtain and review the video evidence, and Fleming, instead of Barksdale, heard his appeals. Thus, if the court were to find in Wall's favor on his due process claims, it would imply the invalidity of his disciplinary offense convictions. Since Wall has produced no evidence that his convictions on these two disciplinary offenses have been overturned, he may not pursue § 1983 claims based on them. *See Edwards*, 520 U.S. at 645-48. Therefore, I will recommend that the court enter judgment in favor of Still, Hicks, Franks, Hensley, Fleming and Ponton on Wall's due process claims.

Wall also has alleged that various defendants have violated his right to be free from cruel and unusual punishment under the Eighth Amendment, either by the use of excessive force, by deliberate indifference to his serious medical needs or by failing to protect him from the use of excessive force or deliberate indifference to his serious medical needs. As stated above, many of these claims are barred because Wall failed to exhaust his administrative remedies. Of these

---

[2] A disciplinary hearing officer's decision not to review surveillance video himself does not constitute a due process violation. *See DePaola v. Clarke*, 2019 WL 1370882, at *6 n.9 (W.D. Va. Mar. 26, 2019) (citing *Neal v. Casterline*, 129 F. App'x 113, 115 (5th Cir. 2005)).

claims, Wall may pursue only his claims based on allegations of the use of excessive force by Defendants Rasnick, Hicks, Lyall and Large for the August 14, 2015, altercation and use of OC pepper spray and for his fingers being bent back during his escort and his excessive force/deliberate indifference claim for being placed in restraints without decontamination.

The Eighth Amendment to the U.S. Constitution protects prison inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian,* 503 U.S. 1, 5 (1992); *Whitley v. Albers,* 475 U.S. 312, 319 (1986). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994*); Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984).

The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component. *See Williams,* 77 F.3d at 761 (citing *Wilson v. Seiter,* 501 U.S. 294, 302 (1991)). Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson,* 503 U.S. at 9 (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)). To meet the objective component in an excessive force case, an inmate must show that the force used was "nontrivial," *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), given that "contemporary standards of decency always are violated… whether or not significant injury is evident." *Hudson,* 503 U.S. at 9. "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Wilkins,* 559 U.S. at 37 (quoting *Hudson,* 503 U.S. at 7). In

fact, the extent of the injury may suggest that "'the use of force could plausibly have been thought necessary' in a particular situation" or "provide some indication of the amount of force applied." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7). For example, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins,* 559 U.S. at 38 (quoting *Johnson*, 481 F.2d at 1033). As *Wilkins* clarified, it is the nature of the force "that ultimately counts" and provides the "core judicial inquiry" in an excessive force case. 559 U.S. at 37, 38. In particular, courts must consider "whether [the force] was nontrivial and 'was applied…maliciously and sadistically to cause harm.'" *Wilkins*, 559 U.S. at 39 (quoting *Hudson*, 503 U.S. at 7).

To meet the subjective component in an excessive force case, the inmate must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320-21. The inquiry under the subjective standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. The Supreme Court in *Whitley* set out several factors which should be considered in determining whether prison officials acted maliciously and sadistically. In particular, the court should consider:

1)     The need for application of force,

2)     The relationship between that need and the amount of force used,

3)     The threat "reasonably perceived by the responsible officials," and

4)     "any efforts made to temper the severity of a forceful response."

*Williams,* 77 F.3d at 762 (citing *Whitley,* 475 U.S. at 321).

While I am persuaded that the evidence presented showed that the force used against Wall in the initial altercation was objectively excessive, I am not persuaded that the force used against Wall was subjectively excessive. More specifically, I find that Wall's injuries – a bruised, swollen and bloodied face, a knot on the back of his head and a broken finger – show that the force used against him was "nontrivial." Nevertheless, based on the evidence presented, I am persuaded that the force used was not excessive, in that it was used in a good-faith effort to maintain or restore discipline. I find Wall's version of being attacked without provocation not credible.

In his Complaint, Wall alleged that Rasnick started the altercation on August 14 by grabbing Wall's left arm and then punching Wall in the left side of his face. (Complaint, Docket Item No. 42, at 4.) Wall alleged that Hicks then charged him and took him to the ground on his back, where he immediately tried to roll over on his stomach to assume a "nonthreatening position" while both Rasnick and Hicks continued to punch his head and face. (Complaint, Docket Item No. 42, at 4.) Wall also alleged that he was "handcuffed and shackled, while laying in a prostrate position offering no resistance" before the vestibule door opened allowing other officers to enter. (Complaint, Docket Item No. 42, at 5.) Wall alleged that he then was sprayed with OC pepper spray, kicked and punched and lost consciousness. (Complaint, Docket Item No. 42, at 5.)

At the January 2019 bench trial, Wall testified that, when he turned around to ask why the vestibule door was not opening, Rasnick grabbed his left arm and told him to "shut up." Wall said nothing about Rasnick punching him in the left side of the face. Wall also testified that he stepped to his right with his hands up and open and was attempting to get down on the floor when Hicks tackled him. Wall testified that, while on the floor, Hicks had placed Wall's left hand in

handcuffs and, then he, Wall, had voluntarily put his right hand behind his back so that Hicks could cuff it before the vestibule door opened.

At the evidentiary hearing upon remand, Wall merged the two previous versions into his testimony. At this hearing, Wall testified that, when he got to the vestibule door, he turned around, and Officer Rasnick grabbed his left arm, punched him in the head and told him to shut up. Wall said that he put his hands up and stepped back. He said that while he was "on the floor tussling with Officer Rasnick, or where he's tussling with me, I'm just trying to avoid his attack, Officer Hicks entered the fray." Wall also said, however, that Hicks took all three of them to the floor, and he "immediately" rolled onto his stomach and put his hands out to show he was not resisting.

Wall specifically denied swinging either of his arms and hitting Officer Hicks. Wall stated, "During this whole altercation, I never threw a punch. My hands [were] up the whole time … retreating." Wall said that when he went to the floor, he attempted to roll to the left to get on his stomach, but he could not because Hicks was in the way. He said that he immediately then rolled right onto his stomach, put his hands behind his back, and his hands were restrained before Lyall and Large came in.

Wall testified that he did not recall exiting the A Building because he was going in and out of consciousness. When asked why he was going in and out of consciousness, Wall stated that "when they came in, somebody hit me in the back of my head behind my ear, and I lost consciousness." Wall then stated that he went in and out of consciousness during the entire incident that day. Wall further testified that he was unconscious when the guards carried him out of the A

Building, and he did not regain consciousness until was in the recreation yard area right outside of the A Building door.

Wall stated that, as soon as he entered the B Building, he was placed against a wall in the B Building entryway. Wall said that someone from behind hit him in his side, and the escorting officers increased the pressure on the handcuffs, putting the handcuffs on as tightly as they would go. He said that, while he stood against the wall, he was hit several times in his back and the side of his face. He said someone from behind rammed his face directly into the wall and started his nose bleeding. Wall said that he later learned that it was Officer Akers who pushed his face into the wall. He said that Akers pushed with all his force on the back of Wall's head and kept Wall's face pressed to the wall.  Wall said that he tried to turn his face to the left to keep some of the pressure off his nose, but he was told not to move. Wall testified that all this occurred after Unit Manager Collins asked his name.

Wall said that the officers kept him in the B Building entryway from 10 to 15 minutes before they walked him through the B-3 pod to a cell to be strapped down. Wall said he was escorted to cell B-308, a cell equipped with a camera, to be strapped down. Wall said that the B-3 pod also had three surveillance cameras inside the pod. Wall said, when he got to the cell, someone put a spit mask over his face, and he could not breathe so he lost consciousness again as he was being strapped down. He said that no one ever asked him if he needed or wanted to be decontaminated. Wall said the next thing he remembered was he woke up strapped down when another inmate hollered in his vent asking him if he was alright. When questioned further, Wall admitted that while the officers were removing his clothing, he was "going in and out of consciousness from the head wound" before he "lost total consciousness."

On cross-examination, Wall testified that, once he was taken to the ground, he did not resist, fight or throw any punches. Instead, he simply lay on the ground with his hands behind his back.  He said that Large then came in and, without any warning, sprayed him with OC spray, and he was kicked and punched multiple times from multiple directions. He said he did not know how many blows hit him, but it was more than 10. He said one of the blows struck him in the back of his head, and he lost consciousness.

Defendants Hicks, Rasnick, Large and Lyall all testified to the contrary. Both Hicks and Rasnick testified that Wall refused an order to be restrained by pulling away from them and using profanity toward them. All four of these defendants testified that Wall was not restrained when the vestibule door opened and Large and Lyall entered. In fact, Large and Lyall testified that they restrained Wall. All four of these defendants testified that Wall was never passively lying on the floor after being restrained. Furthermore, the video evidence confirms much of the officers' versions of events. In particular, the video shows that Hicks and Rasnick still were struggling with Wall, who was on his feet, as the A-1 vestibule door opened. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:03.) The video also shows that Hicks and Rasnick were still struggling with Wall, who was then on the floor, when Large and, then, Lyall entered the A-1 pod, and that all four officers then struggled with Wall. (Plaintiff's Exhibit No. 13, A123 Vestibule at 4:01:16 to 4:01:35.)

Based on this evidence, I am persuaded that Wall provoked the initial use of force by Hicks and Rasnick in taking him to the ground by his aggressive act when they attempted to restrain him. I further find that the use of OC pepper spray and the physical force used to place Wall in restraints was necessitated by Wall continuing to struggle with the officers. I do not find credible Wall's claims that

responding officers continued to kick and punch him even after he was restrained and removed from the pod. Again, the video evidence from both the surveillance and the handheld cameras refutes this statement for the periods of time that Wall was shown on these recordings.

Insofar as Wall claims a use of excessive force and/or bystander liability based on an officer bending his hands and injuring his left hand during his escort to the B Building, I find that Wall has failed to meet his burden on this claim. As stated above, the plaintiff asserting a § 1983 claim has the burden of proof, including proving who used excessive force. *See Oliver*, 250 F. Supp. 2d at 598. In his Complaint, Wall stated that "an unidentified escorting officer [was] bending and twisting my fingers." (Complaint at 5.) In his testimony, Wall stated that, to his knowledge and belief, he was escorted from the A Building to the B Building by Dockery and Gwinn, but he admitted that he did not know which officer was on which side. Several officers testified that Wall continued to make threats and that he lunged forward repeatedly while being escorted to the B Building. Collins testified that no greater force was used than that force necessary to control Wall during his escort. Collins also testified that Wall made no complaint of any pain in or injury to his wrists during his escort. Wall, himself, testified that he made no statements at all to the officers who escorted him.

Also, every officer who was present that day and who testified at trial stated that they did not see any officer punch, hit or kick Wall at any time. Multiple officers also testified that they used and/or witnessed officers use no greater force than necessary to gain and maintain control of Wall. Thus, I find that the force used against Wall by the defendants on August 14, 2015, was not excessive, in that the defendants used only that amount of force necessary to obtain and maintain control of Wall. Insofar as Wall alleges that placing him in five-point restraints

was a use of excessive force, I am persuaded that the evidence that Wall continued to threaten staff justified this use of force.

Wall's Complaint also appears to state a claim for excessive force and/or deliberate indifference for being placed in restraints without being decontaminated. A prison official is deliberately indifferent if he knows of, but disregards, an inmate's serious medical need and/or a serious risk of injury. *See Farmer*, 511 U.S. at 844-45. Therefore, liability under this standard requires two showings. First, the evidence must show that the prison official subjectively recognized a serious medical need or risk of injury. It is not sufficient that the official should have recognized it; the official must actually have known of it. *See Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebee v. Murphy*, 797 F.2d 179, 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978); *Rush v. Vandevander*, 2008 WL 495651, at *1 (W.D. Va. Feb. 21, 2008). Second, the evidence must show that the prison official subjectively recognized that his actions were "inappropriate in light of that risk." *Rich*, 129 F.3d at 340 n.2. It is insufficient that the official should have recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001). "[D]eliberate indifference entails something more than mere negligence, … [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

It is undisputed that Wall was not placed in the shower after OC pepper spray was used on him. Both Collins and Large testified that they asked Wall if he

needed to be placed in the shower to decontaminate before he was placed in five-point restraints. Both said that Wall refused to answer them. Also, Nurse Deel, who examined Wall after he was placed in five-point restraints, said that Wall made no request of her to be placed in the shower to decontaminate. In fact, the video shows that Defendant Collins asked Wall if he had any complaints for the nurse, and he did not answer. (Plaintiff's Exhibit No. 14 at 16:40.) The video does not show that Wall was coughing, gasping or having any trouble breathing when Nurse Deel examined him. Nurse Deel also testified that she would have ordered that Wall be placed in the shower to decontaminate if she had thought it was necessary. Furthermore, Deel testified that, if she had thought Deel needed any further medical assessment or treatment, she would have obtained it. Based on this evidence, I am persuaded that placing Wall in five-point restraints without a shower was not done maliciously or sadistically to cause harm as is required for a finding of excessive force. I also am persuaded that doing so did not pose any deliberate indifference to any serious risk of injury or medical need.

Having found no use of excessive force or deliberate indifference by any of the defendants, there can be no bystander liability on the part of any defendants for failing to protect Wall. Therefore, I will recommend that the court find in favor of Defendants Rasnick, Hicks, Lyall, Large, Akers, Collins, Taylor, Bishop, Testerman, Addington, Dockery, Gwinn, Mullins, Deel and Barksdale on Wall's excessive force and/or deliberate indifference claims. I also will recommend that the court find in favor of Defendants Rasnick, Hicks, Collins, Akers and Taylor on Wall's claim that they conspired to use excessive force against him. At trial, Wall produced no evidence of any such conspiracy.

Case 7:17-cv-00385-JPJ-PMS   Document 155   Filed 11/13/23   Page 94 of 103
Pageid#: 2056

Next, I will address Wall's, Hicks's and Rasnick's state law claims. Based on my review of Wall's Complaint, it raises the following state law claims against the following defendants:

1.  A claim under Virginia state law alleging an assault by Rasnick, Hicks, Large, Lyall, Collins, Taylor, Akers, Bishop, Dockery and Gwinn based on the use of excessive force and placing him in restraints;

2.  A claim under Virginia state law alleging abuse of process by McCoy and Church based on their generating disciplinary reports for Red Onion after Wall's transfer to Wallens Ridge; and

3.  A claim under Virginia state law against all defendants alleging negligence and willful and wanton negligence.

Both Hicks and Rasnick have filed counterclaims under state law for common law assault and battery against Wall.

Under Virginia common law, an assault occurs when a person engages in an overt act intended to inflict bodily harm, coupled with the present ability to inflict such harm or engages in an overt act intended to place the victim in fear of bodily harm and creates a well-founded fear in the victim. *See Bowie v. Murphy*, 624 S.E.2d 74, 80 (Va. 2006) (quoting *Carter v. Commonwealth*, 606 S.E.2d 839, 841 (Va. 2005)). Under Virginia common law, a battery occurs when a person engages in the unwanted touching of another that is neither consented to, excused nor justified. *See Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003). Although the torts of assault and battery often appear together, the difference between the two is battery requires actual physical contact, while assault requires only the fear of physical injury. *See Koffman*, 574 S.E.2d at 261. Based on the view of the evidence outlined above on Wall's excessive force claims, I will recommend that the court

find in favor of the defendants on Wall's assault claim and in favor of Hicks and Rasnick on their assault and battery claims against Wall.

At the May 2023 hearing, counsel for Wall argued that the evidence was legally insufficient to find Wall liable for a battery of Rasnick. In particular, counsel argued that there was no evidence before the court that Wall had intentionally touched Rasnick. That argument is in error. Wall, himself, testified that he and the officers "tussled" on the ground. Also, on cross-examination at the May 2023 hearing, Wall specifically testified that he touched Rasnick, in that he attempted to push Rasnick off of him. Rasnick testified that, once on the floor, Wall was fighting him and Hicks "to try to get loose." Hicks also testified that, once on the floor, Wall was "fighting hard" while he and Rasnick attempted to restrain Wall.

Wall's counsel also argued that the evidence was insufficient to find Wall liable on Rasnick's assault claim. In particular, counsel argued that there was no evidence in the record from which the court could find that Rasnick was in apprehension of an imminent battery. I find that the evidence of battery set out above is sufficient evidence from which to find that Rasnick was in apprehension of a battery. Furthermore, Large testified that, when he entered the pod, Wall was thrashing from side to side and hitting the officers. In describing what occurred, Large said, "I [was] responding to an assault. ... We [were] fighting for our lives, you are in fight or flight mode just trying to defend ourselves."

I further find that both Hicks and Rasnick suffered physical injuries as the result of Wall's battery, for which Wall should be held liable. "'There is no fixed rule or exact standard by which damages can be measured in personal-injury cases. The law does not assume that a particular injury calls for a definite amount of

compensation…. The amount to be awarded is therefore largely a question … to be determined … in view of the facts and circumstances of each particular case.'" *Williams Paving Co., Inc. v. Kreidl*, 104 S.E.2d 758, 764 (Va. 1958) (quoting 15 AM. JUR., Damages, § 71, p. 479). In determining the amount of damages to award in a personal injury case, the court may consider the nature and extent of a plaintiff's injuries, including any alleged permanency, *see Glass v. David Pender Grocery Co.*, 5 S.E.2d 478, 481 (Va. 1939), as well as the plaintiff's pain and suffering, *see Rome v. Kelly Springfield Tire Co.*, 234 S.E.2d 277, 281 (Va. 1977) (citing *Robertson v. Stanley*, 206 S.E.2d 190, 193 (N.C. 1974)).

Based on the evidence presented at trial, I find that Wall struck Hicks in the eye, causing a cut in Hicks's eyebrow area that had to be closed with sutures and has left a permanent scar. I also find that Hicks suffered a fracture to a bone in his right hand near his wrist during the scuffle with Wall. I further find that, during the scuffle with Wall, Rasnick tore the meniscus in his right knee, requiring surgical repair. Hicks and Rasnick testified to these injuries and provided medical records to support their claimed injuries. I also find that Hicks suffers from post-traumatic stress disorder as a result of this incident. I find credible Hicks's testimony that his psychological injury was so severe that his appearance at trial was the first time he had left his home in several months. The undisputed evidence is that neither Hicks nor Rasnick incurred any out-of-pocket expenses for medical treatment because their injuries were covered by workers' compensation. Additionally, neither Hicks nor Rasnick makes any claim for lost wages. Nonetheless, I find that both Hicks and Rasnick have suffered injuries that have caused them significant pain and suffering to date, and will likely continue to do so. That being the case, I will recommend that the court award each Hicks and Rasnick the requested amount of $20,000.00 in compensatory damages for their injuries.

Hicks and Rasnick also seek an award of punitive damages against Wall. Under Virginia law, the tort of battery can be sufficient to prove the type of malice and willful and wanton conduct necessary to award punitive damages. *See Baldwin v. McConnell*, 643 S.E.2d 703 (Va. 2007); *Bannister v. Mitchell*, 104 S.E. 800 (Va. 1920). Under Virginia law, punitive damages are exemplary damages, which are "something in addition to full compensation, and something not given as plaintiff's due, but for the protection of the public, as a punishment to defendant, and as a warning and example to deter him and others from committing like offenses." *Baker v. Marcus*, 114 S.E.2d 617, 620 (Va. 1960). There is no set standard for determining the amount of punitive damages. *See Worrie v. Boze*, 95 S.E.2d 192, 201 (Va. 1956). However, Virginia courts have held that, in determining whether an award of punitive damages is excessive, a court should consider the "reasonableness between the damages sustained and the amount of the award and the measurement of punishment required, … whether the award will amount to a double recovery, … the proportionality between the compensatory and punitive damages … and the ability of the defendant to pay…." *Poulston v. Rock*, 467 S.E.2d 479, 484 (Va. 1996) (internal citations omitted).

Considering these factors in light of the facts of this case, I will recommend that the court award each Hicks and Rasnick the requested amount of $20,000.00 in punitive damages for their injuries. In reaching this conclusion, the court notes that Wall's actions were not merely negligent, but were intentional. I find that Wall's admissions as to his statements to the officers prior to his assault and battery shows that his actions were intentional. Wall testified that he told Rasnick "Fuck you," in response to his order to lockdown. Other evidence further shows that Wall specifically refused the officers' orders to lockdown or to submit to be restrained.  The court also has found that Wall purposefully struck Hicks with his fist. There can be no doubt that a person swinging his fist at another intends to

injure. Also, the court has found that Wall continued to struggle and inflicted additional injuries even after he was taken to the floor. Any punitive damages awarded should send a clear signal that such conduct by incarcerated persons against correctional officers should be severely punished. I do not recommend an award of punitive damages in an amount any greater than the recommended compensatory damages, in part, because Wall, as an incarcerated person, has little ability to pay an award of any damages.

Wall's Complaint also contains a claim under Virginia state law alleging abuse of process by McCoy and Church based on their generating disciplinary reports for Red Onion after Wall's transfer to Wallens Ridge. To prevail on a cause of action for abuse of process under Virginia law, a plaintiff must prove: (1) the existence of an ulterior purpose; and (2) an act in the use of process not proper in the regular course of the proceedings. *See Donohoe Const. Co., Inc. v. Mount Vernon Assocs.*, 369 S.E.2d 857, 862 (Va. 1988) (citing *Mullins v. Sanders*, 54 S.E.2d 116, 121 (Va. 1949)). The distinctive nature of malicious abuse of process lies in the perversion of regularly issued process to accomplish some ulterior purpose for which the procedure was not intended. *See Glidewell v. Murray-Lacy & Co.*, 98 S.E. 665 (Va. 1919).

Without deciding whether the facts alleged against McCoy and Church would qualify as "process" under Virginia law,[3] Wall, at trial, did not produce any evidence of an ulterior motive on the part of McCoy or Church. In fact, the only mention of Defendants McCoy and Church in the evidence presented at trial is their names and signatures on the Disciplinary Offense Reports as "Officer in Charge" and on the Penalty Offers issued in the disciplinary charges placed against

---

[3] *See Ubl v. Kachouroff*, 937 F. Supp. 2d 765, 769-70 (E.D. Va. 2013) ("process" is a mandate of a court by which a party is commanded to do certain acts, such as subpoenas, summonses, injunctions, orders, writs, warrants and the like).

Wall as a result of the August 14, 2015, altercation. (Docket Item Nos. 84-6 at 1, 3; 84-7 at 1, 3; 84-8 at 1, 3; 84-9 at 1, 3; 84-10 at 1, 3.) I find that this evidence is not sufficient to prevail on a claim of abuse of process. Therefore, I will recommend that the court enter judgment in favor of McCoy and Church on Wall's abuse of process claim.

Wall's Complaint also contained a claim under Virginia state law for negligence and willful and wanton negligence against all defendants. To prevail on a cause of action for negligence under Virginia law, a plaintiff must prove: (1) the existence of a legal duty; (2) the defendant's violation of that duty; and (3) the defendant's violation of the duty owed the plaintiff was the proximate cause of injury to the plaintiff. *See Kellermann v. McDonough,* 684 S.E.2d 786, 790 (Va. 2009). Whether a legal duty in tort exists is a pure question of law. *See Kellermann*, 684 S.E.2d at 790. In this case, Wall alleged violation of no duty by the defendants other than those addressed above. Since I have recommended that the court enter judgment in favor of the defendants on these claims, I also recommend that the court enter judgment in favor of the defendants on this claim.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Wall's Complaint contained no allegations against Defendants Bryant and Rose. Therefore, I recommend that the court enter judgment in favor of these defendants;

2.      Wall has presented no evidence against Defendants Hughes and Clarke. Therefore, I recommend that the court enter judgment in favor of these defendants;

3.      Wall did not fully exhaust his administrative remedies as to his claims that he was run into metal poles while being escorted to the B Building, that an officer had smashed his head into the wall in the B Building vestibule and that he was denied medical care after losing consciousness;

4.      Wall presented no evidence that Defendants Barksdale and Holbrook took any action to impair Wall's constitutionally protected liberty interests under the Due Process Clause. Therefore, I recommend that the court enter judgment in favor of these defendants on Wall's due process claims;

5.      Wall presented no evidence that his disciplinary offense convictions for aggravated assault in ROSP-2015-1481 and ROSP-2015-1503 have been overturned. Thus, he may not pursue § 1983 claims based on them because, if the court were to find in Wall's favor on these claims, it would imply the invalidity of his convictions. Therefore, I recommend that the court enter judgment in favor of Still, Hicks, Franks, Hensley, Fleming and Ponton on Wall's due process claims;

6.      Based on the evidence presented, I find that none of the defendants used any excessive force against Wall in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Therefore, I recommend that the court enter judgment in favor of Rasnick, Hicks, Lyall, Large, Akers, Collins, Taylor, Bishop, Testerman, Addington, Dockery,

Gwinn, Mullins, Deel and Barksdale on Wall's excessive force claims;

7.     Based on the evidence presented, I find that none of the defendants conspired to use excessive force against Wall. Therefore, I recommend that the court enter judgment in favor of Defendants Rasnick, Hicks, Collins, Akers and Taylor on this claim;

8.     Based on the evidence presented, I find that none of the defendants were deliberately indifferent to Wall's serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Therefore, I recommend that the court enter judgment in favor of Defendants Bishop, Akers, Taylor, Deel and Barksdale on Wall's deliberate indifference claim;

9.     Based on the evidence presented, I find that Defendants Rasnick, Hicks, Large, Lyall, Collins, Taylor, Akers, Bishop, Dockery and Gwinn did not assault Wall. Therefore, I recommend that the court enter judgment in favor of these defendants on Wall's state law assault claim;

10.    Based on the evidence presented, I find that Wall did commit an assault and battery on Hicks and Rasnick on August 14, 2015. Therefore, I recommend that the court enter judgment against Wall and in favor of these counter-plaintiffs on their state law assault and battery claims;

11.    Based on the evidence presented, I recommend that the court award Hicks compensatory damages in the amount of $20,000.00 and punitive damages in the amount of $20,000.00;

12.  Based on the evidence presented, I recommend that the court award Rasnick compensatory damages in the amount of $20,000.00 and punitive damages in the amount of $20,000.00;

13.  Wall produced no evidence to show an ulterior motive on the part of Defendants McCoy and Church. Therefore, I recommend that the court enter judgment in favor of McCoy and Church on Wall's state law abuse of process claim; and

14.  I recommend that the court enter judgment in favor of the defendants on Wall's state law negligence claim.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court enter judgment in favor of the defendants on Wall's claims. I also recommend that the court enter judgment against Wall, and in favor Hicks, on his claims for assault and battery and award compensatory damages in the amount of $20,000.00 and punitive damages in the amount of $20,000.00. I also recommend that the court enter judgment against Wall, and in favor Rasnick, on his claims for assault and battery and award compensatory damages in the amount of $20,000.00 and punitive damages in the amount of $20,000.00.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which

objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: November 13, 2023.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE